# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

---

DIRECTV, LLC,

            Plaintiff,

       v.

NEXSTAR MEDIA GROUP, INC.; MISSION
BROADCASTING, INC.; and WHITE
KNIGHT BROADCASTING, INC.,

           Defendants.

Case No.   1:23-cv-02221-JGK

---

## **COMPLAINT**

### INTRODUCTION

1.     Plaintiff DIRECTV, LLC ("DIRECTV") brings this lawsuit to recover damages and obtain injunctive relief against Defendants Nexstar Media Group Inc. ("Nexstar"), Mission Broadcasting, Inc. ("Mission"), and White Knight Broadcasting, Inc. ("White Knight") for conspiring to raise and fix the prices of retransmission consent fees for the Big-4 broadcast networks (ABC, CBS, FOX, and NBC) in violation of federal antitrust laws.

2.     Over the past several months, DIRECTV has attempted to negotiate retransmission renewal agreements with Defendants Mission and White Knight. To date, those negotiations have been unsuccessful and have resulted in service disruptions—known in the industry as "blackouts"—for nearly ███████ consumers. The reason those negotiations have been unsuccessful is Defendants' unlawful price-fixing conspiracy.

3.     DIRECTV is a multichannel video programming distributor ("MVPD") that provides its customers with satellite and streaming access to popular broadcast television programming.

4.     In order to provide their subscribers with access to popular broadcast networks, MVPDs agree to pay broadcasters or broadcast station groups a "retransmission consent fee." At least some of these retransmission consent fees are ultimately passed on to the MVPDs' subscribers as a component of their subscription packages. MVPDs seek to pay reasonable retransmission consent fees so they can keep the cost of their subscription packages as competitive as possible, while increasing consumer choice through access to a broad variety of programming. But when broadcast station groups conspire to fix prices for retransmission consent fees, MVPDs—and ultimately consumers—are forced to pay supracompetitive prices or lose access to the most popular broadcast television programming.

5.     Federal law aims to promote competition among broadcasters in a number of ways. For example, subject to limited exceptions, FCC regulations and antitrust laws prohibit a single broadcast station group from owning, operating, or controlling two of the top-four rated stations, which are generally those channels affiliated with the Big-4 networks, in the same designated market area ("DMA")—a term for common geographic markets like the metropolitan New York City area. This is known as the "Duopoly Rule." Thus, when a broadcast station group proposes to acquire a second Big-4 affiliate in the same DMA where it already owns one, it almost always must divest one of its stations to another broadcast station group to comply with this rule. In such circumstances, federal law permits the divesting and the divested stations to enter into certain "sharing arrangements," under which one station can provide limited services to another. This might include, for example, non-managerial technical services, the sharing of news facilities, and the sharing of groundskeeping, maintenance, security, and other services related to those facilities. There are, however, important limits on such arrangements. For example, the two stations are prohibited from negotiating retransmission consent fees together in the same market—a

prohibition extending to sharing competitively sensitive information which would support coordinated negotiations.

6.     Over the years, however, some divesting broadcast station groups—such as Nexstar—have stretched the limits of what is permissible under such arrangements. The industry term for a divested station relying on services from the divesting station is "sidecar." Just as a motorcycle sidecar depends on the motorcycle itself for every aspect of its direction, so too does the sidecar broadcaster depend on the larger group, such as Nexstar, for many aspects of its operations.

7.     Mission and White Knight are known as Nexstar's "sidecars." These entities exist effectively as divestiture vehicles for Nexstar when competition concerns would forbid Nexstar from acquiring a broadcaster.

8.     Under the antitrust laws and the Communications Act, Nexstar and its sidecars are required to function as independent competitors. While Nexstar may be permitted to retain certain ties to its sidecars, these entities are supposed to be sufficiently independent from Nexstar so they can act as a competitive constraint against Nexstar in the various markets in which they both own stations. As Nexstar admits in its most recent annual report filed with the Securities and Exchange Commission ("SEC"), the sidecars "with which we have sharing agreements must separately negotiate their retransmission consent agreements with MVPDs for stations in markets where we also own a station." *Nexstar Media Group, Inc.* Annual Report at 17 (Form 10-K) (Feb. 28, 2023).

9.     But Defendants' conduct in recent negotiations with DIRECTV demonstrates that Mission and White Knight are now unlawfully coordinating with Nexstar to raise prices and extract supracompetitive retransmission consent fees from DIRECTV in "overlap" DMAs—those markets where both Nexstar and either Mission or White Knight each own a Big-4 station.

10.     To accomplish this unlawful and anticompetitive aim, Mission and White Knight have entered into an agreement in which they have effectively relinquished decision-making authority to Nexstar, which has served as the ringleader of a conspiracy to harm competition and violate the antitrust laws. This conspiracy is evidenced in numerous ways.

11.     First, Nexstar has prohibited Mission's and White Knight's management teams from engaging in any direct negotiations with DIRECTV. DIRECTV's efforts to negotiate with Mission and White Knight personnel have been repeatedly rejected or ignored. Instead, Nexstar has orchestrated a common third party—"independent" consultant Eric Sahl—to be the exclusive and common negotiator and spokesperson for all of its sidecars, including Mission and White Knight. It is no coincidence that every Nexstar sidecar uses this same agent for these competitively sensitive and supposedly confidential negotiations.

12.     Sahl's conduct during negotiations demonstrates that he answers directly to Nexstar and not to its sidecars' purported management teams—which, in the case of White Knight, does not even appear to exist (its President has a full-time job as a lobbyist with a trade association, and its corporate headquarters is his residence) and, in the case of Mission, is composed of former Nexstar employees who do not participate in retransmission negotiations.

13.     As further evidence of Nexstar's control over Sahl during Mission and White Knight negotiations, Sahl became incommunicado during a critical period of those negotiations with DIRECTV in October 2022 while Nexstar's management was occupied by retransmission consent fee negotiations with Verizon. After the Verizon negotiations stalled and Nexstar's management was available to provide new directions, Sahl immediately resumed negotiations with DIRECTV.

14.     Second, Defendants' coordination is further evident in their public relations strategies. Mission and White Knight issued nearly identical public statements on the same day concerning their blackouts with DIRECTV. Those press releases contained verbatim language from a public statement issued *the following day* by Nexstar concerning its blackout with Verizon. These cut-and-paste talking points are not the result of independent action, but rather, constitute a concerted effort by Defendants to further coordinate in their negotiation processes.

15.     Third, more generally, Nexstar and its sidecars are so inextricably intertwined that they have ample opportunities to conspire with one another. Indeed, Nexstar includes Mission and White Knight in its public financial filings with the SEC. It does so precisely because of the many agreements with its sidecars requiring them to consult Nexstar in connection with nearly all material decisions affecting their economic performance, including budgeting, advertising sales, and hiring and firing of personnel, as asserted by Nexstar in its consolidated financial statements. This interconnectedness facilitates Nexstar's scheme to coordinate with its sidecars on retransmission pricing.

16.     Although their negotiations are required to be separate from Nexstar's own, during Mission's and White Knight's negotiations with DIRECTV, Sahl: (i) referenced non-public and highly confidential information regarding Nexstar's next generation broadcasting technology, (ii) demanded retransmission consent fees for CW stations that White Knight did not own *two weeks before* Nexstar announced to the public it acquired a 75% interest in the entire CW network, and (iii) demanded terms and engaged in negotiation tactics that advanced the interests of Nexstar to the detriment of its sidecars. Had Nexstar not been guiding Sahl during the Mission and White Knight negotiation process, Sahl would not have known this sensitive and confidential Nexstar information and demanded the terms he did.

17.     And Sahl has regularly blurred the lines between the various Nexstar sidecars he represents—repeatedly breaching confidentiality obligations and failing to conduct negotiations independently for each of these entities.

18.     All signs point to the fact that Mission and White Knight—through their common agent, Sahl—are taking instructions from Nexstar in their negotiations with DIRECTV. Nexstar's end-game, however, is not simply raising the prices DIRECTV has to pay Mission and White Knight. Nexstar's contract with DIRECTV is set to expire in ████. Given the enormous scale of Big-4 stations owned by Nexstar, the ████ contract renewal will be DIRECTV's largest single retransmission consent agreement in terms of total dollars paid to a broadcast station group.

19.     With an eye to these ████ negotiations, which cover all of Nexstar's stations across the country, Nexstar wants to ensure that its sidecars have set a sufficiently high price floor in their negotiations so Nexstar can enter its own negotiations with DIRECTV with confidence that it can attain a similarly supracompetitive rate. Accordingly, Nexstar has coordinated with Mission and White Knight to act as its stalking horses for its own larger deal, and the sidecars are therefore incentivized to hold out for higher rates.

20.     Mission's and White Knight's willingness to do Nexstar's bidding is unsurprising given the many contractual arrangements between these entities. Among the many agreements that Nexstar has entered into with Mission, White Knight, and their respective shareholders, are option agreements allowing Nexstar to—at any time—purchase 100% of the equity in both sidecars at pre-specified prices. In other words, the owners of Mission and White Knight do not bear any risk or reward associated with ownership or equity. They have no financial incentive to maximize the equity value of their companies. Rather, as Nexstar's own SEC filings report, it is Nexstar that has the right to receive nearly all of the profits generated by these two sidecars. As a practical matter,

the "owners" and "managers" of Mission and White Knight have no skin in the game, have no incentive to take any action that would advance their own entity's interests to the detriment of Nexstar, and are simply custodians to Nexstar's strategic directives.

21.     Defendants' conduct is unlawful. When one competitor instructs another what price to accept for its products or otherwise coordinates in its negotiations, it is straightforward price fixing and a per se violation of the antitrust laws. Moreover, Defendants' sharing of competitively sensitive information among themselves not only furthers this price-fixing conspiracy, it is itself an additional and independent violation of the antitrust laws.

22.     Aside from violating the antitrust laws, in the course of carrying out its conspiracy and directing its sidecars' conduct, Nexstar also has caused Mission and White Knight to breach key provisions of their contracts with DIRECTV relating to confidentiality and non-disparagement. All Defendants, too, have intentionally and tortiously interfered with DIRECTV's relationships with its subscribers. These actions have resulted in additional damage to DIRECTV.

## JURISDICTION AND VENUE

23.     This Court has subject-matter jurisdiction over this action pursuant to 15 U.S.C. §§ 15 and 26, and 28 U.S.C. §§ 1331 and 1337, as DIRECTV asserts claims for violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

24.     This Court has subject-matter jurisdiction over DIRECTV's state law claims under 28 U.S.C. § 1367 because its state law claims are so related as to form part of the same case or controversy as its federal claims. Exercising supplemental jurisdiction over DIRECTV's state law claims will avoid unnecessary duplication and multiplicity of actions and, therefore, promote judicial economy, fairness, and convenience.

25.     This Court has personal jurisdiction over Defendants because each Defendant transacted business throughout the United States (including, for Nexstar and Mission, in this District); sold and negotiated retransmission rights for stations in this District; entered into an unlawful conspiracy to increase retransmission consent fees, including fees for stations in the U.S. (including in this District); engaged in an unlawful exchange of confidential retransmission consent fee information, including fees for stations in the United States (including in this District); engaged in conduct that was directed at, and had the intended effect of, causing injury to persons residing in, located in, or doing business throughout the United States (including in this District); has registered agents in the United States (including in this District); may be found in the United States (including in this District); or is otherwise subject to the service of process provisions of 15 U.S.C. § 22.

26.     This Court also has personal jurisdiction over Defendants because, ████████████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████.

27.     Venue in this District is proper pursuant to 15 U.S.C. §§ 15 and 22, 28 U.S.C. §§ 1391(b)-(d), and 28 U.S.C. § 1407. At all relevant times, Defendants transacted business within this District, carried out interstate trade and commerce in substantial part in this District, and/or have an agent, and/or can be found in this District. Defendants sold and distributed retransmission consent rights in a continuous and uninterrupted flow of interstate commerce, which included sales of such rights in the United States (including in this District). Defendants' conduct had a direct, substantial, and reasonably foreseeable effect on interstate commerce in the United States.

28. Venue in this district is also proper because ██████████ ████████████████████████████████████████████████ ██████████████████████████████████████████.

29. ██████████████████████████████████████ ████████████████████████████████████████████████ ██████████.

## THE PARTIES

30. DIRECTV, LLC is a Delaware corporation headquartered in El Segundo, California. DIRECTV is the nation's leading satellite television provider and has millions of subscribers throughout the country, all of whom receive multiple channels of digital video programming.

31. Nexstar Media Group, Inc. ("Nexstar") is a Delaware corporation headquartered in Irving, Texas. Nexstar is the largest broadcaster in the United States. Nexstar owns or operates 200 broadcast stations in 116 markets.

32. Mission Broadcasting, Inc. ("Mission") is a Delaware corporation headquartered in Wichita Falls, Texas. Mission is a broadcaster that owns television stations in 26 markets, including Big-4 stations in 23 markets in the United States—every one of which also has a Nexstar Big-4 station.

33. White Knight Broadcasting, Inc. ("White Knight") is a Delaware corporation headquartered in Lafayette, Louisiana. White Knight is a broadcaster that owns two Big-4 stations in two markets—each of which also has a Nexstar Big-4 station.

## NON-PARTY CO-CONSPIRATOR

34.     Eric Sahl is an individual who lives in Denver, Colorado. He is a Media Consultant and Managing Partner with SKMG, LLC, President of ID Media, LLC, and is the former Head of Content Acquisition for Dish Network. Since at least 2019, he has served as an outside consultant in negotiations involving White Knight and Mission.

## FACTUAL ALLEGATIONS

**A.      Broadcast Industry Background and Consolidation.**

**1.      Industry background.**

35.     Prior to the advent of satellite, cable, and streaming video services, Americans relied on free, over-the-air broadcasts from their local stations for television programming. Anyone with an antenna in range of a broadcast signal could watch these broadcasts for free, including the most popular sports, news, and entertainment shows from major networks.

36.     Local broadcasters package together programming for their viewers by affiliating with national television networks and by creating their own programming—for example, local news. Today, broadcasters' affiliation with television networks and other suppliers of programming generally gives them the exclusive rights to air such programming within DMAs identified by Nielsen Media.

37.     Big-4 broadcast affiliates in any given DMA are owned either by the network itself (such stations being referred to as "owned and operated") or by third-party owners, such as Nexstar. In the case of third-party owners, the owners acquire the right to transmit network programming in the DMA from the network in question—most importantly, "prime time" content, national sports, and network news. The local broadcaster is then responsible for obtaining the

rights to syndicated programming, and producing and acquiring its own local content—most importantly, local news—for distribution in the DMA.

38.     Today most Americans do not receive broadcast programming for free over the air. Instead, many of them receive programming through cable operators, satellite carriers, and other MVPDs.

39.     Just as viewers could watch broadcast television signals for free, for many years, cable operators could carry those signals essentially for free. In 1992, however, Congress enacted a law under which it granted broadcasters the right to negotiate with cable operators and other MVPDs for "retransmission consent fees." Under this law, broadcasters were allowed to charge MVPDs a fee for the right to retransmit their signals to MVPD subscribers.

40.     For nearly a decade and a half, broadcasters regularly allowed retransmission of their signals for minimal fees or simply received in-kind payment from MVPDs, such as the purchase of advertising, cross-promotions, or carriage of affiliate channels. This relationship benefited consumers, MVPDs, and broadcasters alike. MVPDs allowed consumers in areas with weak broadcast signals to access broadcast programming, and a growing audience provided increasing advertising revenues to broadcasters.

41.     All that changed, however, beginning in the mid-2000s, when the largest broadcast station groups (including Nexstar) began to demand significant fees from MVPDs for the right to retransmit their stations' signals.

42.     Since 2006, retransmission consent fees paid by MVPDs to broadcast station groups have increased a staggering *5,770 percent*—from $214.6 million in 2006 to an estimated $12.6 billion in 2022—all to simply retransmit a signal that viewers can receive for free with an over-the-air antenna. And the increases continue. A recent FCC Order notes that retransmission

consent fees have increased from $9.5 billion in 2017 to $13.5 billion in 2021.[1] Thus, what was once a free product has become an increasingly costly burden on millions of American households.

43.     Some of this rapidly escalating cost, like any input cost, is passed on to American consumers through their monthly satellite and cable television bills. In fact, it is now the single greatest cost-driver of television for millions of American families.

### 2.     Broadcast station group consolidation has invited scrutiny from the FCC and the Department of Justice.

44.     In the last two decades, consolidation among television broadcast station groups has increased substantially.

45.     In broadcast station group mergers, the merging parties have been required to gain various approvals to transfer station licenses. The FCC and Antitrust Division of the Department of Justice ("DOJ") have consistently required the merging parties to divest stations when a merger poses competitive harm.

46.     For example, the FCC's Duopoly Rule prohibits a broadcast station group from owning, operating, or controlling more than one of the top-four full power broadcast stations in a DMA, subject to certain exceptions not at issue here.[2]

47.     Likewise, the DOJ has repeatedly required Nexstar to divest Big-4 stations in DMAs where a proposed acquisition would result in Nexstar owning more than one Big-4 station and thus would substantially lessen competition under Section 7 of the Clayton Act, 15 U.S.C. § 18. Indeed, DOJ has specifically challenged at least two Nexstar transactions on this precise ground.

---

[1] *In the Matter of Consent to Transfer Control of Certain Subsidiaries of TEGNA Inc. to SGCI Holdings III LLC*, Hearing Designation Order, DA 23-149 ¶ 20 (Feb. 24, 2023).
[2] 47 C.F.R. § 73.3555(b)(1)(ii).

48.    For example, in 2016, DOJ challenged Nexstar's proposed acquisition of Media General because, among other things, it would give Nexstar the power to demand higher retransmission fees from MVPDs in six markets.

49.    As DOJ explained in a Competitive Impact Statement filed in that case:

> The proposed merger would also diminish competition in the negotiation of retransmission agreements with MVPDs in the DMA Markets. The acquisition would provide Nexstar with the ability to threaten MVPDs in each of the DMA Markets with the simultaneous blackout of at least two major broadcast networks. . . . That threatened loss of programming, and the resulting diminution of an MVPD's subscribers and profits, would significantly strengthen Nexstar's bargaining position. Prior to the merger, an MVPD's failure to reach a retransmission agreement with Nexstar for a broadcast television station might result in a blackout of that station and threaten some subscriber loss for the MVPD. But because the MVPD would still be able to offer programming on Media General's major network affiliates, which are at least partial substitutes for Nexstar's affiliates, many MVPD subscribers would simply switch stations instead of cancelling their MVPD subscriptions. After the merger, an MVPD negotiating with Nexstar over a retransmission agreement could be faced with the prospect of a dual blackout of major broadcast networks (or worse), a result more likely to cause the MVPD to lose subscribers and therefore to accede to Nexstar's retransmission fee demands. For these reasons, the loss of competition between the Nexstar and Media General stations in each DMA Market would likely lead to an increase in retransmission fees in those markets and, because increased retransmission fees typically are passed on to consumers, higher MVPD subscription fees.[3]

50.    As a result of DOJ's challenge, Nexstar was required to divest stations in any DMA where it and Media General both owned Big-4 Stations.[4] Moreover, "[t]o ensure that the Divestiture Stations are operated independently from Nexstar after the divestitures" the Final Judgment entered in that case prohibits Nexstar, for a ten-year period from:

---

[3] Competitive Impact Statement at 8-9, *United States v. Nexstar Broad. Grp., Inc.*, No. 1:16-cv-01772-JDB (D.D.C. Sept. 2, 2016), *available at* https://www.justice.gov/atr/case-document/file/910661/download.

[4] *See generally* Final Judgment, *United States v. Nexstar Broadcasting Group, Inc.*, No. 1:16-cv-01772-JDB (D.D.C. Nov. 16, 2016), *available at* https://www.justice.gov/atr/case-document/file/925071/download.

entering into any agreements during the term of the Final Judgment that create a long-term relationship with or any entanglements that affect competition between Nexstar and an Acquirer of a Divestiture Station concerning the Divestiture Assets after the divestitures are completed. Examples of prohibited agreements include agreements during the term of the Final Judgment to reacquire any part of the Divestiture Assets; agreements to acquire any option to reacquire any part of the Divestiture Assets or to assign the Divestiture Assets to any other person; agreements to enter into any local marketing agreement, joint sales agreement, other cooperative selling arrangement, or shared services agreement; *agreements to conduct other business negotiations jointly with the Acquirer(s) with respect to the Divestiture Assets*; and agreements to provide financing or guarantees of financing with respect to the Divestiture Assets.[5]

51.     DOJ also challenged Nexstar's 2019 acquisition of Tribune Media Company on identical grounds and obtained identical relief.

52.     In that case, DOJ's complaint noted that, because the acquisition would result in Nexstar owning more than one Big-4 station in multiple DMAs, "[t]he proposed merger would enable Nexstar to black out more Big-4 stations simultaneously in each of the[se] Big 4 [] DMAs than either Nexstar or Tribune could black out independently today, likely leading to increased retransmission consent fees charged to such MVPDs."[6]

53.     Once again, DOJ required Nexstar to divest at least one Big-4 station in each of these DMAs, and further prohibited Nexstar for a period of ten years, from entering into any agreement to:

(1) reacquire any part of the Divestiture Assets, unless approved by the United States in its sole discretion; (2) acquire any option to reacquire any part of the Divestiture Assets or to assign the Divestiture Assets to any other person; (3) enter into any Cooperative Agreement, (except as provided in this Paragraph XI(A) or in Paragraph XI(B)), or conduct other business

---

[5] Competitive Impact Statement, *supra* note 3, at 11-12 (emphasis added).
[6] Complaint ¶ 30, *United States v. Nexstar Media Grp., Inc.*, No. 1:19-cv-02295 (D.D.C. July 31, 2019), *available at* https://www.justice.gov/atr/case-document/file/1192131/download.

negotiations jointly with any Acquirer with respect to the Divestiture Assets divested to such Acquirer; or (4) provide financing or guarantees of financing with respect to the Divestiture Assets.[7]

54.     The requirements imposed under both the Media General and Tribune Media final judgments reflect DOJ's determination that divestiture of a Big-4 station alone is insufficient to prevent antitrust harm where, as here, Nexstar retains financial or operational control over any entity to whom it divests a station.

### 3.     The "sidecar" business model.

55.     To comply with FCC and DOJ requirements, broadcast station groups routinely divest Big-4 stations where a merger would cause two or more such stations to overlap in a local market. Typically, a large broadcast station group seeking to enter into a transaction that otherwise would give it two or more Big-4 stations in a DMA commits to divest overlap stations to a smaller station group. Following these divestitures, the larger group often enters into a variety of shared services agreements with the sidecar, under which the larger broadcast station group provides services to the smaller one.

56.     The term "sidecar" reflects the fact that an independent smaller broadcaster is connected to and being "driven" by the larger group under these series of contractual arrangements. Sidecars, however, have as a core premise their continued ability to compete fully and effectively with the larger broadcaster that provides them with designated services; they are not supposed to simply provide a fig leaf for the appearance of competition to shield the dominant broadcast station group from antitrust scrutiny. Specifically, FCC rules require sidecars to be completely independent regarding their own programming, finances, and personnel.

---

[7] Final Judgment at 17-18, *United States v. Nexstar Media Grp., Inc.*, No. 1:19-cv-02295 (D.D.C. Feb. 10, 2020), *available at* https://www.justice.gov/atr/case-document/file/1247801/download.

57.     Here, Defendants have abused the sidecar model to engage in anticompetitive and unlawful coordination with the intent of reaping supracompetitive profits from MVPDs and consumers.

58.     In particular, hidden within the ruse of a legitimate relationship, Defendants have agreed to leverage their collective ownership of Big-4 stations in overlap DMAs to gain anticompetitive advantages in negotiations with MVPDs and, in doing so, have produced the exact competitive harm the antitrust laws were intended to prevent.

59.     Defendants' coordination is a natural product of their financial and operational agreements, under which Mission's and White Knight's absentee owners have no economic incentive to take actions that would benefit their entities to the detriment of Nexstar. These owners are economically indifferent to the outcome of negotiations and willing to take actions that benefit Nexstar even if such actions would result in a substantial loss of revenue for the sidecars—thus undermining the very purpose for which the sidecar is supposed to exist.

**B.      Retransmission Consent Has Become One of the Most Significant Cost Drivers for MVPDs and Consumer Television Packages.**

60.     MVPDs like DIRECTV typically negotiate retransmission consent agreements with broadcasters and broadcast station groups every three to four years.

61.     Typically, an MVPD and a broadcast station group negotiate retransmission consent fees for all of that group's stations in a single agreement, with a single monthly rate per subscriber that applies to all of that group's Big-4 stations in the DMAs across the nation and a commitment to distribute the channel to a specified percentage of the MVPD's subscribers within that DMA. As the nationwide scale of a broadcast station group's footprint increases, it is typically able to demand higher retransmission rates across that group's overall footprint. Not every

broadcast station group has a nationwide footprint, however, and some only have stations in a few DMAs.

62.     If negotiations are unsuccessful, the broadcast station group stops providing its signals to the MVPD so its stations become "blacked out" and unavailable to the MVPD's subscribers until a new agreement is reached. In such a blackout, the broadcast station group will stop providing its signals across its entire footprint. In this way, broadcast station groups effectively hold the MVPD's subscribers hostage, depriving them of access to programming unless and until the MVPD agrees to pay the higher fees that the broadcast station group demands (of which some portion is ultimately passed on to the MVPD's subscribers themselves in the form of higher subscription prices for its video product).

63.     During retransmission consent negotiations, MVPDs know that subscribers may cancel their service if they do not have access to Big-4 stations because such a blackout prevents them from watching local news and weather, prime time network shows, tentpole events (such as The Oscars and The Emmys), and live sports (such as NFL, NBA, MLB, and NHL games, as well as college football and basketball games) on the affected Big-4 stations.

64.     As certain broadcast station groups have increased their scale through consolidation, these groups' negotiation leverage—primarily the threat of pulling their signals— has increased, as MVPDs suffer the broader potential subscriber losses associated with a broadcast station group's stations going dark. Using this increased leverage, these larger broadcast station groups have driven up the cost of retransmission consent fees to MVPDs, and ultimately to consumers in the form of higher monthly subscriber fees.

C.    **Nexstar Is the Country's Largest Broadcast Station Group, and Mission and White Knight Are Its Sidecars.**

65.    Over the past 26 years, Nexstar has achieved tremendous growth through acquisition to become the largest local broadcast station group in America, with 200 owned or partner stations in 116 U.S. markets reaching 212 million people. Additionally, Nexstar owns nationally distributed television networks including The CW, NewsNation, Antenna TV, and Rewind TV.

66.    Nexstar's sidecars are depicted in the chart below:

## Nexstar Acquisitions and Its Sidecars

**Mission Broadcasting**

1997 - Nexstar acquired WBRE creating a local duopoly with Nexstar's WYOU.
- Nexstar sold WYOU to newly created Mission Broadcasting.
- Mission now owns 23 Big-4 affiliated stations all of which overlap with Nexstar owned Big-4 stations.

**Vaughan Media**

2017 - Nexstar acquired Media General and its 71 stations in 48 markets
- Nexstar inherited the shared services agreements and took over operation of the Vaughan stations.
- Vaughan currently owns two Big-4 stations which are operated by Nexstar.

**White Knight Broadcasting**

2015 - Nexstar acquired Communications Corporation of America and its 19 owned or operated stations and inherited White Knight as a sidecar.
- White Knight currently owns two Big-4 stations which are operated by Nexstar.

**Marshall Broadcasting**

2014 – Following Nexstar's acquisition of Communications Corporation of America and Grant Broadcasting, Nexstar divested three overlap stations to Marshall and entered into local service agreements with Marshall.
- Marshall went bankrupt in 2019 and Mission Broadcasting acquired its stations in 2020.

1.    **Nexstar funded Mission Broadcasting at its inception as a divestiture vehicle.**

67.    As part of its strategy of growth through acquisition, Nexstar has continuously relied on mechanisms to structure its business to preemptively circumvent legal restrictions on concentration. A key aspect of this strategy was to forgo acquiring stations it was not allowed to acquire, choosing instead to have one of its "sidecars," such as Mission or White Knight, acquire

these stations, and then enter into relationships with those entities. Typically, these sidecars retained nominal ownership interests in the stations themselves, but Nexstar fully coordinated their competitive direction.

68.    In 1997, Nexstar acquired a handful of stations, including one that overlapped in a local market (Wilkes-Barre/Scranton) with an existing Nexstar station. To gain clearance to proceed with the acquisition, Nexstar arranged financing for a retired station manager to buy the overlap station, and Mission Broadcasting was born.

69.    Even though Mission's funding initially came from Nexstar, and Nexstar operated Mission's stations, Mission was structured to be a separate and independent company. As Nexstar has acquired more broadcasters, Mission has grown alongside it by taking ownership of stations that overlapped with Nexstar's existing portfolio.

70.    Today, Mission is the fourteenth largest broadcast station group in the country, solely by virtue of serving as one of Nexstar's sidecars. It owns stations in 26 markets, including Big-4 stations in 23 DMAs, as indicated on the map below:



71.     All 23 of Mission's Big-4 stations have a competing Nexstar Big-4 station in the relevant DMAs and are supposed to be independent of, and compete with, Nexstar.

72.     While purporting to be competing with Nexstar, half of Mission's current senior leadership are former Nexstar employees with decades of experience working for Nexstar.

### 2. White Knight became a Nexstar sidecar through Nexstar's acquisition of Communications Corporation of America.

73.     Nexstar's relationship with White Knight began in 2013 when Nexstar and Mission jointly acquired Communications Corporation of America ("CCA") and White Knight Broadcasting for $270 million. At the time of the acquisition, CCA operated White Knight as a sidecar in Baton Rouge, Louisiana, and Tyler-Longview, Texas. Nexstar inherited CCA's stations and continues to use White Knight as a sidecar under CCA's original local services arrangements with White Knight. White Knight owns two stations, both Big-4 affiliates, in Baton Rouge, LA (NBC) and Tyler-Longview, TX (FOX), as indicated on the map below:



74.     Nexstar has a competing Big-4 station in the two markets where White Knight has a Big-4 station—both of which are supposed to be independent of, and compete with, Nexstar.

### 3.     Nexstar discloses information concerning Mission and White Knight in SEC filings.

75.     Both Mission and White Knight are 100% owned by independent third parties and are not Nexstar's subsidiaries. Despite that fact, Nexstar is required under U.S. Generally Accepted Accounting Principles to disclose information about them in its public SEC filings. *See, e.g.*, *Nexstar Media Group, Inc.* Annual Report (Form 10-K) (Feb. 28, 2023). Nexstar refers to its sidecars as variable interest entities ("VIEs"), and informs investors that under various local service agreements, it has historically "received substantially all of the consolidated VIEs' available cash, after satisfaction of operating costs and debt obligations" and "anticipates it will continue to receive substantially all of the consolidated VIEs' available cash[.]" *See, e.g.*, Nexstar Media Group, Inc. Quarterly Report (Form 10-Q) (Nov. 9, 2022).

76.     Nexstar itself represents to its investors that consolidated financial reporting is required because of, among other things: (1) its local service agreements with its sidecars, (2) its power over significant activities affecting the sidecars' economic performance, including budgeting for advertising revenue, certain advertising sales, and, in some cases, hiring and firing of sales force personnel, and (3) purchase options granted by the sidecars which permit Nexstar to acquire the assets and assume the liabilities of all of the consolidated sidecars' stations at any time.

77.     Nexstar's extensive "oversight" of its sidecars shows that the sidecars do not truly compete with Nexstar as they are supposed to. Under the agreements referenced in Nexstar's SEC filings, Nexstar is not only responsible for operating significant portions of Mission's and White Knight's businesses, but also has a right to purchase all of the sidecars' assets and regularly receives substantially all of their profits. The sidecars' nominal owners have nothing to gain or

lose from the financial performance of their companies. They are thus forced to ignore the ordinary responsibilities of management—like negotiating retransmission consent agreements on a standalone basis—and simply follow the clearly scripted directions from Nexstar.

### D. The Relevant Market for Retransmission Consent of Big-4 Stations in Overlap DMAs.

#### 1. Relevant product market.

78.     The relevant product market in this case is the market for retransmission consent of Big-4 stations. In this market, broadcast station groups such as Nexstar are the "sellers" and MVPDs are the "buyers."

79.     In this context, the FCC and DOJ have long taken the position that a Big-4 broadcast station is different from other broadcast stations and cable channels, such that a Big-4 station is not interchangeable with a non-Big-4 station. Big-4 broadcast content has special appeal to television viewers in comparison to the content that is available through other broadcast stations and cable channels.

80.     Big-4 stations are typically the highest ranked in terms of audience share and ratings in each DMA, primarily due to their unique and high-value content, including professional sports, popular primetime network programs, local news, and tentpole events. Further, each Big-4 station typically has exclusive rights to broadcast this content within its DMA. MVPDs typically consider the Big-4 stations in a local area to be closer substitutes for one another.

81.     In contrast, non-Big-4 stations are not close substitutes for Big-4 stations because they do not carry the most popular programming exclusive to the Big-4 stations, such as professional sports and new episodes of hit shows. Non-Big-4 broadcast stations, such as The CW Network or Telemundo, typically feature more niche and syndicated programming and such programming can often easily be found via other means.

2.      **Relevant geographic markets.**

82.      The first relevant geographic market in this case is the United States because when MVPDs negotiate retransmission consent agreements with broadcasters and broadcast station groups, they generally do so for an area covering their respective national or multi-state geographic footprints. These contracts are not negotiated on a station-by-station basis; rather, retransmission rates are negotiated for some or all of that broadcast group's stations all at once.

83.      Not every broadcaster and broadcast station group, however, competes at a national level. Therefore, in addition to the national geographic market, there are distinct geographic submarkets consisting of the individual DMAs in which Defendants overlap. The FCC uses DMAs as geographic markets with respect to its regulations, including the Duopoly Rule. DOJ also uses DMAs as geographic markets when it reviews proposed mergers and acquisitions between broadcasters.

84.      In the event of a blackout of a Big-4 station, the Copyright Act and FCC rules generally prohibit an MVPD from importing the same network's content from another DMA. Moreover, local stations are generally granted network exclusivity within their own DMA. Thus, Big-4 station viewers in one DMA cannot switch to the same Big-4 programming from another DMA in the face of a blackout. Therefore, substitution to stations outside the DMA cannot prevent an increase in the fees charged for retransmission consent for broadcast stations in the DMA. Each DMA thus constitutes a geographic market for the licensing of Big-4 television retransmission consent.

85.      Of those DMA markets, the relevant geographic markets at issue here are "overlap" DMAs where both Nexstar and either Mission or White Knight each own a Big-4 station.

86.      Mission owns Big-4 stations in 23 DMAs, and **_all_** 23 of those are DMAs in which both Nexstar and Mission own a Big-4 station.

87.    White Knight owns Big-4 stations in two DMAs, ***both*** of which also include a Big-4 station owned by Nexstar.

**E.    In Violation of the Antitrust Laws, Mission and White Knight Have Unlawfully Agreed and Coordinated with Nexstar to Demand Higher Retransmission Consent Rates.**

88.    Under the antitrust laws and the Communications Act, Nexstar and its sidecars are required to function as independent competitors. But Nexstar has used its contracts and entanglements with its sidecars to conspire and coordinate with those entities, such that Mission and White Knight are neither acting as independent decisionmakers from Nexstar, nor competing with it.

89.    Instead of allowing the natural competitive process to occur through separate and independent retransmission consent negotiations with DIRECTV, Nexstar and its sidecars have, by all appearances, agreed to work together to drive up the price of retransmission consent rates.

**1.    Nexstar has coordinated Mission's and White Knight's negotiations with DIRECTV.**

90.    In ▮▮▮▮▮▮, DIRECTV entered into Retransmission Consent Agreements with Mission and White Knight, each of which ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

91.    In June 2022, DIRECTV opened negotiations to renew these contracts by sending proposed terms to each of Mission and White Knight.

92.    DIRECTV has repeatedly asked to speak with Mission's and White Knight's senior executives. It is the industry practice in retransmission consent negotiations for senior executives to directly communicate with one another to attempt to reach a deal before a blackout occurs—and almost unheard of that senior executives would not communicate with an MVPD after a blackout has begun. However, at no point in time were Mission's or White Knight's executives

ever available for discussions. Instead, DIRECTV was informed that all negotiations for both entities would be conducted by Sahl.

93.     DIRECTV's executives entered into extensive negotiations with Sahl. As is typical for these types of agreements, these negotiations entailed constant, real-time communications.

94.     Reflecting the constant pace of these communications, Sahl even provided advance notice to DIRECTV in July 2022 when he expected to be unavailable on certain days for personal reasons.

95.     As the Mission's and White Knight's agreements were set to expire, the parties agreed to extend the expiration date several times from ███████████████ to accommodate Sahl's schedule and allow additional time for negotiations.

96.     In August 2022, Sahl provided counterproposals to DIRECTV's terms for Mission and White Knight. Sahl's counterproposals were alarming in multiple respects.

97.     At the outset, Sahl requested increases to the retransmission consent fees for both White Knight and Mission that were radically disproportionate to the number of stations owned by White Knight and Mission.

98.     This was remarkable because one of the primary factors in determining the per subscriber fees for retransmission consent agreements is the number of Big-4 station subscribers covered by the agreement. Put simply, broadcast station groups who own a larger number of Big-4 stations serving a larger number of subscribers generally exert their leverage to obtain higher rates.

99.     Sahl's requested fees were so disproportionate to the size of White Knight and Mission that they seemed intentionally calculated to prevent the parties from reaching an agreement.

100.    In addition, as part of his demands on behalf of White Knight, Sahl initially demanded retransmission consent fees for CW stations even though White Knight did not own any. This would be a highly unusual demand by any other broadcaster. But in this case, Sahl's ask had a clear motivation, as Nexstar was on the cusp of announcing that it had agreed to acquire a 75% ownership interest in the entire CW network. Sahl first made this demand on *August 1*, 2022; Nexstar announced it had agreed to acquire the ownership interest on *August 15*, 2022 (and ultimately closed this transaction in October 2022).

101.    White Knight had absolutely no economic reason to raise CW in negotiations with DIRECTV, which DIRECTV pointed out to Sahl, noting that it was improper and illegal for White Knight to be coordinating rate negotiations with Nexstar.

102.    The only plausible explanation for this conduct, which was against White Knight's economic interests, was that Nexstar directed Sahl to include the CW in the White Knight negotiations to ascertain DIRECTV's willingness to pay for CW stations and ultimately inform Nexstar's future negotiations.

103.    In mid-October 2022, ████████████████████████████████████████ ████████████████, Sahl simply stopped responding to DIRECTV without explanation.

104.    During Sahl's disappearance, Nexstar was negotiating with Verizon and on the cusp of blacking out its stations. As shown in the below timeline, Sahl failed to respond to DIRECTV's October 12, 2022 counterproposal until after October 17, 2022. During Sahl's disappearance, Nexstar went dark on Verizon.



105.    Sahl has never explained his delayed response during this critical period. But given this timeline, the most plausible explanation is that Sahl did not respond to DIRECTV because he was awaiting instruction from Nexstar on how to respond to DIRECTV's October 12, 2022 counterproposal. Sahl, however, was likely unable to obtain those instructions because Nexstar was preoccupied with its Verizon negotiations and wanted to see how that dispute turned out before coordinating with Mission and White Knight to counter DIRECTV's last proposal. Shortly after the Verizon blackout began, the typical real-time negotiation process promptly resumed.

106.    During Sahl's disappearance, Mission, White Knight, and Nexstar all issued nearly identical press releases concerning their respective blackouts. These press releases further illustrate how Nexstar was coordinating its sidecars' negotiations and related public relations messaging.

107.    On October 16, 2022, despite being two separate companies in different geographies, White Knight and Mission issued separate statements with cut-and-paste talking points about their respective blackouts on DIRECTV.

108.    Notably, these statements were clear violations of non-disparagement clauses in each of DIRECTV's contracts with Mission and White Knight, each of which provide:



109.    On the following day, on October 17, 2022, Nexstar issued yet a third statement with the identical talking points about its blackout related to failed negotiations with Verizon. The three statements containing identical language are shown below:

110.    White Knight's October 16 statement provides:[8]

### White Knight (Oct 16) Statement re DIRECTV Blackout

KFXK FOX 51 has a contract with DirecTV that allows them to deliver our programming to you.  That contract has expired and DirecTV has removed KFXK FOX 51 from your schedule. KFXK FOX 51 has presented a proposal for fair value compensation, based on the importance and value our programming brings our viewers. Despite our tireless efforts, DirecTV has refused our fair offer and is making negotiations very difficult. They will tell you it's for your benefit, but don't believe it. Our offer is fair. And now they hold you the subscriber hostage.  It's not right.

111.    Mission issued two statements dated October 16 and October 30 containing the same exact talking points.[9]

---

[8] *Attention DirecTV Subscribers*, KETK (Oct. 16, 2022), *available at* www.ketk.com/attention-directv-subscribers/ [https://web.archive.org/web/20221016165200/https://www.ketk.com/attention-directv-subscribers/].
[9] *DirecTV Subscribers: WNAC could be forced off your line-up, and important programming you pay for could disappear!*, WNAC (Oct. 16, 2022), *available at* https://keepmystation.com/WNAC [https://web.archive.org/web/20221016015430/https://keepmystation.com/WNAC]; *DirecTV Subscribers: WNAC has been forced off your line-up, and important programming you pay for has disappeared.*, WNAC (Oct. 30, 2022), *available at* https://keepmystation.com/WNAC, [https://web.archive.org/web/20221030164330/https://keepmystation.com/WNAC].

## Mission Statements (Oct 16 & Oct 30) re DIRECTV Blackout

WNAC has a contract with DirecTV that allows them to deliver our programming to you. That contract expires Tuesday, Oct. 18, and if a new agreement is not reached, DirecTV might remove WNAC from your channel line-up. WNAC has presented a proposal for fair value, based on the importance and value our programming brings our viewers. Despite our tireless efforts, ==DirecTV has refused our fair offer and is making negotiations very difficult. Our offer is fair.== And now they may hold you the subscriber hostage. It's not right.

WNAC and DirecTV have a contract that allows them to carry our programming to you. That contract has expired and DirecTV removed WNAC from your schedule. WNAC has presented a proposal for fair value, based on the importance and value our programming brings to our viewers. Despite our tireless efforts, ==DirecTV has refused our fair offer and is making negotiations very difficult.== You might have seen them do this before. ==They will tell you it's for your benefit, but don't believe it. Our offer is fair.== And now they hold you the subscriber hostage. It's not right.

112.    And finally, *Nexstar*'s October 17 statement regarding its blackout with *Verizon* contains the same exact verbiage as White Knight's and Mission's statements:[10]

## Nexstar (Oct 17) Statement re Verizon Blackout

==**"Verizon Fios has refused our fair offer, and is making negotiations very difficult,"**== a Nexstar spokesperson said in a statement to viewers. "You may have seen them do this before. ==They will tell you it's for your benefit, but don't believe it. Our offer is fair."==

113.    The identical statements in all three press releases clearly originated from the same source: Nexstar, who drafted talking points that it intended to use for itself, and provided those same talking points to Mission and White Knight. As with other aspects of the negotiations, the public relations decisions about Mission's and White Knight's negotiations with DIRECTV were being orchestrated by Nexstar.

---

[10] Matthew Keys, *Nexstar says Verizon is lying about Fios carriage dispute*, The Desk (Oct. 17, 2022), *available at* https://thedesk.net/2022/10/nexstar-says-verizon-lying-about-carriage-dispute/
[https://web.archive.org/web/20221018030833/https://thedesk.net/2022/10/nexstar-says-verizon-lying-about-carriage-dispute/].

114.     After blackouts commenced for both Mission and White Knight, DIRECTV again attempted to make direct contact with the sidecars' senior executives to continue negotiations.

115.     On October 25, 2022, DIRECTV executives reached out to Anthony "Toby" J. Malara III—White Knight's purported "President"—to attempt to negotiate a deal and end the blackout. Yet, when DIRECTV tried to contact Malara, it received an "out-of-office" email stating that he was unavailable for the rest of the month due to his full-time job with the American Staffing Association.

116.     Aside from this automated email, Malara never responded to DIRECTV—an unheard-of occurrence in high-stakes retransmission negotiations that, if unsuccessful, would result in continued material and ongoing revenue losses for White Knight.

117.     Malara's complete absence from these negotiations demonstrates that the negotiations were being directed by Nexstar and not White Knight. Indeed, prior to the White Knight blackout, Sahl never once even mentioned Malara or any need to consult with any White Knight representative.

118.     DIRECTV had a similarly unusual experience with Mission's president, Dennis Thatcher, after Mission forced a blackout on DIRECTV in October 2022. When DIRECTV reached out to Thatcher to try and reach a resolution with Mission and restore the stations to DIRECTV, Thatcher refused to negotiate and referred DIRECTV to speak with Sahl.

119.     Since then, DIRECTV has been unable to make any headway in its negotiations, and Mission's and White Knight's stations remain blacked out on DIRECTV.

120.     And DIRECTV has not been the only MVPD victimized by Defendants' conspiracy. More recently, as of January 6, 2023, Mission and White Knight have also blacked out

on DISH, who has publicly stated that both networks are demanding unreasonably high retransmission fees given their viewership with DISH's subscribers.

> **2.  White Knight's and Mission's lack of independent management oversight demonstrates that they take direction from Nexstar.**

121.   White Knight and Mission did not independently conduct negotiations with DIRECTV, as the antitrust laws require them to. Instead, they elected to cede control of their decision-making authority to Nexstar through its chosen agent, Sahl.

122.   These sidecars are not truly competing if there is no one managing their operations. And they certainly cannot compete with Nexstar when it is clear that Nexstar is directing all of their major business operations.

123.   White Knight in particular lacks even the most basic hallmarks of a freestanding business. White Knight has channels in Texas and Louisiana. Yet, in an application to the FCC, Knight Broadcasting of Shreveport License Corp. listed its corporate address as 3316 Willow Glen Drive, Oak Hill, Virginia 20171. As shown in the picture below, this is not an office; it is the residence of Anthony "Toby" J. Malara III, the President, Secretary, and Director of White Knight Holdings, and the CEO of Malara Enterprises, LLC, White Knight's parent company:



124.     Despite ostensibly running a broadcast station group, Malara has a full-time job as the Vice President of Government Relations for the American Staffing Association. In that role, he "advises on all staffing-related legislation and regulation" and "directs the association's political activities through its political action committee, Staffing PAC." Further, White Knight's most recent license renewal states, "Station WVLA-TV employs fewer than five full-time employees. Accordingly, the station is not required by the FCC's rules to produce EEO public file reports."

125.     And while Mission purports to have an active senior management team, two of its four members are long-time Nexstar employees. As reported on Mission's website, VP Sharon Moser spent "twelve years at the station level and ten years in corporate accounting for the Irving, TX based, Nexstar Broadcast Group, Inc." and VP Lance Carwile worked as "a Group Program Coordinator and Regional Program Director for . . . Nexstar Broadcasting"; and two entities that were ultimately acquired by Nexstar, including LIN Media and Media General.

> **3.     In prior negotiations, Sahl has exhibited a repeated pattern of confidentiality breaches and fealty to Nexstar.**

126.     DIRECTV has negotiated numerous retransmission consent agreements with both Mission and White Knight. In each of these negotiations, Mission's and White Knight's purported executives were nowhere to be seen and did not engage in any direct conversations with DIRECTV. Instead, they have required DIRECTV to conduct all discussions with the same, single individual: Sahl.

127.     Sahl is not an employee of Mission or White Knight. Instead, he is President of ID Media, LLC and a managing partner at Sahl Karofsky Media Group ("SKMG") LLC, an entity that was voluntarily dissolved on March 24, 2022.

128.    Considering the importance of these retransmission consent agreements, it is unheard of that broadcast station groups would rely exclusively on a third-party agent to handle negotiations, particularly once negotiations have resulted in a blackout of those groups' stations. Instead, it is the industry practice for broadcast station group executives themselves—who have "skin in the game"—to handle, or at least participate in, these high-stakes negotiations.

129.    Over the years, during retransmission consent agreement negotiations, Sahl has demonstrated a refusal to treat Nexstar's sidecars as independent entities and has repeatedly breached confidentiality provisions by unlawfully using and sharing confidential information obtained from one sidecar to gain advantages in negotiations on behalf of others.

130.    Both White Knight and Mission entered into an Amendment to Retransmission Consent Agreement with DIRECTV. Each of these amendments contains an identical confidentiality clause providing that:



131.    In May 2019, Sahl requested to negotiate agreements for three of Nexstar's sidecars simultaneously: Mission, White Knight, and Marshall Broadcasting, Inc. (another Nexstar sidecar that went bankrupt in 2019 and sold its three stations to Mission in 2020). DIRECTV indicated that Sahl needed to negotiate each of the entities' agreements separately. Sahl refused to do so and submitted draft agreements on behalf of White Knight and Marshall with language lifted directly from DIRECTV's agreement with Mission.

132.    DIRECTV notified Sahl that his representation of all three entities—without any safeguards in place to protect the confidentiality of each "independent" company's negotiations—

was a clear breach of confidentiality provisions in DIRECTV's agreements with each of the sidecars. Sahl, however, rejected this position and refused to respect the confidentiality obligations under the sidecars' agreements.

133.    In 2021, Sahl represented Vaughan Media, another Nexstar sidecar, in retransmission negotiations with DIRECTV. As part of these negotiations, Sahl referenced competitively sensitive information concerning the contracts for White Knight and Mission, including retransmission rates, and claimed that it was necessary to extend the expiration of the Vaughan contracts to make all Nexstar sidecar contracts co-terminus.

134.    In an attempt to justify this request, Sahl commented that Nexstar was still developing its ATSC 3.0 or NextGen TV strategy. This strategy was not public information at the time, and Sahl did not explain how he was aware of a confidential Nexstar business strategy. Sahl could only have learned this information from Nexstar and was pushing for Vaughan's contract extension to achieve an objective of Nexstar: enabling Nexstar to orchestrate a single round of negotiations on behalf of all of its sidecars at the same time.

135.    Once again, DIRECTV complained that Sahl's transparent use of confidential information to coordinate what are required to be independent negotiations breached confidentiality provisions in agreements with each of the sidecars. Despite DIRECTV's warnings, the confidentiality breaches continued.

136.    DIRECTV formally notified Mission's "management" of Sahl's tactics during the Vaughan negotiation and demanded that Mission take all necessary steps to ensure that Mission and its agents honored their confidentiality obligations to DIRECTV. Mission's "management" did not even respond to this notice, let alone take the steps DIRECTV requested.

**4.    Nexstar's multiple agreements with its sidecars provide Defendants with ample opportunities to conspire on retransmission rate negotiations.**

137.    Nexstar's substantial entanglement with Mission and White Knight provides it with ample opportunities to conspire and unlawfully share competitively sensitive information. As noted above, a larger broadcast station group can provide certain services for its sidecar, but the sidecar is supposed to be independent and is not permitted to jointly negotiate retransmission fees.

138.    Here, the sheer number of agreements between Nexstar and its sidecars illustrates the numerous opportunities Nexstar has to communicate with its sidecars to discuss issues raised in these contracts. Nexstar has at least 27 shared service agreements ("SSAs") and joint sales agreements ("JSAs") with its sidecars—two with White Knight and 26 with Mission. These agreements encompass the White Knight stations KFXK and WVLA, as well as the following Mission stations: KAMC, KASN, KASY, KCIT, KJTL, KLJB, KLRT, KMSS, KODE, KOLR, KPEJ, KRBC, KRWB, KSAN, KTVE, KWBQ, WAWV, WLAJ, WNAC, WTVO, WTVW, WUTR, WVNY, WXXA, WPIX, and WYOU.

139.    In addition to these SSAs and JSAs, Nexstar has the following additional agreements covering Mission stations:

- KFQX – On June 13, 2014, Nexstar assumed a local marketing agreement ("LMA") that this station had been operating under since 1994. The agreement renewed a provision that permits Nexstar to provide "substantially all" of the station's programming.

- KHMT – On December 1, 2009, Nexstar assumed a time brokerage agreement ("TBA") that the station had been operating under since 1994. The agreement renewed a provision giving Nexstar sole responsibility for the sale of all brokered program and commercial time, and to furnish personnel, materials, and programs for broadcast.

- WFXP – On July 17, 2006, Nexstar assumed a TBA that the station had been operating under since 1996. This TBA gave Nexstar 162 hours per week of broadcast time on WFXP.

- WNAC – On June 10, 2022, Nexstar assumed a joint marketing and programming agreement ("JMPA") that the station had been operating under since 1996. The Nexstar/Mission amendment gave Nexstar all revenues of the station.

- WPIX – Nexstar and Mission entered into a local programming and marketing agreement ("LPMA") on December 30, 2020. This LPMA makes all of the station airtime available to Nexstar for programming and entitles Nexstar to all advertising revenues.

140.    While the types of agreements listed above are generally designed to give a broadcast station some input into its sidecar's programming and operations, the Nexstar/Mission and Nexstar/White Knight agreements grant Nexstar an extraordinary level of control over its sidecars.

141.    For example, the JSAs between Nexstar and White Knight/Mission provide Nexstar the right to sell all of the commercial advertising time for each station.

142.    And most of the Mission SSAs for the stations listed above are "global shared service agreements" that permit Nexstar and Mission to enter into programming agreements with no limitations. However, no such programming agreements can be found in those stations' public files, as would be required by FCC regulations.

143.    In the past, DOJ has expressed significant concerns about antitrust harm from agreements between broadcast station groups and the new owners of their divested stations. In each of the antitrust enforcement actions challenging Nexstar's acquisitions of Media General and Tribune Media Company, DOJ sought and obtained a final judgment barring Nexstar from entering into these and similar types of agreements "[t]o ensure that the Divestiture Stations are operated independently from Nexstar after the divestitures[.]"[11]

---

[11] Competitive Impact Statement, *supra* note 3, at 11.

**5. Nexstar has reached out to DIRECTV about sidecar billing account receivable requests.**

144.  As further evidence of their entanglement, on at least one occasion, *Nexstar* emailed DIRECTV with a billing question regarding DIRECTV's payments to *White Knight*. On September 30, 2022, Nexstar Director of Credit and Operations Christi Lunski emailed a screenshot of a July 2022 bill DIRECTV had sent to White Knight to inquire about a term used on the bill. That screenshot contained the exact per subscriber rate found in DIRECTV and White Knight's retransmission consent agreement. This demonstrates that White Knight was sharing its invoices received from DIRECTV with Nexstar, and allowing Nexstar to handle follow-up requests pertaining to those invoices—regardless of whether that task involved Nexstar's exposure to competitively sensitive and confidential rate information.

145.  It is improper for Nexstar to handle billing issues on White Knight's behalf, particularly as these invoices contain confidential rate information protected under the confidentiality provisions of DIRECTV's agreements with White Knight—something that a real competitor should never see given the extremely material and sensitive nature of those key economic deal terms.

146.  Moreover, the fact that White Knight's payments and billing issues are handled directly by Nexstar gives the entities yet another clear opportunity to conspire and to freely exchange commercially sensitive, non-public rate information.

**6. Nexstar negotiated CBS affiliation agreements for Mission.**

147.  The level of Nexstar's coordination with its sidecars is evident in conduct unrelated to DIRECTV. In January 2022, ViacomCBS and Nexstar renewed multiple affiliation agreements. As part of the deal, Nexstar included—along with a license for channels owned by it—a license for two CBS stations owned by Mission and operated by Nexstar: KOLR in Springfield, MO and

WYOU in Wilkes Barre, PA. It is surprising that Mission did not negotiate these renewals itself, as it is supposed to be competing with Nexstar in these DMAs. The renewals yet again exemplify an unusually high level of coordination between Nexstar and Mission.

**7.     Nexstar is perpetuating a pattern of anticompetitive conduct that has previously resulted in a settlement with DOJ.**

148.    This is not the first time that Nexstar has been accused of colluding with competitors in violation of the antitrust laws.

149.    On December 13, 2018, DOJ filed a complaint naming Nexstar and six other broadcast television corporations as defendants in a civil antitrust complaint.[12] The complaint alleged that the defendants had agreed among themselves and other broadcast stations in local markets to exchange competitively sensitive information about spot advertising revenues.

150.    On May 22, 2019, DOJ and Nexstar reached a settlement, and the court entered a final judgment in which Nexstar agreed not to communicate with or use competitively sensitive information regarding any station in the same DMA that Nexstar does not own or operate. Competitively sensitive information includes non-public information related to pricing, pricing strategies, pacing, holding capacity, revenues, or market shares.

151.    In addition, as described above, DOJ has repeatedly challenged Nexstar transactions and negotiated consent judgments that not only required Nexstar to divest Big-4 stations, but further prohibited them from entering into operational agreements with the entities that acquired those stations.

---

[12] Competitive Impact Statement as to Defendant Nexstar Media Group, Inc., *United States v. Sinclair Broad. Grp., Inc.*, No. 1:18-cv-2609-TSC (D.D.C. Dec. 13, 2018), *available at* https://www.justice.gov/atr/case-document/file/1120166/download.

## CLAIMS FOR RELIEF

### First Claim for Relief
**Sherman Act Section 1 – Per Se Conspiracy to Increase Retransmission Consent Fees**
**15 U.S.C. § 1**
**Against All Defendants**

152.    DIRECTV incorporates by reference the allegations set forth in the preceding paragraphs.

153.    Beginning at a time currently unknown to DIRECTV, but no later than June 2022 and continuing through the present, Defendants entered into a conspiracy in unreasonable restraint of trade to coordinate on, and raise, retransmission consent fees in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

154.    Defendants' acts in furtherance of their conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

155.    Defendants' conspiracy to coordinate on and raise retransmission fees is per se unlawful because it constitutes a conspiracy to fix and raise prices. The anticompetitive effects of Defendants' conspiracy are thus presumed.

156.    DIRECTV has suffered antitrust injury as a direct and proximate result of Defendants' conduct. DIRECTV's injury flows directly from Defendants' unlawful agreement. Specifically, DIRECTV has been deprived of a fair competitive process and has been forced to either accept higher prices or lose access to Mission's and White Knight's networks. Choosing the lesser of two evils, DIRECTV has refused Defendants' supracompetitive, price-fixed demands, resulting in a reduction in output. This is textbook harm to competition, and the harm here has not only been to DIRECTV, but to downstream consumers as well.

157.    Nexstar and its sidecars would not have been able to successfully deploy this ultimatum without their coordination.

158.    As a result of Defendants' anticompetitive conduct, DIRECTV is currently experiencing an anticompetitive output restriction in the form of blacked-out stations and was deprived of a fair competitive process that has resulted in higher prices being demanded of it and lost profits.

**<u>Second Claim for Relief</u>**
**Sherman Act Section 1 – Conspiracy to Increase Retransmission Consent Fees (Rule of Reason)**
**15 U.S.C. § 1**
**Against All Defendants**

159.    DIRECTV incorporates by reference the allegations set forth in the preceding paragraphs.

160.    Beginning at a time currently unknown to DIRECTV, but no later than June 2022 and continuing through the present, Defendants entered into a conspiracy in unreasonable restraint of trade to coordinate on, and raise, retransmission consent fees in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

161.    Defendants' acts in furtherance of their conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

162.    In the alternative to Claim One, Defendants' conspiracy is unlawful under a rule of reason analysis.

163.    The purpose and effect of defendants' conspiracy was to unreasonably restrain competition for retransmission consent rates. Their unlawful coordination distorted competition and, but for the conspiracy, each of the defendants would have negotiated bilaterally with

DIRECTV. Retransmission consent rates were instead inflated to supracompetitive levels and output was suppressed in the form of station blackouts.

164.    These anticompetitive effects provide direct evidence of Defendants' market power.

165.    Defendants' market power is also established indirectly by their market shares for retransmission consent of Big-4 stations in the relevant geographic markets.

166.    In each Overlap DMA, Nexstar has eliminated a major competitor by conspiring with Mission/White Knight instead of competing against them. By conspiring together, Nexstar and its sidecars have the power to charge MVPDs like DIRECTV higher fees for its retransmission rights.

167.    By conspiring with one another, Defendants have collectively achieved an unlawful market share of no less than approximately 50% of the relevant market in each Overlap DMA.

168.    This market power has enabled Defendants to demand an exorbitant retransmission fee or force the blackout of stations on DIRECTV's platforms. This "take it or leave it" ultimatum would not have occurred had Defendants allowed the competitive process to take its natural course in each Overlap DMA market.

169.    Defendants' conspiracy was not reasonably necessary to further any procompetitive purpose, and there are no procompetitive justifications for coordinating on negotiations and agreeing to raise prices; it simply disrupts the ordinary price-setting mechanism of the free market.

170.    DIRECTV has suffered antitrust injury as outlined above.

171.    As a result of Defendants' anticompetitive conduct, DIRECTV is currently experiencing an anticompetitive output restriction in the form of blacked-out stations and was

deprived of a fair competitive process that has resulted in higher prices being demanded of it and lost profits.

### Third Claim for Relief
**Sherman Act Section 1 – Unlawful Information Exchange**
**15 U.S.C. § 1**
**Against All Defendants**

172.    DIRECTV incorporates by reference the allegations set forth in the preceding paragraphs.

173.    Beginning at a time currently unknown to DIRECTV, but no later than June 2022 and continuing through the present, Defendants shared commercially sensitive information related to each Defendant's retransmission consent negotiations with one another in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

174.    Defendants' acts in furtherance of this information sharing were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

175.    Defendants' sharing of competitively sensitive information is unlawful under a rule of reason analysis.

176.    The information Defendants shared with one another consisted of detailed, competitively sensitive and non-public information about the prices (retransmission consent rates) each had agreed to with DIRECTV in the past, and the prices each would agree to in the future.

177.    Defendants possess market power in the market for retransmission consent of Big-4 stations in each of the relevant geographic markets as outlined above. The anticompetitive effects caused by Defendants' information sharing—in the form of higher prices and reduced output—provide direct evidence of Defendants' market power.

178.     Defendants' market power is also established indirectly by their high market shares for retransmission consent of Big-4 stations in the relevant geographic markets.

179.     Further, the structure of the relevant markets makes these markets susceptible to collusion. The relevant markets are highly concentrated. Even where broadcast station groups and their sidecars are nominally separate, Nexstar's sidecars take orders from Nexstar. Moreover, demand for retransmission consent for Big-4 stations is highly inelastic, as these channels contain unique and popular programming for numerous consumers.

180.     Defendants' conspiracy was not reasonably necessary to further any procompetitive purpose, and in any event, there are no procompetitive justifications for sharing current and future pricing information concerning ongoing commercial negotiations.

181.     DIRECTV has suffered antitrust injury as outlined above.

182.     As a result of Defendants' anticompetitive conduct, DIRECTV is currently experiencing an anticompetitive output restriction in the form of blacked-out stations and was deprived of a fair competitive process that has resulted in higher prices being demanded of it and lost profits.

**Fourth Claim for Relief**
**Breach of Contract – New York Law**
**Against Mission**

183.     DIRECTV incorporates by reference the allegations set forth in the preceding paragraphs.

184.     DIRECTV and Mission had a valid and enforceable contract including provisions barring Mission from disparaging DIRECTV or disclosing DIRECTV's confidential and commercially sensitive information.

185.    The non-disparagement and confidentiality clauses in DIRECTV's contract with Mission survive the expiration of their contract and remain in full force and effect today.

186.    DIRECTV adequately performed all of its obligations under the contract.

187.    Despite DIRECTV's adequate performance under the contract, Mission breached multiple provisions of the contract with DIRECTV.

188.    Mission breached the non-disparagement clauses of its contract with DIRECTV by disparaging DIRECTV in public messaging and statements on October 15, 2022, October 16, 2022, and October 30, 2022, including statements that it was DIRECTV who was "making negotiations very difficult" and "hold[ing] you the subscriber hostage." The statement also accuses DIRECTV of lying by noting that "[t]hey will tell you it's for your benefit[.]"

189.    These statements disparaged DIRECTV in connection with the parties' ongoing retransmission consent negotiations as part of a campaign to pressure DIRECTV to surrender to Mission's unreasonable demands and retransmit its stations.

190.    Mission's disparagement of DIRECTV has harmed DIRECTV in the form of lost subscribers. DIRECTV has received continuous complaints from customers demanding that Mission channels be reinstated. One customer recently complained to DIRECTV: "Direc TV and the FOX broadcasting TV station has been off the air since the World Series and the NFL season. Gosh dang it, they have had plenty of time to get contract issues resolved. This is KMSSS 33 FOX in East Texas. If you cannot help me, then pls. direct me to the correct agency." Another customer recently wrote, in part, "[i]f by this Friday January 13 2023, Directv does not get my local Fox 24 channel back on the air I will keep the internet service with them only and cancel my Directv package of the bill." And ███████ of customers have followed through on their threats.

DIRECTV estimates that more than ███████ subscribers have cancelled their DIRECTV subscription as a result of the Mission blackout.

191.    Mission has also repeatedly breached its confidentiality obligations to DIRECTV by providing information received from DIRECTV in confidential negotiations to Nexstar—directly and/or through their common agent Sahl—to discuss retransmission consent rates.

192.    Further, Mission publicly disclosed DIRECTV's competitively sensitive information in the form of subscriber figures. On October 24, 2022, Mission issued a press release stating, "████████████████████████████████████████ ████████." Such information is confidential information to which Mission would not otherwise have access.

193.    Mission's confidentiality breaches have harmed DIRECTV's commercial interests and placed DIRECTV at a competitive disadvantage in the market.

194.    DIRECTV has been damaged as a direct and proximate result of Mission's breaches.

**Fifth Claim for Relief**
**Breach of Contract – New York Law**
**Against White Knight**

195.    DIRECTV incorporates by reference the allegations set forth in the preceding paragraphs.

196.    DIRECTV and White Knight had a valid and enforceable contract including provisions barring White Knight from disparaging DIRECTV or disclosing DIRECTV's confidential and commercially sensitive information.

197.    The non-disparagement and confidentiality clauses in DIRECTV's contract with White Knight survived the expiration of that contract and remain in full force and effect today.

198.    DIRECTV adequately performed all of its obligations under the contract.

199.    Despite DIRECTV's adequate performance under the contract, White Knight breached multiple provisions of the contract with DIRECTV.

200.    White Knight breached the non-disparagement clause of its contract with DIRECTV by disparaging DIRECTV in public statements on October 16, 2022, including statements that it was DIRECTV who was "making negotiations very difficult" and "hold[ing] you the subscriber hostage." The statement also accuses DIRECTV of lying by noting that "they will tell you it's for your benefit[.]"

201.    These statements disparaged DIRECTV in connection with the parties' ongoing retransmission consent negotiations as part of a campaign to pressure DIRECTV to surrender to White Knight's unreasonable demands and retransmit its stations.

202.    White Knight's disparagement of DIRECTV has harmed DIRECTV in the form of lost subscribers. DIRECTV has likewise received continuous complaints from customers demanding that White Knight channels be reinstated, and DIRECTV estimates that nearly ███ ███ subscribers have cancelled their DIRECTV subscription as a result of the White Knight blackout.

203.    White Knight has also repeatedly breached its confidentiality obligations to DIRECTV by providing information received from DIRECTV in confidential negotiations to Nexstar—directly and/or through their common agent Sahl—to discuss retransmission consent rates.

204.    White Knight's confidentiality breaches have harmed DIRECTV's commercial interests and placed DIRECTV at a competitive disadvantage in the market.

205.     DIRECTV has been damaged as a direct and proximate result of White Knight's breaches.

**Sixth Claim for Relief**
**Tortious Interference with Contract – New York Law**
**Against Nexstar**

206.     DIRECTV incorporates by reference the allegations set forth in the preceding paragraphs.

207.     DIRECTV has valid and enforceable contracts with Mission and White Knight, the relevant provisions of which survive expiration of the contracts and continue to bind the parties to them.

208.     With knowledge of the existence of these contracts, Nexstar induced Mission and White Knight to breach its contracts with DIRECTV. White Knight and Mission each breached their valid contracts with DIRECTV at Nexstar's behest.

209.     Nexstar has guided Mission's and White Knight's conduct in its negotiations. Nexstar has also instructed White Knight and Mission to issue the disparaging statements included above—statements that contained identical language to that used by Nexstar in connection with its ongoing retransmission consent disputes.

210.     By coordinating with White Knight and Mission to make these disparaging statements, Nexstar procured breaches of White Knight's and Mission's respective contracts with DIRECTV, as described above.

211.     Nexstar has also caused White Knight and Mission to disclose DIRECTV's confidential information in violation of their contracts.

212.    There was no justification for these breaches. They were simply intended to pressure DIRECTV to capitulate to White Knight's and Mission's unreasonable demands, in direct contravention of the contracts.

213.    Nexstar's actions in interfering with DIRECTV's contractual relations with Mission and White Knight harmed DIRECTV. The disclosure of confidential, commercial sensitive information harmed DIRECTV in that it has placed DIRECTV at a competitive disadvantage in the market. Likewise, Mission's and White Knight's disparagement of DIRECTV, done at Nexstar's behest, has harmed DIRECTV in the form of lost subscribers.

<u>Seventh Claim for Relief</u>
**Tortious Interference with Prospective Economic Advantage – New York Law Against Nexstar**

214.    DIRECTV incorporates by reference the allegations set forth in the preceding paragraphs.

215.    DIRECTV had business relationships with both White Knight and Mission, and Nexstar knew of these contractual relationships.

216.    Nexstar intentionally interfered with DIRECTV's future relations with White Knight and Mission, as well as DIRECTV's future relations with its subscribers, using improper and unlawful means—namely coordinating with White Knight and Mission on what retransmission consent rates to charge DIRECTV and unlawfully sharing information related to those negotiations, leading to blackouts of the stations.

217.    As a direct and proximate result of Nexstar's conduct, DIRECTV's relations with Mission and White Knight have been harmed.

**Eighth Claim for Relief**
**Tortious Interference with Prospective Economic Advantage – New York Law**
**Against Mission**

218.     DIRECTV has relationships with its millions of subscribers.

219.     Mission is aware that DIRECTV has these relationships.

220.     Mission intentionally interfered with DIRECTV's prospective relations with numerous of its subscribers in the applicable DMAs through unlawful and improper means—namely, by (1) entering into an unlawful conspiracy to raise retransmission rates and sharing commercially sensitive information with its competitor, Nexstar, and (2) publishing misleading and disparaging information about its negotiations with DIRECTV.

221.     As a direct and proximate result of Mission's conduct, DIRECTV's relations with its subscribers have been harmed. DIRECTV estimates that approximately ███████ subscribers have cancelled their DIRECTV subscriptions as a result of Mission's unlawful conduct.

**Ninth Claim for Relief**
**Tortious Interference with Prospective Economic Advantage – New York Law**
**Against White Knight**

222.     DIRECTV has relationships with its millions of subscribers.

223.     White Knight is aware that DIRECTV has these relationships.

224.     White Knight intentionally interfered with DIRECTV's prospective relations with its subscribers in the applicable DMAs through unlawful and improper means—namely, by (1) entering into an unlawful conspiracy to raise retransmission rates and sharing commercially sensitive information with its competitor, Nexstar, and (2) publishing misleading and disparaging information about its negotiations with DIRECTV.

225.     As a direct and proximate result of White Knight's conduct, DIRECTV's relations with its subscribers have been harmed. DIRECTV estimates that nearly ███████ subscribers have cancelled their DIRECTV subscriptions as a result of White Knight's unlawful conduct.

## DEMAND FOR JURY TRIAL

226.     Pursuant to Federal Rule of Civil Procedure 38(b), DIRECTV hereby demands a trial by jury of all issues so triable.

## PRAYER FOR RELIEF

Wherefore, DIRECTV prays for judgment as follows:

1.     A permanent injunction prohibiting Nexstar from unlawfully coordinating on retransmission consent negotiations with Mission, White Knight, or any of its sidecars, including, but not limited to, reaching agreements with respect to retransmission consent negotiations or sharing commercially sensitive information related to those negotiations;

2.     An award of general damages according to proof;

3.     An award of treble damages, as required by statute;

4.     An award of punitive damages for Defendants' misconduct;

5.     An award of attorneys' fees and costs;

6.     An award of prejudgment and post-judgment interest at the maximum legal rate; and

7.     Such other and further relief as the Court deems just and proper.

Dated: March 14, 2023

Respectfully submitted,

By: _____

Olivier N. Antoine
Glen G. McGorty
Jared Levine
CROWELL & MORING LLP
590 Madison Ave., 20th Floor
New York, New York 10022
(212) 223-4000
gmcgorty@crowell.com
oantoine@crowell.com
jalevine@crowell.com

Jason C. Murray* (*pro hac vice* forthcoming)
Jordan L. Ludwig* (*pro hac vice* forthcoming)
CROWELL & MORING LLP
515 South Flower Street, 40th Floor
Los Angeles, CA 90071
(213) 622-4750
jmurray@crowell.com
jludwig@crowell.com

*Attorneys for Plaintiff DIRECTV, LLC*