**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| DIRECTV, LLC, | Civil Action No. 23-CV-2221-PAC |
|     Plaintiff, | |
|     v. | Electronically Filed |
| NEXSTAR MEDIA GROUP, INC.;<br>MISSION BROADCASTING, INC.; and<br>WHITE KNIGHT BROADCASTING, INC. | |
|     Defendants. | |

**DEFENDANTS' MEMORANDUM OF LAW
IN SUPPORT OF MOTION TO DISMISS THE COMPLAINT**

**TABLE OF CONTENTS**

I.      INTRODUCTION ................................................................................... 1

II.     BACKGROUND ..................................................................................... 2

        A.      The Market for Retransmission of Television Broadcast Programming. ............... 2

        B.      DIRECTV Entered into RCA Renewal Negotiations with Mission and
                White Knight. ............................................................................................ 4

        C.      DIRECTV Filed this Lawsuit. ...................................................................... 4

III.    LEGAL STANDARD ............................................................................ 5

IV.     ARGUMENT ......................................................................................... 6

        A.      DIRECTV Lacks Standing to Pursue Its Antitrust Claims (Counts One
                Through Three). .......................................................................................... 6

                1.      DIRECTV Does Not Have Constitutional Standing. .............................. 7

                2.      DIRECTV Does Not Have Antitrust Standing. .................................... 9

        B.      DIRECTV Fails to State a Plausible Sherman Act Violation (Counts One
                Through Three). .......................................................................................... 13

                1.      DIRECTV Does Not Adequately Allege an Illegal Agreement. .............. 13

                2.      DIRECTV Does Not Allege a Cognizable Antitrust Market. ................. 23

                3.      DIRECTV Does Not Allege an Unreasonable Restraint on Trade
                        Under Either the *Per Se* or Rule of Reason Standards............................ 26

                4.      DIRECTV Does Not Adequately Allege Information Exchange. ............ 28

        C.      DIRECTV Fails to State a Breach of Contract Claim Against Mission or
                White Knight (Counts Four and Five). ................................................................ 29

                1.      DIRECTV Fails to Adequately Allege That Mission or White
                        Knight Breached Their Non-Disparagement Clauses. ............................. 30

                2.      DIRECTV Fails to Adequately Allege That Mission or White
                        Knight Breached Their Confidentiality Clauses. ..................................... 35

        D.      DIRECTV Fails to State a Tortious Interference with Contract Claim
                Against Nexstar (Count Six)................................................................................. 39

i

E.      DIRECTV Fails to State Tortious Interference with Prospective Economic
        Advantage Claims Against Any Defendant (Counts Seven Through Nine).........41

        1.      DIRECTV's Tortious Interference with Prospective Economic
                Advantage Claims are Duplicative. ..........................................................42

        2.      DIRECTV Fails To Adequately Allege Tortious Interference With
                Prospective Economic Advantage. ..........................................................44

CONCLUSION....................................................................................................................48

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott Labs. v. Adelphia Supply USA*, 2017 WL 5992355 (E.D.N.Y. Aug. 10, 2017)............... 20

*Amcan Holdings, Inc. v. Canadian Imperial Bank of Com.*, 70 A.D.3d 423 (N.Y.
    App. Div. 2010) ........................................................................................................ 48

*Anexia, Inc. v. Horizon Data Sols. Ctr., LLC*, 165 N.Y.S.3d 831 (N.Y. Sup. Ct. 2022)............. 51

*Apotex Inc. v. Acorda Therapeutics, Inc.*, 823 F.3d 51 (2d Cir. 2016)........................................ 42

*Arista Records LLC v. Lime Grp. LLC*, 532 F. Supp. 2d 556 (S.D.N.Y. 2007) ............... 15, 26, 32

*Associated Gen. Contractors v. California State Council of Carpenters*, 459 U.S. 519
    (1983)........................................................................................................................ 10

*Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328 (1990).................................................. 14

*Awards.com, LLC v. Kinko's, Inc.*, 834 N.Y.S.2d 147 (N.Y. App. Div. 2007)........................... 37

*B & M Linen, Corp. v. Kannegiesser, USA, Corp.*, 679 F. Supp. 2d 474 (S.D.N.Y.
    2010) ........................................................................................................................ 53

*Bear, Stearns Funding, Inc. v. Interface Grp.-Nevada, Inc.*, 2007 WL 1988150
    (S.D.N.Y. July 10, 2007) ......................................................................................... 44

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ............................................................... passim

*Bernstein v. O'Reilly*, 2019 WL 10995111 (S.D.N.Y. Mar. 5, 2019) .......................................... 36

*Biotronik A.G. v. Conor Medsystems Ireland, Ltd.*, 22 N.Y.3d 799 (N.Y. 2014) ...................... 38

*Bogan v. Hodgkins*, 166 F.3d 509 (2d Cir. 1999) ...................................................................... 26

*Boustead Secs., LLC v. Leaping Grp. Co., Ltd.*, 2021 WL 3774116 (S.D.N.Y. Aug.
    25, 2021) .................................................................................................................. 34

*Buchanan Cap. Markets, LLC v. DeLucca*, 41 N.Y.S.3d 229 (N.Y. App. Div. 2016)................ 38

*Burton v. Label, LLC*, 344 F. Supp. 3d 680 (S.D.N.Y. 2018) ..................................................... 37

*Bus. Exposure Reduction Grp. Assocs., LLC v. Pershing Square Cap. Mgmt.*, L.P.,
    549 F. Supp. 3d 318 (S.D.N.Y. 2021)...................................................................... 33

*Camelot SI, LLC v. ThreeSixty Brands Grp. LLC*, 2022 WL 4628757 (S.D.N.Y. Sept. 30, 2022) ......................................................................................................... 53

*Carco Grp., Inc. v. Maconachy*, 383 F. App'x 73 (2d Cir. 2010) ................................. 36

*Carr v. Wal-Mart Stores, Inc.*, 2011 WL 939168 (W.D.N.Y. Mar. 16, 2011) ............................. 40

*Carvel Corp. v. Noonan*, 3 N.Y.3d 182 (2004)........................................................ 53, 55

*Cenedella v. Metro. Museum of Art*, 348 F. Supp. 3d 346 (S.D.N.Y. 2018) ............... 8, 18, 20, 25

*Cinema Vill. Cinemart, Inc. v. Regal Entm't Grp.*, 708 F. App'x 29 (2d Cir. 2017) .................. 29

*Citizens for Responsibility & Ethics in Washington v. Trump,* 953 F.3d 178 (2d Cir. 2019) ...................................................................................................... 9

*City of Oakland v. Oakland Raiders*, 20 F.4th 441, (9th Cir. 2021)........................................ 11, 12

*Concord Assocs., L.P. v. Entm't Props. Tr.*, 817 F.3d 46 (2d Cir. 2016) .............................. 27, 30

*Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91 (2d Cir. 2007) ...................................................................................................... 7

*Cortes v. Twenty-First Century Fox Am., Inc.*, 285 F. Supp. 3d 629 (S.D.N.Y.)......................... 35

*Deutsche Bank Nat. Tr. Co. v. Quicken Loans Inc.*, 810 F.3d 861 (2d Cir. 2015) ...................... 48

*Downtown Music Publ'g LLC v. Peloton Interactive, Inc.*, 436 F. Supp. 3d 754 (S.D.N.Y. 2020) ...................................................................................... 26

*EIG Credit Mgmt. Co. v. CNX Res. Corp.*, 2021 WL 1226415 (S.D.N.Y. Mar. 31, 2021) ...................................................................................................... 37

*Elecs. Commc'ns Corp. v. Toshiba Am. Consumer Prod., Inc.*, 129 F.3d 240 (2d Cir. 1997) ................................................................................................ 14, 31, 32

*Elias v. Rolling Stone LLC*, 872 F.3d 97 (2d Cir. 2017)............................................... 6

*Envirosource, Inc. v. Horsehead Res. Dev. Co.,* 1996 WL 363091 (S.D.N.Y. July 1, 1996) ...................................................................................................... 52

*Enzo Biochem, Inc. v. Amersham PLC*, 981 F. Supp. 2d 217 (S.D.N.Y. 2013) ......................... 55

*Enzo Biochem, Inc. v. Molecular Probes, Inc.*, 2013 WL 6987615 (S.D.N.Y. Dec. 6, 2013) ...................................................................................................... 54

*Ethelberth v. Choice Sec. Co.*, 91 F. Supp. 3d 339 (E.D.N.Y. 2015) ............................. 50

*G.K.A. Beverage Corp. v. Honickman*, 55 F.3d 762 (2d Cir. 1995)............................. 54

*Gamm v. Sanderson Farms, Inc.*, 944 F.3d 455 (2d Cir. 2019)................................................ 25, 26

*Ganske v. Mensch*, 480 F. Supp. 3d 542 (S.D.N.Y. 2020) ............................................................ 36

*Gelboim v. Bank of Am. Corp.*, 823 F.3d 759 (2d Cir. 2016) ........................................ 6, 10, 11, 31

*Glanton ex rel. ALCOA Prescription Drug Plan v. AdvancePCS Inc.*, 465 F.3d 1123 (9th Cir. 2006)................................................................................................................................. 8

*Golub Cap. LLC v. NB Alternatives Advisers LLC*, 2022 WL 540653 (S.D.N.Y. Feb. 22, 2022) ............................................................................................................................................ 42

*Hinds Cnty., Miss. V. Wachovia Bank N.A.*, 620 F. Supp. 2d 499 (S.D.N.Y. 2009) .............. 16, 17

*IHS Glob. Ltd. v. Trade Data Monitor, LLC*, 2021 WL 2134909 (D.S.C. May 21, 2021) ............................................................................................................................................. 35

*In re Aluminum Warehousing Antitrust Litig.*, 2014 WL 4277510 (S.D.N.Y. Aug. 29, 2014) .............................................................................................................................................. 17

*In re Amazon.com, Inc. eBook Antitrust Litig.*, 2022 WL 4581903 (S.D.N.Y. Aug. 3, 2022) .............................................................................................................................................. 19

*In re Commodity Exch., Inc.*, 213 F. Supp. 3d 631 (S.D.N.Y. 2016) ........................................... 25

*In re Delta/Airtran Baggage Fee Antitrust Litig.*, 245 F. Supp. 3d 1343 (N.D. Ga. 2017) .............................................................................................................................................. 24

*In re Elevator Antitrust Litig.*, 502 F.3d 47 (2d Cir. 2007).................................................... 18, 26

*In re Inclusive Access Course Materials Antitrust Litig.*, 544 F. Supp. 3d 420 (S.D.N.Y. 2021) ............................................................................................................................ 28

*In re Interest Rate Swaps Antitrust Litig.*, 261 F. Supp. 3d 430 (S.D.N.Y. 2017)................. 18, 20

*In re London Silver Fixing, Ltd., Antitrust Litig.*, 213 F. Supp. 3d 530 (S.D.N.Y. 2016) ............................................................................................................................................ 25, 26

*In re Med. X-Ray Film Antitrust Litig.*, 946 F. Supp. 209 (E.D.N.Y. 1996) .............. 13, 14, 30, 31

*In re Merrill Lynch & Co.*, 273 F. Supp. 2d 351 (S.D.N.Y. 2003)................................................. 6

*In re Novartis & Par Antitrust Litig.*, 2019 WL 3841711 (S.D.N.Y. Aug. 15, 2019)................. 50

*In re Plasma-Derivative Protein Therapies Antitrust Litig.*, 764 F. Supp. 2d 991 (N.D. Ill. 2011)............................................................................................................................... 24

*In re Pork Antitrust Litig.*, 2019 WL 3752497 (D. Minn. Aug. 8, 2019) ..................................... 17

*In re Treasury Sec. Auction Antitrust Litig.*, 595 F. Supp. 3d 22 (S.D.N.Y. 2022) ..................... 32

*Jack L. Inselman & Co. v. FNB Fin. Co.*, 364 N.E.2d 1119 (N.Y. 1977) ................................... 45

*John Hancock Life Ins. Co. v. 42 Delaware Ave. Assocs., LLC*, 15 A.D.3d 939 (N.Y. App. Div. 2005) ........................................................................................................... 45

*Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229 (2d Cir. 2007) ........................................... 2

*Khodeir v. Sayyed*, 323 F.R.D. 193 (S.D.N.Y. 2017) ..................................................................... 44

*Kirch v. Liberty Media Corp.*, 449 F.3d 388 (2d Cir. 2006) ........................................... 45, 47, 54

*Kramer v. Time Warner Inc.*, 937 F.2d 767 (2d Cir. 1991) .......................................................... 2

*Landmark Ventures, Inc. v. Wave Sys. Corp.*, 513 F. App'x 109 (2d Cir. 2013) ................. 33, 36

*Laumann v. Nat'l Hockey League*, 907 F. Supp. 2d 465 (S.D.N.Y. 2012) .................................. 10

*Lavazza Premium Coffees Corp. v. Prime Line Distribs. Inc.*, 575 F. Supp. 3d 445 (S.D.N.Y. 2021) ......................................................................................................... 49

*Lentell v. Merrill Lynch & Co.*, 396 F.3d 161 (2d Cir. 2005) ....................................................... 6

*Lewis v. New York Tel. Co*., 643 F. Supp. 654 (S.D.N.Y. 1984) .................................................. 43

*Lexington 360 Assocs. v. First Union Nat'l Bank of N. Carolina*, 234 A.D.2d 187 (N.Y. App. Div. 1996) .................................................................................................. 43

*Litovich v. Bank of Am. Corp.*, 568 F. Supp. 3d 398 (S.D.N.Y. 2021) ................................ passim

*Lujan v. Defs. Of Wildlife*, 504 U.S. 555 (1992) ........................................................................... 8

*M&C New York (Times Square), LLC v. Accor Mgmt. US Inc.*, 179 N.Y.S.3d 221 (N.Y. App. Div. 2022) ................................................................................................. 40

*Mariah Re Ltd. v. Am. Fam. Mut. Ins. Co.*, 52 F. Supp. 3d 601 (S.D.N.Y. 2014) ...................... 44

*Mathias v. Daily News, L.P.*, 152 F. Supp. 2d 465 (S.D.N.Y. 2001) ........................................... 27

*Mayor & City Council of Balt. v. Citigroup, Inc.*, 709 F.3d 129 (2d Cir. 2013) ............. 15, 21, 23

*Medtech Prods. Inc. v. Ranir, LLC*, 596 F. Supp. 2d 778 (S.D.N.Y. 2008) ................................ 46

*Mehrhof v. Monroe-Woodbury Cent. Sch. Dist.*, 168 A.D.3d 713 (N.Y. App. Div. 2019) ........................................................................................................... 52

*Mizel Roth IRA on Behalf of Consol. Asset Funding 3 LP v. Unified Cap. Partners 3 LLC*, 2021 WL 1164439 (S.D.N.Y. Mar. 25, 2021) ....................................................... 6

*Mumin v. Uber Techs., Inc.*, 239 F. Supp. 3d 507 (E.D.N.Y. 2017)..............................................53

*N. Shipping Funds I, L.L.C. v. Icon Cap. Corp.*, 2013 WL 1500333 (S.D.N.Y. Apr. 12, 2013) ............................................................................................................................47

*Nat'l Mkt. Share, Inc. v. Sterling Nat. Bank*, 392 F.3d 520 (2d Cir. 2004) ..................... 33, 36, 37

*Oliver Wyman, Inc. v. Eielson*, 2016 WL 5339549 (S.D.N.Y. Sept. 22, 2016)...........................51

*Parker Waichman LLP v. Squier, Knapp & Dunn Commc'ns, Inc.*, 138 A.D.3d 570 (N.Y. App. Div. 2016) ......................................................................................................44

*PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101 (2d Cir. 2002).....................................................27

*Petitt v. Celebrity Cruises, Inc.*, 153 F. Supp. 2d 240 (S.D.N.Y. 2001)......................................38

*PharmacyChecker.com, LLC v. Nat. Ass'n of Bd. of Pharmacy*, 530 F. Supp. 3d 301 (S.D.N.Y. 2021) ....................................................................................................................16

*Planete Bleue Television, Inc. v. A&E Television Networks, LLC*, 2018 WL 10579873 (S.D.N.Y. Sept. 19, 2018) ..........................................................................43

*Plasticware, LLC v. Flint Hills Res., LP*, 852 F. Supp. 2d 398 (S.D.N.Y. 2012) .......................52

*POSCO Energy Co. v. FuelCell Energy, Inc.*, 560 F. Supp. 3d 747 (S.D.N.Y. 2021) ...........49, 51

*Reach Music Pub., Inc. v. Warner/Chappell Music, Inc.*, 2014 WL 5861984 (S.D.N.Y. Nov. 10, 2014) ..........................................................................................46

*Satan Wears Suspenders, Inc. v. Jaar*, 2022 WL 2181449 (S.D.N.Y. June 16, 2022)................36

*Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26 (1976)..............................................................9

*Smugglers Notch Homeowners' Ass'n v. Smugglers' Notch Mgmt. Co.*, 414 F. App'x 372 (2d Cir. 2011)......................................................................................................... 28, 30

*Streamline Cap., L.L.C. v. Hartford Cas. Ins. Co.*, 2003 WL 22004888 (S.D.N.Y. Aug. 25, 2003) ......................................................................................................................40

*Texaco Inc. v. Dagher*, 547 U.S. 1 (2006) .................................................................................20

*Thole v. U. S. Bank N.A*, 140 S. Ct. 1615 (2020)...........................................................................7

*Torres v. Walker*, 356 F.3d 238 (2d Cir. 2004)...........................................................................43

*Tractebel Energy Mktg, Inc. v. AEP Power Mktg, Inc.*, 487 F.3d. 89 (2d Cir. 2007) .................43

*United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150 (1940)...................................................14

*Variblend Dual Dispensing Sys. LLC v. Crystal Int'l (Grp.) Inc.*, 2021 WL 1198834
   (S.D.N.Y. Mar. 30, 2021) ............................................................................. 33

*Wellington Shields & Co. LLC v. Breakwater Inv. Mgmt. LLC*, 2016 WL 5414979
   (S.D.N.Y. Mar. 18, 2016) ............................................................................. 46

## I.      INTRODUCTION

Plaintiff DIRECTV, LLC ("DIRECTV") filed this facially deficient antitrust suit to gain a tactical advantage in ███████ negotiations with Defendant Nexstar Media Group, Inc. ("Nexstar") for the renewal of a consent agreement to retransmit Nexstar's television station programming to its subscribers. But these negotiations neither justify using this Court in an ill-conceived effort to gain leverage nor provide adequate legal support for this baseless lawsuit.

Unhappy with industry-wide increasing retransmission consent rates (caused in significant part by rising content costs for broadcast groups), DIRECTV has already failed to agree on retransmission consent renewals with Defendants Mission Broadcasting Inc. ("Mission") and White Knight Broadcasting, Inc. ("White Knight"), losing the right to broadcast their stations. Now, on ███████ its renewal negotiations with Nexstar, DIRECTV concocted this alleged antitrust conspiracy, based on rates proposed by Mission and White Knight that DIRECTV ***did not pay***.

Because DIRECTV did not pay Mission and White Knight's proposed rates and because its agreement with Nexstar has ███████, it lacks standing. DIRECTV lacks constitutional standing because it cannot establish that its alleged injury is redressable or traceable. Even if DIRECTV were to succeed on the merits, nothing would require Defendants to enter renewed contracts with DIRECTV for retransmission consent rights. And at least as troubling, DIRECTV specifically lacks antitrust standing. DIRECTV has ***never*** paid the purportedly inflated retransmission consent fees. As a result, DIRECTV is not a proper party to pursue its dubious antitrust claims.

Even if it had standing, DIRECTV's allegations are replete with speculation, conjecture, and conclusory statements insufficient to maintain this action. The antitrust claims contained in Counts One through Three fail to sufficiently plead the existence of any agreement between

Defendants because DIRECTV neither identifies direct evidence of an agreement nor alleges parallel conduct coupled with "plus factors" sufficient to convert its bald speculation into a cognizable claim. And DIRECTV also fails to allege cognizable product and geographic markets. For these reasons, its antitrust claims must be dismissed.

Finally, DIRECTV's tacked-on state law claims are also fatally flawed. DIRECTV's breach of contract claims fail to adequately allege a breach of any specific portion of the contracts between DIRECTV and White Knight and Mission. These same claims also fail to identify recoverable damages stemming from the purported breaches. DIRECTV's largely duplicative tortious interference claims also fail because DIRECTV does not identify any contractual provision actually breached or independently tortious actions taken by Defendants.

For these reasons, DIRECTV's utterly hollow Complaint should be dismissed.

## II.     BACKGROUND[1]

### A.     The Market for Retransmission of Television Broadcast Programming.

Nexstar, Mission, and White Knight are companies that own broadcast television stations in various local markets, called "designated market areas" ("DMAs"). *See* Compl. ¶¶ 1, 5. Nexstar owns stations in more than 100 DMAs, Mission owns stations in 26 DMAs, and White Knight owns two stations in two DMAs. *Id.* ¶¶ 31–33.

Defendants each own television stations affiliated with "Big-4" networks – ABC, CBS,

---

[1]      The following is based on the allegations in the Complaint, materials referenced and relied upon therein, and matters of public record, all of which may be considered in ruling on a motion to dismiss. *See, e.g.*, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 568 n.13 (2007) (courts may take "notice of the full contents of the published articles" quoted in complaint); *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991) (holding district court was permitted to take judicial notice of public documents filed with SEC on a motion to dismiss). In reciting DIRECTV's factual allegations, Defendants do not admit or suggest their truth. *See Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 237 (2d Cir. 2007) (explaining that, on a motion to dismiss, "the court is to accept as true all facts alleged in the complaint").

NBC, and Fox – that acquire rights to national programming (such as prime time shows and national sports) and create content of their own (such as the local news).[2] *See id.* ¶¶ 1, 31–33, 37. Nexstar owns Big-4 stations in certain DMAs in which Mission and White Knight also own stations, while Mission and White Knight do not own stations in any of the same markets.[3] *See id.* ¶¶ 70, 73, 86–87.

The Big-4 stations each broadcast unique content that is not available through the others.[4] For example, NBC affiliates have exclusive rights to broadcast Notre Dame home football games, while ABC affiliates have exclusive rights to broadcast the Academy Awards. As such, each Big-4 station offers viewers an almost entirely distinctive programming line-up compared to the other Big-4 stations in the DMA. *See id.* ¶ 36.

Broadcast station groups such as Defendants distribute their content to viewers through retransmission consent agreements ("RCAs") negotiated with multichannel video programming distributors ("MVPDs"), including cable or satellite providers like DIRECTV. *See id.* ¶¶ 3, 38–39. These agreements generally give the MVPD the right to carry all the broadcast content from both Big-4 and non-Big-4 stations for negotiated retransmission consent rates. *Id.* ¶ 4. Because the Big-4 stations offer unique content, MVPDs generally attempt to enter RCAs to acquire rights to all four Big-4 stations in each DMA, in addition to hundreds of other channels. *See id.* ¶ 36.

If the RCA between an MVPD and a broadcast group expires without renewal, the MVPD no longer has the right to retransmit the covered stations to its subscribers (though viewers can still

---

[2]     Nexstar and Mission also own non-Big-4 television stations.

[3]     A diagram showing Nexstar, Mission, and White Knight's Big-4 stations is attached as Appendix A. *See also* Compl. ¶¶ 65, 70, 73.

[4]     *See, e.g.,* Appendix B1 & Appendix B2 (based on publicly available information from DIRECTV's website showing representative programming line-up of two Big-4 stations in Denver with no common content offerings).

view the broadcast over-the-air or through alternative services). *See id.* ¶ 62. In recent years, as content costs have risen for broadcast groups, so have retransmission consent rates under RCAs. As DIRECTV observes, retransmission consent fees have increased industry-wide from $214.6 million in 2006 to an estimated $12.6 billion in 2022. *Id.* ¶ 42.

**B.     DIRECTV Entered into RCA Renewal Negotiations with Mission and White Knight.**

In ▮▮▮▮▮, DIRECTV entered RCAs with Mission and White Knight, each of which ran for ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *Id.* ¶ 90. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, DIRECTV opened renewal negotiations with Mission and White Knight. *Id.* ¶ 91. As they had in prior negotiations with DIRECTV, Mission and White Knight engaged an experienced third-party consultant, Eric Sahl, to conduct the negotiations on their behalf. *Id.* ¶¶ 34, 126. Notably, both the Mission-DIRECTV and White Knight-DIRECTV RCAs ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *See infra* § IV.C.2 (discussing ▮▮▮▮▮ of Mission and White Knight RCAs, cited at Compl. ¶ 90, which ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮.

To accommodate the parties' ongoing negotiations, Mission and White Knight separately agreed with DIRECTV to delay the expiration of their respective RCAs from ▮▮▮▮▮▮ ▮▮. Compl. ¶ 95. Ultimately, however, the negotiations broke down, with DIRECTV unwilling to agree on terms with either Mission or White Knight. *Id.* ¶ 2. ▮▮▮▮▮▮▮▮, DIRECTV's agreements with Mission and White Knight thus expired without renewal. *Id.* ¶¶ 104, 114. The RCA between DIRECTV and Nexstar is ▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *Id.* ¶ 18.

**C.     DIRECTV Filed this Lawsuit.**

On March 15, 2023, DIRECTV filed its Complaint against Mission, White Knight, and

Nexstar, alleging that Defendants conspired to raise the retransmission consent fees they demanded (or, in Nexstar's case, would demand in the future) from DIRECTV, in violation of the Sherman Act and common law. *See id*. ¶¶ 1, 152–82, 214–26.

Counts One through Three assert Section 1 antitrust claims against all Defendants for (1) *per se* price-fixing; (2) a price-fixing conspiracy under the rule of reason; and (3) unlawful information exchange. *Id*. ¶¶ 152–82. Counts Four and Five assert breach of contract claims against Mission and White Knight, alleging that they violated non-disparagement provisions of their expired RCAs by publicly blaming DIRECTV for the failed renewal negotiations and confidentiality provisions by sharing confidential information from those negotiations with Nexstar. *Id*. ¶¶ 183–205. Count Six asserts tortious interference with contracts against Nexstar for its alleged role in the foregoing claimed breaches. *Id*. ¶¶ 206–13. Count Seven asserts tortious interference with prospective economic advantage against Nexstar for interfering with DIRECTV's relationships with Mission, White Knight, and DIRECTV's subscribers. *Id*. ¶¶ 214–17. And Counts Eight and Nine assert tortious interference with prospective economic advantage against Mission and White Knight for also interfering with DIRECTV's relationships with its subscribers. *Id*. ¶¶ 218–25.

## III.   LEGAL STANDARD

A complaint must give a defendant "fair notice of what the … claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 545.[5] A plaintiff must allege "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Elias v. Rolling Stone LLC*, 872 F.3d 97, 104 (2d Cir. 2017).

---

[5]     Unless otherwise noted, all emphasis in this Brief has been added, and all internal quotations, citations, and alterations have been omitted.

In deciding a Rule 12(b)(6) motion, the Court may consider "documents integral to the complaint and relied upon in it, even if not attached or incorporated by reference," in addition to "documents or information contained in defendant's motion papers if plaintiff has knowledge or possession of the material and relied on it in framing the complaint." *In re Merrill Lynch & Co*., 273 F. Supp. 2d 351, 356–57 (S.D.N.Y. 2003), *aff'd sub nom. Lentell v. Merrill Lynch & Co.*, 396 F.3d 161 (2d Cir. 2005). But when "a document relied on in the complaint contradicts allegations in the complaint, the document … control[s], and the court need not accept the allegations in the complaint as true." *Mizel Roth IRA on Behalf of Consol. Asset Funding 3 LP v. Unified Cap. Partners 3 LLC*, 2021 WL 1164439, at *1 (S.D.N.Y. Mar. 25, 2021).

## IV.   ARGUMENT

### A.   DIRECTV Lacks Standing to Pursue Its Antitrust Claims (Counts One Through Three).

To survive a motion to dismiss, "an antitrust plaintiff must show both constitutional standing and antitrust standing." *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 770 (2d Cir. 2016). That is, DIRECTV must demonstrate that (i) it satisfies the elements of Article III standing; and (ii) its injury is "of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *See Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 106 (2d Cir. 2007).

DIRECTV satisfies neither of these requirements because it does not – and cannot – allege that it has paid supracompetitive prices. It declined to pay the rates proposed by Mission and White Knight, and it is ████████████████████████████ with Nexstar. Instead, DIRECTV alleges that its inability to broadcast Mission and White Knight's stations caused it to lose customers and that it will continue to cause a loss of customers, including because of its anticipated failure to reach agreement with Nexstar. *See* Compl. ¶¶ 2, 18–19, 158, 171, 182. That

alleged prospective loss of customers is purely speculative. And this indirect, non-price harm is too attenuated from the alleged collusive conduct to establish cognizable harm, either prospectively or retrospectively. Ultimately, that prevents DIRECTV from establishing either constitutional or antitrust standing.

### 1.      DIRECTV Does Not Have Constitutional Standing.

DIRECTV lacks Article III standing because it fails to plead plausible, non-speculative facts showing that, but for the alleged price-fixing, Defendants would have entered – or will enter – into new retransmission consent agreements at "competitive" rates. "To establish standing under Article III of the Constitution, a plaintiff must demonstrate (1) that he or she suffered an injury in fact that is concrete, particularized, and actual or imminent, (2) that the injury [is fairly traceable to] the defendant, and (3) that the injury would likely be redressed by the requested judicial relief." *Thole v. U. S. Bank N.A*, 140 S. Ct. 1615, 1618 (2020); *Lujan v. Defs. Of Wildlife*, 504 U.S. 555, 560–61 (1992). "The party invoking federal jurisdiction bears the burden of establishing these elements." *Id.* at 561. DIRECTV has failed to meet its burden to establish redressability or traceability.

To establish redressability, "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.* Consequently, "[t]here is no redressability, and thus no standing, where (as is the case here) any prospective benefits depend on an independent actor who retains broad and legitimate discretion the courts cannot presume either to control or to predict." *Glanton ex rel. ALCOA Prescription Drug Plan v. AdvancePCS Inc.*, 465 F.3d 1123, 1125 (9th Cir. 2006).

The same principle applies when prospective benefits turn on the discretion of a party. In *Cenedella v. Metro. Museum of Art*, for example, an artist alleged that "but for the alleged conspiracy, the [museum defendants] would purchase and display his artwork, thus raising the

value of his work to the price he believes it deserves." 348 F. Supp. 3d 346, 354–55 (S.D.N.Y. 2018). Judge Koeltl dismissed the artist's complaint, holding: "Because the plaintiff has not pleaded facts indicating that a favorable decision would likely redress his alleged injury, he lacks Article III standing." *Id.* at 355. Specifically, even "[i]f the defendants' alleged conspiracy [was] enjoined, it is mere speculation that the defendants would begin purchasing the plaintiff's work… Which artists' works the defendants purchase is up to the defendants' discretion." *Id.*

The same is true here. DIRECTV claims that "[t]he reason [its] negotiations have been unsuccessful is Defendants' unlawful price-fixing conspiracy." Compl. ¶ 2. But even if Defendants' proposed retransmission consent fees are found to have been raised by anticompetitive activity, it is pure speculation that the parties will reach new retransmission consent agreements. Each Defendant retains the discretion to contract with DIRECTV or not, and the parties might or might not come to an agreement on a myriad of contractual terms. In other words, a judgment in this case enjoining Defendants' alleged collusive behavior will not require Defendants to broadcast their stations with DIRECTV and prevent additional lost customers that DIRECTV contends may result. DIRECTV therefore has not pleaded – and cannot plead – facts demonstrating that success in this lawsuit will redress the harm it alleges.

In addition, DIRECTV's antitrust claims fail because the alleged harm is not "traceable" to the alleged unlawful conduct. "To satisfy the 'traceability' or 'causation' prong of the Article III standing test, allegations must provide more than 'unadorned speculation' to 'connect their injury to the challenged actions.'" *Citizens for Responsibility & Ethics in Washington v. Trump,* 953 F.3d 178, 191 (2d Cir. 2019)*, as amended* (Mar. 20, 2020)*, cert. granted, judgment vacated as moot,* 141 S. Ct. 1262 (2021) (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 44–45 (1976)). The allegations "must plausibly support a 'substantial likelihood' that the plaintiff's

injury was the consequence of the defendant's allegedly unlawful actions (and that prospective relief could mitigate the harm)." *Id.* (quoting *Simon*, 426 U.S. at 45). Here, again, DIRECTV has failed to plausibly allege that the purportedly supracompetitive prices demanded by Defendants caused it to lose customers. DIRECTV has not alleged – because it cannot – that in the absence of the claimed unlawful conduct, Mission and White Knight would have agreed to renewed retransmission agreements with DIRECTV. And that break in the causal chain defeats Article III standing.

In the absence of either redressability or traceability, DIRECTV lacks Article III standing, and the antitrust claims should be dismissed.

## 2.    DIRECTV Does Not Have Antitrust Standing.

For similar reasons, DIRECTV also lacks antitrust standing. To establish antitrust standing, a plaintiff must show that it both (i) is an efficient enforcer of the antitrust laws (*i.e.*, that it is the proper party to bring suit); and (ii) has suffered an antitrust injury. *Gelboim*, 823 F.3d at 772. "In making this determination a court must 'evaluate the plaintiff's harm, the alleged wrongdoing by the defendants, and the relationship between them.'" *Laumann v. Nat'l Hockey League*, 907 F. Supp. 2d 465, 478 (S.D.N.Y. 2012) (quoting *Associated Gen. Contractors v. California State Council of Carpenters*, 459 U.S. 519, 535 (1983)). DIRECTV does not establish either element.

### a)    DIRECTV Is a Non-Purchaser and Therefore Is Not an Efficient Enforcer.

Antitrust standing requires a plaintiff to show that it is the proper party to pursue its claim. This inquiry "turns on: (1) whether the violation was a direct or remote cause of the injury; (2) whether there is an identifiable class of other persons whose self-interest would normally lead them to sue for the violation; (3) whether the injury was speculative; and (4) whether there is a risk that other plaintiffs would be entitled to recover duplicative damages or that damages would be

difficult to apportion among possible victims of the antitrust injury." *Gelboim*, 823 F.3d at 772.

Direct purchasers who pay a collusive overcharge typically have antitrust standing, whereas plaintiffs that "do not purchase the product or pay the overcharge—ordinarily do not." *City of Oakland v. Oakland Raiders*, 20 F.4th 441, 448–49 (9th Cir. 2021), *cert. denied*, 143 S. Ct. 84 (2022). This is because a "nonpurchaser's injury is less direct than the injuries of actual purchasers and highly speculative" – *i.e.*, it is not possible to know if, "in the absence of Defendants' restrictions on output, the nonpurchaser would have made a purchase and, if so, under what terms." *Id.* at 449. Accordingly, a nonpurchaser lacks antitrust standing because its "damages are highly speculative and would be exceedingly difficult to calculate." *Id.*

*City of Oakland* is instructive. The City of Oakland was one of only a limited pool of potential purchasers of host right for the Raiders NFL franchise, and allegedly lost the franchise "solely because it was unable to pay supracompetitive prices." *Id.* at 453. When negotiations broke down, the Raiders moved to a different city. *Id.* at 449. Oakland brought an antitrust suit against the NFL and its franchises, alleging both horizontal price fixing and group boycott claims. *Id.* at 449–50. Oakland claimed lost investment, income, and tax revenues as its purported injuries. *Id.* at 451.

The Ninth Circuit rejected Oakland's claim. The court held that Oakland's alleged injuries were indirect and "speculative" in nature because the City did not actually enter into an agreement with the Raiders. *See id.* At 460–61. Oakland's allegations contained "too many speculative links in the chain of causation between Defendants' alleged restrictions on output and the City's alleged injuries." *Id.* at 460. Consequently, the court could not "know whether, in the absence of Defendants' restrictions on output, the nonpurchaser would have made a purchase and, if so, under what terms." *Id.* at 449; *see also id.* at 460 ("Nonpurchasers who are priced out of the market,

however, present a special problem, due to the speculative nature of the harm.").

DIRECTV's injuries are similarly speculative. Because the parties never reached agreement on renewed retransmission consent terms, it is impossible to know that they ***actually*** would have done so, much less what the rate and non-rate terms would have been, whether that rate would have exceeded market benchmarks, and – critically – whether any premium would have been caused by allegedly collusive activity, as opposed to the market-wide rise in fees that DIRECTV itself observes. *See* Compl. ¶ 42 (noting a "5,770 percent" increase in retransmission consent fees market-wide since 2006); *see also City of Oakland*, 20 F.4th at 459–60 ("[T]here is no way of knowing [] what would have occurred in a more competitive marketplace. Would new teams have joined the NFL? Would they have found Oakland attractive? Would the Raiders have left Oakland in any event? Would the Raiders have stayed in the Bay Area, but not in Oakland? What price would the City have paid to retain the Raiders or acquire another team? Would the City have been willing and able to pay a competitive price? There are too many speculative links in the chain of causation between Defendants' alleged restrictions on output and the City's alleged injuries."). Even if antitrust violations existed, any number of other MVPDs that have actually paid for and are currently retransmitting Defendants' stations would be more efficient enforcers.

### b) DIRECTV Has Not Suffered an Antitrust Injury.

DIRECTV also fails to allege a plausible antitrust injury because (1) Defendants are not actual competitors in the retransmission consent market; and (2) DIRECTV fails to demonstrate that Defendants' alleged conspiracy resulted in DIRECTV's supposed injuries.

*First*, Defendants do not compete with each other for RCAs. Section 1 of the Sherman Act is designed to prevent injuries from unlawful agreements between "***actual competitors***." *See, e.g.*, *In re Med. X-Ray Film Antitrust Litig.*, 946 F. Supp. 209, 215–16 (E.D.N.Y. 1996). But Big-4 stations are not competitive substitutes for one another in any given local market. MVPDs like

DIRECTV do not choose between available Big-4 stations, like a consumer might choose between different brands of eggs at the supermarket. Rather, because each Big-4 network offers substantial exclusive content, MVPDs generally seek to obtain rights to every Big-4 station where they have subscribers, like consumers buying all the ingredients for an omelet. Since all four Big-4 stations are individually desirable in each DMA, retransmission rights for Big-4 stations are not substitutable or competitive goods.[6]

It follows that the purchase of the right to retransmit the signal of one Big-4 station in a local market has no effect on the price for the rights to retransmit the signals of the other Big-4 stations in that market. Indeed, DIRECTV does not allege that it can credibly play one Big-4 station off against another during RCA negotiations. To the contrary, DIRECTV contends that retransmission consent rates are driven by the number of Big-4 stations owned by a particular broadcast station group, irrespective of the rate DIRECTV agreed to pay for **other** Big-4 stations in that DMA. *See* Compl. ¶ 98. Because Defendants are not "actual competitors" in the retransmission market, DIRECTV has not adequately alleged an antitrust injury. *See In re Med. X-Ray Film Antitrust Litig.*, 946 F. Supp. at 215–16.

*Second*, DIRECTV also has not alleged any injury **caused** by an antitrust violation. It is not enough that the plaintiff's claimed injury flows from the unlawful conduct; instead, an antitrust injury must "'flow[] from that which makes defendants' acts unlawful.'" *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990). DIRECTV's only alleged injury – the loss of subscribers due to its choice to abandon RCA negotiations – is not an injury that resulted from alleged price fixing. *See, e.g.*, *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 223 (1940) (noting

---

[6]    Indeed, the complete differences in the network programming line-ups between Big-4 stations further demonstrate that the Big-4 networks are not viewed as substitutes, even by DIRECTV subscribers. *See* Appendices B1 and B2.

horizontal price fixing agreements violate antitrust laws because they *result in* supracompetitive prices; a "combination formed for the purpose *and with the effect of* raising, depressing, fixing, pegging, or stabilizing the price of a commodity in interstate or foreign commerce is illegal per se"). Rather, DIRECTV's alleged injury "flows" from its own decision not to enter into an agreement, and from its subscribers' purported decisions to cancel or not renew subscriptions because of lack of access to a particular station among a hundred others that DIRECTV provides.[7]

### B. DIRECTV Fails to State a Plausible Sherman Act Violation (Counts One Through Three).

In any event, DIRECTV's antitrust claims must be dismissed for failure to state a claim. The Sherman Act requires a "complaint pleading a violation of section 1 [to] allege [1] a contract, combination or conspiracy [2] that unreasonably restrains trade." *Elecs. Commc'ns Corp. v. Toshiba Am. Consumer Prod., Inc.*, 129 F.3d 240, 243 (2d Cir. 1997). In addition, a Section 1 claim "must allege a relevant geographic and product market in which trade was unreasonably restrained or monopolized." *Arista Records LLC v. Lime Grp. LLC*, 532 F. Supp. 2d 556, 575 (S.D.N.Y. 2007).

DIRECTV's antitrust claims fail across the board: DIRECTV does not adequately plead the existence of an agreement, a cognizable market, or an unreasonable restraint on trade.

#### 1. DIRECTV Does Not Adequately Allege an Illegal Agreement.

Counts One through Three must be dismissed because DIRECTV fails to plausibly plead the existence of an actual agreement. To survive dismissal, DIRECTV must plead, as to each Defendant, "enough factual matter (taken as true) to suggest that an agreement was [actually] made." *Twombly*, 550 U.S. at 556; *see also Mayor & City Council of Balt. v. Citigroup, Inc.*, 709

---

[7] DIRECTV does not claim, *e.g.*, that Defendants have entered into a group boycott or any other concerted refusal to enter into an agreement.

F.3d 129, 136 (2d Cir. 2013) (plaintiffs must plead "enough facts to support the inference that a conspiracy actually existed"). A plaintiff may "assert direct evidence that the defendants entered into an agreement in violation of the antitrust laws." *Citigroup, Inc.,* 709 F.3d at 136. But where, as here, a plaintiff relies only on circumstantial allegations, it must plead both parallel conduct by the defendants and additional "plus factors" from which a conspiracy can be inferred. *See Litovich v. Bank of Am. Corp.*, 568 F. Supp. 3d 398, 425 (S.D.N.Y. 2021); *see also Twombly*, 550 U.S. at 552 ("[A]llegations of parallel business conduct, taken alone, do not state a claim under § 1.").

DIRECTV does not allege direct evidence of an agreement. *See* DIRECTV Opp. to Nexstar Letter Motion at 2, ECF No. 45 (arguing that "DIRECTV has pleaded an extensive constellation of facts from which an agreement can reasonably be inferred"); *cf. PharmacyChecker.com, LLC v. Nat. Ass'n of Bd. of Pharmacy*, 530 F. Supp. 3d 301, 333 (S.D.N.Y. 2021) ("Direct evidence of a conspiracy is explicit and requires no inferences to establish the proposition or conclusion being asserted."). Accordingly, DIRECTV must plead both parallel conduct and plus factors that plausibly support the inference of an antitrust conspiracy on the part of each Defendant. *See Litovich*, 568 F. Supp. 3d at 425; *see also Hinds Cnty., Miss. V. Wachovia Bank N.A.*, 620 F. Supp. 2d 499, 513 (S.D.N.Y. 2009) ("To state a claim against each Defendant, [plaintiffs] must make allegations that plausibly suggest that each Defendant participated in the alleged conspiracy."). DIRECTV fails in both respects.

### a)      DIRECTV does not allege parallel conduct.

DIRECTV does not plausibly tie Nexstar to any purported price-fixing conspiracy. Instead, it makes only conclusory allegations that Nexstar "used its contracts [] with its sidecars to conspire," that Nexstar "orchestrated" Mission and White Knight's "negotiations with DIRECTV," and that the "only plausible explanation" for those negotiations' failure was Nexstar's alleged interference. Compl. ¶ 88, 102, 105, 113. But the Complaint is wholly devoid of any

*factual* allegations to support those claims. DIRECTV does not allege, for example, that Nexstar used the same consultant as Mission and White Knight to negotiate its own contracts. Nor does it allege that Nexstar has demanded allegedly anticompetitive fees as a result of the parties' supposed collusion. DIRECTV's bare conclusions and speculation that Nexstar participated in a price-fixing conspiracy are insufficient to state a claim.[8] *See Hinds Cnty.*, 620 F. Supp. 2d at 513 ("When a complaint relies either on wholly conclusory statements of concerted action, or, at best, on merely parallel conduct, and when plaintiffs sprinkle the words 'conspired,' 'concerted,' and 'concertedly' throughout the complaint, that complaint is insufficient to state a § 1 claim.").

DIRECTV's parallel conduct allegations against Mission and White Knight are equally deficient. To begin with, even if DIRECTV had adequately alleged parallel conduct between Mission and White Knight, such allegations would be irrelevant because they are not competitors. Mission and White Knight do not own Big-4 stations in any overlapping market. *See* Compl. ¶¶ 70–74. Thus, alleged parallel conduct between them cannot substantiate an antitrust conspiracy. *In re Aluminum Warehousing Antitrust Litig.*, 2014 WL 4277510, at *32 (S.D.N.Y. Aug. 29, 2014), *supplemented*, 2014 WL 4743425 (S.D.N.Y. Sept. 15, 2014) *and aff'd,* 833 F.3d 151 (2d Cir. 2016) ("Plaintiffs claim to have alleged a horizontal conspiracy in restraint of trade, but they do not allege that defendant warehouses, the LME or the trader defendants are horizontal competitors. In the absence of the latter, the former cannot be correct.").

Even if Mission and White Knight were competitors (they are not), DIRECTV fails to

---

[8]     DIRECTV's sole *factual* allegation that could be construed as parallel conduct by Nexstar alleges that Nexstar issued a press statement "nearly identical" to ones issued by Mission and White Knight. Compl. ¶ 106. Such "statements are nearly always analyzed as plus factors" and "[r]arely" constitute "evidence of parallel conduct itself." *See In re Pork Antitrust Litig.*, 2019 WL 3752497, at *8 (D. Minn. Aug. 8, 2019). Regardless, one instance of similar press release statements does not constitute parallel conduct supporting a conspiracy.

allege sufficient parallel conduct between Mission and White Knight. Apart from its conclusory allegations, DIRECTV describes three allegedly parallel actions between Mission and White Knight: (1) use of the same RCA negotiator; (2) similar demands for higher retransmission consent fees; and (3) the fact that both Mission and White Knight have services contracts with Nexstar. Because each of those actions had a lawful purpose and an obvious business explanation, DIRECTV fails to nudge its conspiracy claims from merely possible to plausible. *See Cenedella*, 348 F. Supp. 3d at 358 (a "plaintiff's complaint can be dismissed where there is an obvious alternative explanation to the facts underlying the alleged conspiracy among the defendants"); *see also In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) ("While *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to nudge plaintiffs' claims across the line from conceivable to plausible.").

*First*, as DIRECTV concedes, Eric Sahl is highly experienced in his field. *See* Compl. ¶ 34 ("Eric Sahl…is the former Head of Content Acquisition for Dish Network"); *id.* ¶ 126 (recognizing that DIRECTV "has negotiated numerous retransmission consent agreements" with Mr. Sahl). Given the intricate and specialized subject matter of RCAs and Mr. Sahl's extensive background in the industry, Mission and White Knight's separate decisions to use Mr. Sahl to conduct RCA negotiations makes "perfect business sense." *See In re Interest Rate Swaps Antitrust Litig.*, 261 F. Supp. 3d 430, 462 (S.D.N.Y. 2017) ("An inference of conspiracy will not arise when the conspirators' parallel conduct made perfect business sense," "there are obvious alternative explanations for the facts alleged," or "the alleged facts suggest competition at least as plausibly as they suggest anticompetition conspiracy"); *see also Twombly*, 550 U.S. at 557 ("[A]llegations of parallel conduct … must be placed in [] context.").

*Second*, Mr. Sahl's alleged demand for higher retransmission rates on behalf of Mission

16

and White Knight also has an obvious and common-sense alternative explanation: to increase revenue. *See In re Amazon.com, Inc. eBook Antitrust Litig.*, 2022 WL 4581903, at *16 (S.D.N.Y. Aug. 3, 2022), *report and recommendation adopted*, 2022 WL 4586209 (S.D.N.Y. Sept. 29, 2022) (rejecting inference of parallel conduct from allegations that defendants had "at bottom an interest in maximizing their potential profits—an interest universally shared by all businesses"). It is not uncommon for broadcast station owners to propose rate increases in RCA negotiations. And it is no secret that modern television content has exploded in production value and scale. Consistent with rising content costs, retransmission consent fees across the entire industry have risen dramatically, increasing by approximately $4 billion in the last five years alone. *See* Compl. ¶ 42. Against the backdrop of an ***industry-wide*** increase in retransmission consent fees, "[t]here is no reason to infer that [Mission and White Knight] had agreed among themselves to do what was only natural anyway." *See Litovich*, 568 F. Supp. 3d at 417.

*Third*, denigrating the shared services agreements between Nexstar and Mission and White Knight, DIRECTV characterizes the alleged conspiracy as "a natural product of [the] financial and operational agreements" that Mission and White Knight have with Nexstar. Compl. ¶¶ 57–59. Notably, however, DIRECTV does not contend that shared services agreements between Nexstar and Mission or White Knight are illegal in and of themselves. *Cf. Twombly*, 550 U.S. at 556 (holding that "lawful parallel conduct fails to bespeak unlawful agreement"). A common, industry-wide, and FCC-regulated business practice cannot, in and of itself, support an inference of unlawful conspiracy. *See In re Interest Rate Swaps Antitrust Litig.*, 261 F. Supp. 3d at 462 ("Following *Twombly*, for a complaint to state a § 1 claim based on parallel conduct by competitors, it must plead facts sufficient to indicate that this conduct flowed from a preceding agreement rather than from defendants' own business priorities."); *see also Texaco Inc. v. Dagher,*

547 U.S. 1, 6 n.1 (2006) (determining that joint ventures are not *per se* antitrust violations and presuming the joint venture was lawful where its formation had been approved by regulators).

**b)      DIRECTV fails to adequately allege "plus factors."**

Because DIRECTV has not adequately alleged parallel conduct, the Court does not need to conduct a plus factor analysis. *See Abbott Labs. v. Adelphia Supply USA*, 2017 WL 5992355, at *10 (E.D.N.Y. Aug. 10, 2017) ("A court need not reach the question of sufficiency of the alleged plus factors where plaintiffs have failed in the first instance to adequately allege parallel conduct."); *see also Cenedella*, 348 F. Supp. 3d at 358 (in addition to pleading parallel conduct, "the plaintiff must present circumstantial facts – 'plus factors' – to support the inference that a conspiratorial agreement took place"). But DIRECTV's failure to allege necessary plus factors independently requires dismissal.

Courts focus on three main plus factors: (1) "a common motive to conspire;" (2) "evidence that shows that the parallel acts were against the apparent individual economic self-interest of the alleged conspirators;" and (3) "evidence of a high level of interfirm communications." *See Citigroup, Inc.*, 709 F.3d at 136. DIRECTV fails to plausibly allege facts indicating the existence of these, or any other, plus factors.

***Absence of Common Motive.*** DIRECTV has not plausibly alleged a common motive to conspire. Mission and White Knight do not own stations in the same DMAs. To elide that fact, DIRECTV speculates that Defendants' "end-game" was to "ensure that [Mission and White Knight] have set a sufficiently high price floor in their negotiations so Nexstar can enter its own negotiations with DIRECTV with confidence that it can obtain a similarly supracompetitive rate." Compl. ¶¶ 18–19. But DIRECTV does not allege what possible benefit Mission and White Knight obtain from increasing Nexstar's "price floor." Instead, Mission and White Knight had an "unsurprising, and expected" motive to increase retransmission consent revenues for their own

18

stations, consistent with the rising programming costs and retransmission rates across the industry for almost twenty years. *See Citigroup, Inc.*, 709 F.3d at 138; *see also* Compl. ¶ 37.

Regardless, DIRECTV's motive argument suffers from a fundamental fatal flaw – DIRECTV fails to allege that Mission and White Knight's negotiated rates would have any relevance to or influence on Nexstar's future negotiations with DIRECTV. To the contrary, DIRECTV suggests the ***opposite*** is true for three reasons. *First*, DIRECTV contends that the retransmission consent rates are confidential and "protected under the confidentiality provisions of DIRECTV's agreements" with Mission and White Knight. *See* Compl. ¶ 145. As such, they could not set a "price floor" for Nexstar's negotiations with DIRECTV.

*Second*, Mission and White Knight began negotiating with DIRECTV in June 2022 – more than ███████████ Nexstar's retransmission consent agreement with DIRECTV was set to expire. *Id.* ¶¶ 18, 91. But, as DIRECTV observes, retransmission consent fees have increased year over year, rendering any 2022 rate demanded by Mission and White Knight outdated by ███████ ██████████████████████████████████████████████. *See id.* ¶ 22.

*Third*, as "the largest local broadcast station group in America" – larger than either Mission or White Knight by a considerable margin – Nexstar has no conceivable need for Mission or White Knight to set the floor for Nexstar's own negotiations. *See id.* ¶ 65. DIRECTV itself contends that "one of the primary factors in determining the per subscriber fees for retransmission consent agreements is the number of Big-4 station subscribers covered by the agreement." *Id.* ¶ 98. "Put simply, broadcast station groups who own a larger number of Big-4 stations serving a larger number of subscribers generally exert their leverage to obtain higher rates." *Id.* Nexstar reaches more viewers than any television company in the country, with stations in over one hundred DMAs reaching 212 million people. *Id.* ¶ 65. By comparison, Mission owns stations in 26 DMAs and

White Knight owns stations in two. *Id.* ¶¶ 70, 73. Given Nexstar's obvious, inherent leverage, it had no plausible motive or need to conspire with Mission and White Knight in violation of the law. Nexstar has more than enough bargaining power on its own, and therefore had no need to exploit the rates Mission and White Knight demanded but did not secure through some mechanism that DIRECTV never identifies or explains.

     ***No Actions Against Self-Interest.*** DIRECTV does not allege that Defendants acted against their self-interest. The crux of Defendants' alleged conspiracy is that Mission and White Knight sought increased retransmission consent fees for their stations. And, as detailed above, DIRECTV has not alleged any actions by Nexstar, much less those against its self-interest. This plus factor is thus absent from DIRECTV's Complaint.

     ***Dearth of Interfirm Communications.*** DIRECTV similarly fails to allege sufficient facts to infer a high level of interfirm communications. Allegations of interfirm communications may support an inference of conspiracy where there are alleged to be "extensive communications among high-level officials" that "represent[] a departure from the ordinary pattern of communications between defendants" or "where there is evidence that defendants exchanged confidential information or sought to conceal their communications." *Litovich*, 568 F. Supp. 3d at 433. The Court's analysis of communications "is not mechanical, and the probative value of such evidence depends on the participants, the information exchanged, and the context—specifically, the connection between the content and the [] conspiracy alleged." *Id.* at 434.

     Here, DIRECTV does not allege ***any*** direct communications between Defendants. And its suggestions of indirect communications do not indicate ***any*** coordination as to rates – only "the ordinary pattern of communications between defendants." *Id.* at 433; *cf. Citigroup, Inc.*, 709 F.3d at 139 (finding a handful of "actual communications between competitors" to be, at most,

suggestive of "a high level of interfirm *awareness*" and insufficient to constitute a plus factor (emphasis original)).

*First*, DIRECTV makes much of the fact that Defendants issued "nearly identical" press statements regarding their respective stalled negotiations in October 2022. *See* Compl. ¶¶ 106–13. In DIRECTV's view, the similarity of Defendants' statements demonstrates that "the public relations decisions about Mission's and White Knight's negotiations with DIRECTV were being orchestrated by Nexstar." *Id.* ¶ 113. But public relations decisions about the objective fact of failed negotiations are (1) not proof of any coordination as to *price* or other confidential information, and (2) unsurprising, given that Nexstar provides numerous services – including marketing services – to Mission and White Knight.[9] *See, e.g.*, Compl. ¶ 139; *cf. In re Delta/Airtran Baggage Fee Antitrust Litig.*, 245 F. Supp. 3d 1343, 1373 (N.D. Ga. 2017) (declining to consider public earnings statement a plus factor because it conveyed "precisely the type of information companies legitimately convey to their [consumers], and courts are properly reluctant to characterize them as evidence of unlawful conspiracies"); *In re Plasma-Derivative Protein Therapies Antitrust Litig.*, 764 F. Supp. 2d 991, 1001 (N.D. Ill. 2011) (finding it "difficult to imagine" how generic public statements "render the conspiracy allegation more plausible").

*Second*, DIRECTV implies that by each hiring Mr. Sahl to negotiate their RCA renewals, Mission and White Knight communicated confidential information. *See* Compl. ¶ 129. But DIRECTV proffers only conclusory allegations, without any specific factual allegation suggesting

---

[9]    DIRECTV similarly alleges that, on "one occasion," a Nexstar employee "emailed DIRECTV with a billing question" regarding DIRECTV's payments to White Knight. Compl. ¶ 144. This communication is likewise expected and unsurprising in light of the services agreements in place between the parties. And, importantly, DIRECTV does not allege that the communication was in any way related to the alleged conspiracy or agreement to extract higher fees. *See Litovich*, 568 F. Supp. 3d at 434 (plaintiff's "allegations [did] not support a plus factor of high levels of interfirm communications *relevant to the alleged boycott*" (emphasis original)).

that Mr. Sahl shared confidential information between Defendants or used one Defendant's confidential information to benefit another. And there are no allegations supporting DIRECTV's contention that Nexstar must have "orchestrated" Mr. Sahl's negotiations on behalf of Mission or White Knight. *Id.* ¶ 11. At bottom, Mr. Sahl's engagement as an independent, third-party negotiator is not a plausible factual basis for this plus factor. *See Cenedella*, 348 F. Supp. 3d at 359 (rejecting plaintiff's allegation that galleries directed museums not to purchase certain art as "a wholly conclusory allegation and not supported").

*Third*, DIRECTV again points to Mission and White Knight's shared services agreements with Nexstar. But DIRECTV concedes that these types of arrangements are "routine." *See* Compl. ¶ 55. Without more, the mere **existence** of legitimate and lawful business relationships cannot constitute a plus factor. *See Gamm v. Sanderson Farms, Inc.*, 944 F.3d 455, 466 (2d Cir. 2019) (finding "the mere opportunity to conspire" does not support an inference that "an illegal combination actually occurred"); *In re London Silver Fixing, Ltd., Antitrust Litig.*, 213 F. Supp. 3d 530, 559–60 (S.D.N.Y. 2016) (determining that, "even at the pleading stage, the structure" of the defendants' legally permitted communications "does not constitute a plus factor").

**Lack of Other Plus Factors.** DIRECTV also has not plausibly alleged other plus factors to substantiate its Section 1 claims. Throughout, DIRECTV relies on the refrain that Defendants had "ample opportunities to conspire on retransmission rate negotiations." *See, e.g.,* Compl. ¶¶ 15, 137–38, 146. But it is axiomatic that an "opportunity to collude does not translate into collusion." *In re Commodity Exch., Inc.*, 213 F. Supp. 3d 631, 661 (S.D.N.Y. 2016); *see Gamm* 944 F.3d at 466 ("[T]he law is clear that the mere opportunity to conspire does not by itself support the inference that such an illegal combination actually occurred.").

Similarly, DIRECTV's descriptions of prior government investigations are both irrelevant

and improper. None of those investigations involved allegations of an antitrust conspiracy, much less one regarding retransmission consent rates. *See* Compl. ¶¶ 148–51. And prior unrelated government investigations do not constitute a plus factor in any event. *See London Silver Fixing*, 213 F. Supp. 3d at 560; *see also Elevator Litig.*, 502 F.3d at 52 (rejecting the suggestion that "if it happened there, it could have happened here").

Because DIRECTV has wholly failed to allege either parallel conduct or plausible plus factors necessary to maintain its Section 1 claims, Counts One through Three should be dismissed.

### 2. DIRECTV Does Not Allege a Cognizable Antitrust Market.

Counts One through Three must also be dismissed for failure to allege a cognizable antitrust market. To survive a motion to dismiss, a Section 1 claim "must allege a relevant geographic and product market in which trade was unreasonably restrained or monopolized." *Arista Records LLC*, 532 F. Supp. 2d at 575; *see also Downtown Music Publ'g LLC v. Peloton Interactive, Inc.*, 436 F. Supp. 3d 754, 765 n.5 (S.D.N.Y. 2020) (noting that a relevant market definition "is an element of a per se case to describe the relevant market in which [courts] may presume the anticompetitive effect would occur" (quoting *Bogan v. Hodgkins*, 166 F.3d 509, 515 (2d Cir. 1999)).

"A relevant product market consists of products that have reasonable interchangeability for the purposes for which they are produced—price, use and qualities considered." *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002). The geographic market analysis, on the other hand, seeks to "identify the precise geographic boundaries of effective competition in order to reach a more informed conclusion on potential harm to the market." *Mathias v. Daily News, L.P.*, 152 F. Supp. 2d 465, 481 (S.D.N.Y. 2001). Courts generally measure a market's geographic scope, meaning the area of effective competition, by determining the areas in which the seller operates and where buyers can practically turn for supply of the relevant product. *Concord Assocs., L.P. v.*

*Entm't Props. Tr.*, 817 F.3d 46, 53 (2d Cir. 2016). These components must be analyzed together. Without a proper delineation of both the product and geographic markets, a Sherman Act claim fails. *Id.* ("[T]he product and geographic components illuminate the relevant market analysis, which is essential for assessing the potential harm to competition from the defendants' alleged misconduct." (quoting *Mathias v. Daily News, L.P.*, 152 F. Supp. 2d 465, 481 (S.D.N.Y. 2001)). Here, DIRECTV fails under each market analysis.

a)   **Product Market.**

The alleged product market must bear a "rational relation to the methodology courts prescribe to define a market for antitrust purposes – analysis of the interchangeability of use or the cross-elasticity of demand, and it must be plausible." *Smugglers Notch Homeowners' Ass'n v. Smugglers' Notch Mgmt. Co.*, 414 F. App'x 372, 375 (2d Cir. 2011). Where an alleged market fails to include all interchangeable substitute products, "the relevant market is legally insufficient and a motion to dismiss may be granted." *Id.*

DIRECTV contends that the relevant product market is "the market for retransmission consent of Big-4 stations," based solely on the FCC and DOJ's traditional positions that Big-4 broadcast stations are "different" from other broadcast stations and cable channels. Compl. ¶¶ 78–79. But those are merely litigation positions – not laws, regulations, or judicial precedent. And they ignore the broader market for video programming. Non-Big-4 stations, non-broadcast cable programming channels (*e.g.*, ESPN, TNT, etc.), and streaming services (*e.g.*, Netflix, HBO, etc.) all provide video programming, compete with Big-4 stations for viewers' attention, and are purchased and distributed by MVPDs. A properly defined relevant product market would thus encompass the sale of video programming rights by all video programming services distributed by MVPDs. *Cf. Smugglers Notch*, 414 F. App'x at 375 ("We are not persuaded that the alleged uniqueness of vacation properties at the Village is sufficient to establish a relevant product

market.").

DIRECTV also fails to plausibly allege that the Big-4 stations are interchangeable substitutes. *See*, *e.g.*, *In re Inclusive Access Course Materials Antitrust Litig.*, 544 F. Supp. 3d 420, 438–39 (S.D.N.Y. 2021). Rather, as detailed above, they simply are not. DIRECTV does not allege that it or other MVPDs treat Big-4 stations as substitutes for one another. Instead, MVPDs routinely seek to offer customers all four Big-4 stations in each local market because each station offers unique content. *Contrast* Compl. ¶ 80 (claiming that "MVPDs typically consider the Big-4 stations in a local area to be closer substitutes for one another"), *with id.* ¶¶ 63, 190 (alleging that the loss of rights to a single Big-4 station in a DMA caused subscribers to cancel their service, despite continued access to the other three). Because DIRECTV's alleged product market fails to comprise interchangeable substitute products, it is legally insufficient.

### b)   Geographic Market.

DIRECTV's failure to define a plausible relevant geographic market separately requires dismissal. *See Cinema Vill. Cinemart, Inc. v. Regal Entm't Grp.*, 708 F. App'x 29, 31 (2d Cir. 2017). An adequately alleged geographic market must include "the areas in which the seller operates and where consumers can turn, as a practical matter, for supply of the relevant product." *Id.* DIRECTV proposes two distinct geographic markets: (1) a "national" or "multi-state" market; and (2) "submarkets" that encompasses the local television markets in which Defendants' Big-4 stations overlap. Compl. ¶¶ 82–83. Neither is plausible.

DIRECTV fails to adequately allege the existence of a "national" market for retransmission consent rights because it fails to demonstrate that Nexstar, with stations in over 100 DMAs, actually competes with White Knight (with stations in 2 DMAs) or Mission (with stations in 26 DMAs) for retransmission consent rates within the same national or multi-state geographic market. Tellingly, DIRECTV alleges that RCAs "are not negotiated on a station-by-station basis; rather

retransmission rates are negotiated for some or all of that broadcast group's station[s] all at once." *Id.* ¶ 82. DIRECTV does not allege, however, how each Defendant's broadcast station group offering is an "interchangeable substitute[]" for the others' station groups within a national market. For example, DIRECTV does not allege that it or other MVPDs view White Knight's two Big-4 stations as interchangeable with and substitutes for Nexstar's over 100.

Moreover, the alleged "national" or "multistate" geographic market is insufficient because it does not include all interchangeable substitutes. DIRECTV does not include ***any*** other broadcasters within the "national or multistate" geographic market, despite their obvious existence. *See, e.g.*, Compl. ¶¶ 31, 70 (alleging Nexstar is the largest broadcaster in the United States, and Mission is the fourteenth largest, but omitting any reference to the twelve broadcasters in between). DIRECTV's failure to include all interchangeable substitutes is grounds for dismissal. *See Smugglers Notch*, 414 F. App'x at 375 (2d Cir. 2011).

For a similar reason, DIRECTV's alleged geographic "submarkets" – the "overlap DMAs where both Nexstar and either Mission or White Knight each own a Big-4 station" – are insufficient as well. *Id.* ¶ 85. DIRECTV alleges that retransmission consent fee negotiations occur on a national, not DMA-level or station-by-station, basis, which directly contradicts its proposed geographic submarket limited to a certain subset of DMAs. DIRECTV likewise does not explain how Defendants' Big-4 stations in overlapping DMAs are reasonably interchangeable substitutes, if fee negotiations do not even occur, and prices are not determined, at the individual DMA level. The proposed geographic markets are thus "inherently implausible." *Concord Assocs., L.P.*, 817 F.3d at 53.

### 3.  DIRECTV Does Not Allege an Unreasonable Restraint on Trade

**Under Either the *Per Se* or Rule of Reason Standards.**

Counts One through Three must also be dismissed for failure to adequately allege an unreasonable restraint on "interstate or foreign trade or commerce." *In re Med. X-Ray Film Antitrust Litig.*, 946 F. Supp. at 215. Concerted action unreasonably restrains trade if (1) "a specific intent to create an unreasonable restraint of trade is found," known as the rule of reason; or (2) "the restraint constitutes a *per se* violation of the statute." *Id.*

Under the rule of reason, "an agreement will not violate the antitrust laws unless it can be shown that it will have an adverse effect on competition in the relevant market." *Elecs. Commc'ns Corp.*, 129 F.3d at 244. Because DIRECTV does not adequately allege that Defendants are competitors in any relevant market, it cannot demonstrate that there has been any adverse effect on competition.

Nor does DIRECTV adequately allege a *per se* violation. Horizontal price fixing can be a *per se* violation of the Sherman Act only if certain elements are sufficiently alleged: "(1) the existence of an agreement, combination or conspiracy, (2) among actual competitors, (3) with the purpose or effect of raising, depressing, fixing, pegging, or stabilizing the price of a commodity, (4) in interstate or foreign commerce." *In re Med. X-Ray Film Antitrust Litig.,* 946 F. Supp. at 215–16. DIRECTV's *per se* claim (Count One) is not adequately alleged because Defendants are not "actual competitors" in the retransmission market. *See supra*, Section IV.A.2.b. As discussed above, Big-4 television stations are not interchangeable substitutes – *i.e.*, DIRECTV does not allege that it can substitute one Defendant's Big-4 station offerings for another, that the price it pays for one has an impact on the price it pays for another, or that it benefits from any alleged "competition" between the different owners of those stations (*e.g.,* that it plays them off of one another to get better terms). As such, Defendants are not "actual competitors" in the market.

4.      **DIRECTV Does Not Adequately Allege Information Exchange.**

The pleading deficiencies described above compel dismissal of all of DIRECTV's antitrust claims, including DIRECTV's information exchange claim (Count Three). *See Gelboim*, 823 F.3d at 772 (requiring antitrust plaintiffs to establish antitrust standing); *Elecs. Commc'ns Corp.*, 129 F.3d at 243 (requiring Section 1 claims to allege (1) an agreement (2) that unreasonably restrains trade); *Arista Recs.*, 532 F. Supp. 2d at 575 (requiring Section 1 claims to allege a "relevant geographic and product market"). But Count Three fails for an additional reason – it is conclusory and speculative.

A claim for unlawful information exchange must allege that "an agreement to share information has an anti-competitive effect," based on "(1) the structure of the industry and (2) the nature of the information exchanged." *In re Treasury Sec. Auction Antitrust Litig.*, 595 F. Supp. 3d 22, 49 n.24 (S.D.N.Y. 2022). As discussed above, DIRECTV's allegations regarding any purported agreement and information sharing are overwhelmingly speculative and conclusory. As to the structure of the industry and nature of the information allegedly exchanged, DIRECTV claims that the RCAs terms, including pricing terms, are routinely kept confidential, such that sharing them would have anti-competitive effects. But because White Knight and Mission do not compete in any DMA, any alleged exchange of information between the two does not implicate antitrust laws. Furthermore, DIRECTV has not alleged that Nexstar has, ███ rely on, any alleged knowledge of Mission or White Knight's rates, beyond a conclusory allegation that Defendants will share "prices each would agree to in the future." Compl. ¶ 176. Without alleging specific facts regarding what information has been exchanged, by and with whom, and how the information will be used to actually stifle competition, Plaintiff's unlawful information exchange claim fails.

**C.      DIRECTV Fails to State a Breach of Contract Claim Against Mission or White Knight (Counts Four and Five).**

"To state a claim for breach of contract under New York law, a plaintiff must allege (1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages." *Landmark Ventures, Inc. v. Wave Sys. Corp.*, 513 F. App'x 109, 111 (2d Cir. 2013). "Causation is an essential element of damages in a breach of contract action … a plaintiff must prove that a defendant's breach ***directly and proximately*** caused his or her damages." *Nat'l Mkt. Share, Inc. v. Sterling Nat. Bank*, 392 F.3d 520, 525 (2d Cir. 2004) (emphasis original). The failure to plausibly plead causation requires dismissal. *See, e.g., Variblend Dual Dispensing Sys. LLC v. Crystal Int'l (Grp.) Inc.*, 2021 WL 1198834, at \*9 (S.D.N.Y. Mar. 30, 2021) (dismissing contract claim where plaintiff "has not met his burden to allege that any breach by VariBlend directly and proximately caused [his] damages"). Where the plain terms of a contract foreclose recovery, dismissal is likewise appropriate. *See Bus. Exposure Reduction Grp. Assocs., LLC v. Pershing Square Cap. Mgmt.*, L.P., 549 F. Supp. 3d 318, 325 (S.D.N.Y. 2021) ("Where the question of liability turns on applying the unambiguous language of a contract to undisputed facts, granting a motion to dismiss is appropriate.").

Counts Four and Five allege that Mission and White Knight breached their respective RCAs. *First*, DIRECTV alleges that Mission and White Knight breached non-disparagement clauses by issuing disparaging press releases that caused DIRECTV to "los[e] subscribers." Compl. ¶¶ 188–90; 200–02. Those press releases stated, *e.g.*:

> KFXK FOX 51 has a contract with DirecTV that allows them to deliver our programming to you. That contract has expired and DirecTV has removed KFXK FOX 51 from your schedule. KFXK FOX 51 has presented a proposal for fair value compensation, based on the importance and value our programming brings our viewers. Despite our tireless efforts, DirecTV has refused our fair offer and is making negotiations very difficult. They will tell you it's for your benefit, but don't believe it. Our offer is fair. And now they hold you the subscriber hostage. It's not right.

29

*Id.* ¶ 110 (White Knight press release); *see also id.* ¶ 111 (quoting substantially similar Mission press releases). *Second*, DIRECTV alleges that Mission and White Knight breached confidentiality provisions, harming DIRECTV's "commercial interests" and placing DIRECTV "at a competitive disadvantage." *Id.* ¶¶ 191–93; 203–04. Specifically, DIRECTV alleges that Mission and White Knight shared confidential information with Nexstar, derived from each company's RCA negotiations with DIRECTV. *Id.* ¶¶ 191, 203. DIRECTV alleges that Mission further breached its confidentiality obligations by publicly disclosing that the impasse ████████████████████████ ████████████████. *Id.* ¶ 192. Neither theory adequately states a claim.

### 1. DIRECTV Fails to Adequately Allege That Mission or White Knight Breached Their Non-Disparagement Clauses.

Assuming that DIRECTV has adequately alleged its own performance under the Mission and White Knight RCAs,[10] DIRECTV's non-disparagement claim nevertheless fails because (1) neither Defendant disparaged DIRECTV; and (2) DIRECTV does not identify any damages *resulting* from the alleged disparagement or contemplated by the parties' RCAs.

In the absence of a contractual definition, "'disparage' is defined as 'to unjustly discredit or detract from the reputation of (another's property, product, or business)' and 'disparagement' is defined as 'a false and injurious statement that discredits or detracts from the reputation of another's property, product, or business.'" *Cortes v. Twenty-First Century Fox Am., Inc.*, 285 F. Supp. 3d 629, 637 (S.D.N.Y.), *aff'd*, 751 F. App'x 69 (2d Cir. 2018) (collecting cases). True and/or

---

[10] DIRECTV conclusorily alleges that it "adequately performed all of its obligations under the contract[s]." Compl. ¶¶ 186, 198. But such statements do not discharge a plaintiff's obligations to adequately plead the second element of a contract claim. *See, e.g.*, *Boustead Secs., LLC* v. *Leaping Grp. Co., Ltd.*, 2021 WL 3774116, at *3 (S.D.N.Y. Aug. 25, 2021) ("Boustead alleges that it 'performed all of its obligations pursuant to its contracts with Leaping Group and ATIF, which included but are not limited to, financial advising, underwriting services and other activities as specifically described in the parties' respective agreements.' Plaintiff's allegation is conclusory and insufficient to plead performance.").

factual statements do not "unjustly" discredit or detract from a party's reputation. *See, e.g.*, *IHS Glob. Ltd. v. Trade Data Monitor, LLC*, 2021 WL 2134909, at *13 (D.S.C. May 21, 2021) (applying New York law). Mission and White Knight's press releases were overwhelmingly factual and descriptive. *See* Compl. ¶¶ 110–11 (describing the parties' RCA, failed negotiations, and resulting impasse). To the extent DIRECTV takes issue with the statement that DIRECTV made negotiations "difficult," and that the parties' failure to reach agreement would impact the customer (*i.e.*, "hold you the subscriber hostage"), those opinions are not false. And they do not otherwise rise to the level of disparagement – unless DIRECTV believes that its own public statements about Defendants were likewise disparaging. *See* Appendix 3, DIRECTV News Tweet, ("Hey Little Rock and Pine Bluff, we know not being able to watch your favorite shows or news on your local FOX and CW stations (KLRT/KASN) is frustrating. That's why we're taking the stations' owner and Nexstar to court."; with a graphic depicting "Mission Broadcasting," "White Knight Broadcasting" and "Nexstar").[11]

In any event, however, DIRECTV's non-disparagement claims fail on their face for failure to identify cognizable or resulting damages. The fourth element of a breach of contract claim is damages resulting from the defendant's breach. *See Landmark Ventures*, 513 F. App'x at 111. "Because a plaintiff may recover only for damages that are directly and proximately caused by a defendant's breach of contract, causation is an element—and a crucial one—of the plaintiff's prima facie case." *Nat'l Mkt. Share*, 392 F.3d at 526; *accord Carco Grp., Inc. v. Maconachy*, 383

---

[11]     *See, e.g.*, *Satan Wears Suspenders, Inc. v. Jaar*, 2022 WL 2181449, at *3 n.6 (S.D.N.Y. June 16, 2022) ("Since Fed. R. Evid. 201 permits courts to take judicial notice of any fact that is not subject to reasonable dispute because it can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned, this Court takes judicial notice of this Twitter post and the reply tweets."); *Ganske v. Mensch*, 480 F. Supp. 3d 542, 545 (S.D.N.Y. 2020) (taking judicial notice of tweets that contextualized complaint's allegations on a motion to dismiss).

F. App'x 73, 75–76 (2d Cir. 2010) (vacating damages award where district court did not adequately determine breach of contract proximately caused damages, as opposed to other intervening causes); *Bernstein v. O'Reilly*, 2019 WL 10995111, at *7 (S.D.N.Y. Mar. 5, 2019) (dismissing contract claim where plaintiff did not allege "facts showing damage caused by O'Reilly's alleged breach of contract"). Moreover, to recover lost profits on a breach of contract claim, a plaintiff must establish not only that "such damages were actually caused by the breach," but also that "the particular damages were fairly within the contemplation of the parties to the contract at the time it was made." *Awards.com, LLC v. Kinko's, Inc.*, 834 N.Y.S.2d 147, 152 (N.Y. App. Div. 2007), *aff'd*, 14 N.Y.3d 791 (2010). DIRECTV's non-disparagement claims fail in both respects.

DIRECTV alleges that Mission and White Knight's "disparagement of DIRECTV has harmed DIRECTV in the form of lost subscribers." Compl. ¶¶ 190, 202. But the Complaint negates any possible inference that the alleged breaches of contract caused DIRECTV's purported damages. Not one factual allegation links DIRECTV's lost subscribers to either company's alleged disparagement. Instead, DIRECTV plainly alleges that its "subscribers have cancelled their DIRECTV subscription *as a result of the [Mission/White Knight] blackout*." *Id.* (further describing customer complaint that "the FOX broadcasting TV station has been off the air since the World Series and the NFL season" and customer complaint that if "Directv does not get my local Fox 24 channel back on the air I will … cancel my Directv package"). DIRECTV's alleged damages, in other words, stem entirely from the parties' failed negotiations – not from any supposedly disparaging statement.

Because DIRECTV alleges on its face that its claimed injuries are not "directly traceable to the [alleged] breach" and are instead "the result of other intervening causes," DIRECTV's non-disparagement theory fails to state a claim. *Nat'l Market Share*, 392 F.3d at 526; *accord EIG Credit*

*Mgmt. Co. v. CNX Res. Corp.*, 2021 WL 1226415, at *9 (S.D.N.Y. Mar. 31, 2021) (dismissing claim for damages where plaintiff could not plausibly demonstrate that "but for" alleged breach, it would not have suffered damages); *Burton v. Label, LLC*, 344 F. Supp. 3d 680, 694 n.6 (S.D.N.Y. 2018) ("Plaintiffs do not sufficiently allege contractual liability beyond the $1,200 servicing fee, as they do not plausibly allege that the additional consequential damages sought … were caused by ADP's breach."); *Petitt v. Celebrity Cruises, Inc.*, 153 F. Supp. 2d 240, 263 (S.D.N.Y. 2001) ("Even assuming that plaintiffs' breach of contract claim were … adequately alleged, the claim would still be subject to dismissal because plaintiffs have failed to establish that their damages were caused by Celebrity's breach.").

DIRECTV's non-disparagement theory fails for the additional reason that neither the Mission-DIRECTV RCA nor the White Knight-DIRECTV RCA ███████████████████ ██████ and DIRECTV does not allege otherwise. Lost customers are, stated differently, lost profits. *See Buchanan Cap. Markets, LLC v. DeLucca*, 41 N.Y.S.3d 229, 230 (N.Y. App. Div. 2016) ("Plaintiff essentially complains that it has lost customers to defendants' new firm. However, lost profits are clearly compensable with money damages."); *see also Toltec Fabrics, Inc. v. Aug. Inc.*, 29 F.3d 778, 780 (2d Cir. 1994) ("New York law permits a breach-of-warranty claimant to recover for loss of goodwill, which is sometimes referred to as loss of future profits, or loss of customers…."). Under New York law, lost profits on collateral business arrangements, like DIRECTV's collateral relationships with its subscribers, can only be recovered where "it is established that the damages were fairly within the contemplation of the parties." *Biotronik A.G. v. Conor Medsystems Ireland, Ltd.*, 22 N.Y.3d 799, 806 (N.Y. 2014).

Here, DIRECTV does not allege that lost profits were within the parties' contemplation,

and ████████████████████ confirms that they were not.[12] ████████████ Mission and

White Knight's RCAs, entitled ██████████████████ provides as follows:



Thus, the RCAs' ██████████████████████ foreclose the recovery of any damages arising

from a breach of contract, with the exception of ██████████████████████████ or

████████████████████████████ The RCAs' ██████████████████ appears in

████████, but is distinct from the ██████████████████. *See* Compl. ¶ 130 (quoting

██████████████████████), *id.* ¶ 108 (quoting ████████████████████████.

Non-disparagement, in other words, is not a "confidentiality claim[]."

    But even if it were, the RCAs' ████████████████████████ does not extend to ██

████. The RCA's ████████████████████ bars the recovery of ██████████████████

████████████████████ Accordingly, the terms of the RCAs indicate on their face

that the parties expressly considered and rejected ██████████████. When carving out an

exception for ██████████████, the RCAs specifically did not revive ██████████████████

████. Instead, the exception permits ██████████████████████████████████████

alone. Because it is axiomatic that every term in a contract "should be given effect," and that

---

12 ████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
██████████████████████████████████████████

13 ████████████████████████████████████████████████████████████████
████████████████████████████████████████

"courts may not add or excise terms," *M&C New York (Times Square), LLC v. Accor Mgmt. US Inc.*, 179 N.Y.S.3d 221, 227 (N.Y. App. Div. 2022), the RCAs foreclose DIRECTV's lost profits demand, and with it DIRECTV's non-disparagement claim, *see, e.g.*, *Carr v. Wal-Mart Stores, Inc.*, 2011 WL 939168, at *6 (W.D.N.Y. Mar. 16, 2011) ("[A]n agreement barring the recovery of lost profits is enforceable even where the obvious purpose of the contractual relationship was the creation of such profits…. Consequently, the Court finds that Plaintiff's breach of contract claim against Bimbo must be dismissed."); *Streamline Cap., L.L.C. v. Hartford Cas. Ins. Co.*, 2003 WL 22004888, at *5 (S.D.N.Y. Aug. 25, 2003) (dismissing claim for lost business opportunities where "the complaint does not even allege that the parties contemplated [such damages] at the time of contracting" and their agreement "contains a provision specifically disclaiming any [such] liability").

**2.      DIRECTV Fails to Adequately Allege That Mission or White Knight Breached Their Confidentiality Clauses.**

DIRECTV also fails to adequately allege that Mission and White Knight breached their confidentiality obligations or that DIRECTV suffered any cognizable damages as a result. Both Mission and White Knight's RCAs provide:



*See* Compl. ¶ 130 (excerpting this provision). In support of this claim, DIRECTV alleges (1) that each "provid[ed] information received from DIRECTV in confidential negotiations to Nexstar—

directly and/or through their common agent Sahl," *id*. ¶¶ 191, 203, and (2) that Mission also publicly disclosed DIRECTV's "competitively sensitive information" in a press release stating that ███████████████████████████████████████████████████, *id.* ¶ 192. As a result of these alleged disclosures, DIRECTV claims Mission and White Knight have harmed its "commercial interests and placed DIRECTV at a competitive disadvantage in the market." *Id.* ¶¶ 193, 204. These allegations likewise fail to state a viable claim.

*First*, neither alleged action describes a breach of the RCAs. To begin with, there is no factual allegation in the Complaint to support the assertion that Mission, White Knight, or their consultant provided confidential information to Nexstar. *See id*. ¶¶ 126–36 (describing RCA negotiations with Mission and White Knight and alleging simply that Mr. Sahl wore multiple hats therein). But, even if there were, the Complaint makes clear that the parties' "confidential negotiations" related to prospective ***new*** deals. *See, e.g.*, *id.* ¶ 2 ("Over the past several months, DIRECTV has attempted to negotiate retransmission renewal agreements with Defendants Mission and White Knight. To date, those negotiations have been unsuccessful…."). As noted above, the RCAs' ██████████████ provisions prohibit █████████████████████████ █████████████████████. *Id.* ¶ 130. But they do not dictate how ***future*** agreements may be negotiated, or with whom ***prospective*** contract terms may be discussed. Because prospective terms under prospective RCAs are not ████████████████████ for purposes of the existing RCAs, DIRECTV's allegations that Mission and White Knight shared "information [with Nexstar] received from DIRECTV in confidential negotiations," Compl. ¶¶ 191, 203, fail to describe a breach of the existing contracts.

DIRECTV's press release allegation fares no better. DIRECTV asserts that in October 2022, Mission disclosed "confidential information to which Mission would not otherwise have

access," when stating in a press release that ████████████████████████████████

████████████████████ Compl. ¶ 192. This allegation likewise fails to describe a breach of

confidentiality because it does not adequately allege that ***Mission's*** tally of subscribers in its own

markets constitutes data ████████████████████ from DIRECTV. *Id.* ¶ 130. Indeed,

news sources of which the Court may take judicial notice demonstrate that such subscriber counts

are widely available in the public domain. *See, e.g.*, *Mission, White Knight Broadcasting Reject*

*DirecTV Plea to Restore Channels*, FIERCE VIDEO (Oct. 28, 2022) ("There are 25 Mission stations

and two White Knight broadcasting stations that were pulled from DirecTV …. Together they

impact an estimated 1.3 million … according to Justin Nielson, principal analyst at Kagan, S&P's

media research group"); *see also Apotex Inc. v. Acorda Therapeutics, Inc.*, 823 F.3d 51, 60 (2d

Cir. 2016) ("[W]e may properly take judicial notice of this document (without converting

[plaintiff's] motion to dismiss into a motion for summary judgment) because [it] is publicly

available and its accuracy cannot reasonably be questioned.").

Because DIRECTV has not alleged that Mission or White Knight "did anything [they were]

not allowed to do under the [RCAs], it has not alleged facts sufficient to nudge its [breach of

contract] claim across the line from conceivable to plausible." *Golub Cap. LLC v. NB Alternatives*

*Advisers LLC*, 2022 WL 540653, at *13 (S.D.N.Y. Feb. 22, 2022); *accord Torres v. Walker*, 356

F.3d 238, 245 (2d Cir. 2004) ("If a contract is clear, courts must take care not to alter or go beyond

the express terms of the agreement, or to impose obligations on the parties that are not mandated

by the unambiguous terms of the agreement itself."); *Lewis v. New York Tel. Co.*, 643 F. Supp.

654, 660 (S.D.N.Y. 1984) ("There is, however, no such obligation in the July 28 agreement and

these claims must therefore be dismissed.").

*Second*, DIRECTV's confidentiality claim fails to plead actual, concrete damage. Under

New York law, damages arising from contract claims "must be not merely speculative, possible, and imaginary, but they must be reasonably certain and such only as actually follow or may follow from the breach of the contract." *Tractebel Energy Mktg, Inc. v. AEP Power Mktg, Inc.*, 487 F.3d. 89, 110 (2d Cir. 2007). "In the absence of any allegations *of fact* showing damage, mere allegations of breach of contract are not sufficient to sustain a complaint." *Lexington 360 Assocs. v. First Union Nat'l Bank of N. Carolina*, 234 A.D.2d 187, 189–90 (N.Y. App. Div. 1996); *see also Planete Bleue Television, Inc. v. A&E Television Networks, LLC*, 2018 WL 10579873, at *15 (S.D.N.Y. Sept. 19, 2018) (dismissing breach of contract claim where "Plaintiff's allegations of damage related to the omission of credits [we]re speculative and conjectural"); *Mariah Re Ltd. v. Am. Fam. Mut. Ins. Co.*, 52 F. Supp. 3d 601, 614 (S.D.N.Y. 2014), *aff'd*, 607 F. App'x 123 (2d Cir. 2015) ("[E]ven assuming Mariah alleged a breach…, dismissal would nevertheless be appropriate for failure to adequately plead damages. Mariah does not allege *facts* to show that the record-keeping error resulted in damages.").

DIRECTV alleges that Mission and White Knight's confidentiality breaches have "harmed DIRECTV's commercial interests and placed DIRECTV at a competitive disadvantage in the market." Compl. ¶¶ 193, 204. But DIRECTV offers zero facts in support of either generic claim. The vague *possibility* that alleged breaches of confidentiality – including a press release mirroring publicly available data – "harmed DIRECTV's commercial interests" is not sufficient. *See Parker Waichman LLP v. Squier, Knapp & Dunn Commc'ns, Inc.*, 138 A.D.3d 570, 570–71 (N.Y. App. Div. 2016) ("The complaint's boilerplate allegations that defendants disclosed confidential information, thereby causing harm, are too vague and conclusory to sustain a breach of contract cause of action."); *accord Khodeir v. Sayyed*, 323 F.R.D. 193, 202 (S.D.N.Y. 2017) ("Sayyed has failed to plausibly plead *how* he was damaged by plaintiffs' violation of the occupancy restriction.

38

… the defect in the pleading is not a lack of notice or of a specific amount of damages. The defect is that it does not plausibly show any damage at all that resulted from the alleged violation of the provision."); *Bear, Stearns Funding, Inc. v. Interface Grp.-Nevada, Inc.*, 2007 WL 1988150, at *21 (S.D.N.Y. July 10, 2007) ("Interface has failed to present any evidence of ***actual*** damages related to confidential information … and its counterclaim based on the confidentiality agreements must be dismissed.").

Because DIRECTV fails to allege any actual breach by Mission or White Knight and cognizable damage to DIRECTV, Counts Four and Five must be dismissed.

### D. DIRECTV Fails to State a Tortious Interference with Contract Claim Against Nexstar (Count Six).

"Under New York law, the elements of tortious interference with contract are (1) the existence of a valid contract between the plaintiff and a third party; (2) the defendant's knowledge of the contract; (3) the defendant's intentional procurement of the third party's breach of the contract without justification; (4) actual breach of the contract; and (5) damages resulting therefrom." *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 401 (2d Cir. 2006). Count Six of the Complaint fails on at least three levels.

*First*, for the reasons discussed above, DIRECTV does not adequately allege that either Mission or White Knight have breached their contracts with DIRECTV. To tortiously interfere with a contract, "it is axiomatic that there must be a breach of that contract by the other party." *Jack L. Inselman & Co. v. FNB Fin. Co.*, 364 N.E.2d 1119, 1120 (N.Y. 1977); *accord Kirch*, 449 F.3d at 401 (element four). "[W]ithout a breach, [DIRECTV] cannot prevail on the [claim] insofar as it alleges tortious interference with contractual relations." *John Hancock Life Ins. Co. v. 42 Delaware Ave. Assocs., LLC*, 15 A.D.3d 939, 940 (N.Y. App. Div. 2005).

*Second*, DIRECTV does not allege that Nexstar had actual knowledge of the Mission or

White Knight RCAs – much less the specific ███████████████████████ provisions that were allegedly breached. General awareness of a contract is not enough to satisfy the second element of a tortious interference claim. Instead, a plaintiff must allege that a defendant had actual knowledge of the contract, including the specific contract term(s) that it allegedly caused to be breached. *See, e.g.*, *Wellington Shields & Co. LLC v. Breakwater Inv. Mgmt. LLC*, 2016 WL 5414979, at *4 (S.D.N.Y. Mar. 18, 2016) ("In order to meet the second element of a tortious interference with contract claim, it is not sufficient for a plaintiff to show that a defendant has constructive knowledge of a contract; rather, there must be evidence of ***actual*** knowledge. … Accordingly, to satisfy this element, Plaintiff must show that Defendants had actual knowledge of the terms of the contract and of the contractual obligation that was allegedly breached[.]" (emphasis in original)); *Reach Music Pub., Inc. v. Warner/Chappell Music, Inc*., 2014 WL 5861984, at *10 (S.D.N.Y. Nov. 10, 2014) ("While sufficiently clear that Reach had general knowledge of the Songwriter Agreements before filing its first action on September 3, 2008, it is not clear if Reach had the necessary knowledge of the covenant not to sue contained therein. Reach must have actual knowledge of the covenant to be held liable for tortious interference."); *Medtech Prods. Inc. v. Ranir, LLC*, 596 F. Supp. 2d 778, 797 (S.D.N.Y. 2008) ("From these allegations, it cannot be said that Plaintiff is claiming that DenTek saw the governing contracts and therefore was aware of the [confidentiality] limitations they imposed . . . . Given these allegations, the Court finds inadequate the general claim of DenTek's knowledge of the contracts.").

DIRECTV does not allege that Nexstar had specific knowledge of the Mission and White Knight RCAs – apart from their existence – and certainly does not allege that Nexstar knew about those agreements' ██████████████████████ provisions. "Accordingly, [DIRECTV] has failed to sufficiently set forth facts to plausibly suggest [Nexstar] knew of the contractual

provisions that [it] purportedly caused [Mission and White Knight] to breach." *See N. Shipping Funds I, L.L.C. v. Icon Cap. Corp.*, 2013 WL 1500333, at *4 (S.D.N.Y. Apr. 12, 2013) (dismissing tortious interference claim predicated on alleged breach of confidentiality and non-disparagement provisions; "Since Icon's tortious interference with contract claim is predicated on Boa's alleged breach of the confidentiality and nondisparagement covenants of the Settlement Agreement rather than breach of the entire Settlement Agreement, Icon must allege that Northern and the third-party defendants had knowledge of these specific covenants, not just knowledge of the Settlement Agreement in general. Icon has made no such allegation.").

*Third*, as also discussed above, DIRECTV does not allege facts describing *any* damages resulting from alleged breaches of the Mission and White Knight RCAs. Instead, DIRECTV only generally describes injuries stemming from lost subscribers, not damages from alleged breaches of ██████████████████. *See* Compl. ¶ 213 (alleging same "competitive disadvantage" and "lost subscribers" damages discussed above); *but see Kirch*, 449 F.3d at 401 (identifying "damages *resulting*" from the procurement of a breach as the fifth element of a tortious interference claim).

### E.   DIRECTV Fails to State Tortious Interference with Prospective Economic Advantage Claims Against Any Defendant (Counts Seven Through Nine).

Counts Seven through Nine, which allege that each Defendant tortiously interfered with DIRECTV's prospective economic advantage, must also be dismissed because they are duplicative and, in any event, fail to state a claim.

Count Seven alleges that Nexstar intentionally interfered with DIRECTV's future relations with White Knight, Mission, and DIRECTV's subscribers by "coordinating with White Knight and Mission on what retransmission consent rates to charge DIRECTV and unlawfully sharing information related to those negotiations[.]" Compl. ¶ 216. Counts Eight and Nine allege that

Mission and White Knight interfered with DIRECTV's future relations with subscribers by "(1) entering into an unlawful conspiracy to raise retransmission consent rates and sharing commercially sensitive information with [their] competitor, Nexstar, and (2) publishing misleading and disparaging information about [their] negotiations with DIRECTV." *Id.* ¶¶ 220, 224.

### 1.   DIRECTV's Tortious Interference with Prospective Economic Advantage Claims are Duplicative.

"Under New York law, claims are duplicative [and are properly dismissed as such] when both arise from the same facts and seek the identical damages for each alleged breach." *Deutsche Bank Nat. Tr. Co. v. Quicken Loans Inc.*, 810 F.3d 861, 869 (2d Cir. 2015); *accord Amcan Holdings, Inc. v. Canadian Imperial Bank of Com.*, 70 A.D.3d 423, 426 (N.Y. App. Div. 2010). Common law claims are duplicative of statutory claims "where the claims will rise and fall together." *POSCO Energy Co. v. FuelCell Energy, Inc.*, 560 F. Supp. 3d 747, 760 (S.D.N.Y. 2021). And a tortious interference claim is duplicative of a breach of contract claim where it is asserted "against the same party that has allegedly breached its contract, and where the plaintiff's tort allegations are based on the same conduct as that which gave rise to the alleged contract breach." *Lavazza Premium Coffees Corp. v. Prime Line Distribs. Inc.*, 575 F. Supp. 3d 445, 471 (S.D.N.Y. 2021). Both sets of circumstances are present here.

*First*, DIRECTV's tortious interference claims are duplicative of its antitrust claims. Counts Seven through Nine allege that Defendants each tortiously interfered with DIRECTV's prospective relations by "entering into an unlawful conspiracy to raise retransmission rates and sharing commercially sensitive information[.]" Compl. ¶ 220; *id.* ¶ 224; *id.* ¶ 216 (similarly alleging Nexstar "coordinat[ed] with White Knight and Mission on what retransmission consent rates to charge DIRECTV and unlawfully shar[ed] information related to those negotiations").

These are the same allegations underlying DIRECTV's antitrust claims. *See id.* ¶ 153 (Count One) ("Defendants entered into a conspiracy … to coordinate on, and raise, retransmission consent fees"); *id.* ¶ 160 (Count Two) ("Defendants entered into a conspiracy … to coordinate on, and raise, retransmission consent fees"); *id.* ¶ 173 (Count Three) ("Defendants shared commercially sensitive information related to each Defendant's retransmission consent negotiations with one another").

Because the conspiracy and information sharing components of DIRECTV's tortious interference claims are simply its antitrust claims repackaged, those theories of recovery are duplicative and should be dismissed. *See, e.g.*, *In re Novartis & Par Antitrust Litig.*, 2019 WL 3841711, at *7 (S.D.N.Y. Aug. 15, 2019) (dismissing unjust enrichment claims that "will rise and fall with [plaintiff's] statutory claims" as duplicative); *Ethelberth v. Choice Sec. Co.*, 91 F. Supp. 3d 339, 362 (E.D.N.Y. 2015) (dismissing common law claims as duplicative of statutory claim where the "claims are premised on the same facts").

*Second*, DIRECTV's tortious interference claims against Mission and White Knight are also duplicative of its breach of contract claims. DIRECTV alleges that Mission and White Knight further interfered with DIRECTV's prospective relations with subscribers by "publishing misleading and disparaging information about [their] negotiations with DIRECTV." Compl. ¶¶ 220, 224. But that is identical to the conduct underlying DIRECTV's non-disparagement claims. *See id.* ¶ 188 ("Mission breached the non-disparagement clauses of its contract with DIRECTV by disparaging DIRECTV in public messaging and statements"), *id.* ¶ 200 ("White Knight breached the non-disparagement clause of its contract with DIRECTV by disparaging DIRECTV in public statements"). Indeed, the damages DIRECTV claims in each context are exactly the same. *Compare id.* ¶¶ 221, 225 (Counts Eight and Nine) ("As a direct and proximate result of

[Mission's/White Knight's] conduct, DIRECTV's relations with its subscribers have been harmed. DIRECTV estimates that ███████ subscribers have cancelled their DIRECTV subscriptions as a result of [Mission's/White Knight's] unlawful conduct."), *with id.* ¶¶ 190, 202 (Counts Four and Five) ("[Mission's/White Knight's] disparagement of DIRECTV has harmed DIRECTV in the form of lost subscribers. … DIRECTV estimates that ███████ subscribers have cancelled their DIRECTV subscription as a result of the [Mission/White Knight] blackout.").

Because the disparagement components of DIRECTV's tortious interference claims rest on the same alleged facts, and assert the same injuries, as DIRECTV's disparagement claims, they are duplicative of those claims and should be dismissed. *See POSCO Energy*, 560 F. Supp. 3d at 760 ("Here, the tortious interference claim arises from the same facts and seeks the identical damages for the alleged breach of the [agreements] and violations of Delaware statutory law. As such, it must be dismissed as duplicative." (collecting cases)); *accord Oliver Wyman, Inc. v. Eielson*, 2016 WL 5339549, at *11 (S.D.N.Y. Sept. 22, 2016) ("[B]ecause Plaintiff's cause of action for tortious interference with prospective business advantage … is premised on the very same allegations that form the breach of contract claims, it also must fail." (collecting cases)); *Anexia, Inc. v. Horizon Data Sols. Ctr., LLC*, 165 N.Y.S.3d 831, at *3 (N.Y. Sup. Ct. 2022) ("When a tortious interference claim is grounded in the same conduct as a breach of contract claim, the tortious interference claim should be dismissed as duplicative of the contract based claims.").

### 2.   DIRECTV Fails To Adequately Allege Tortious Interference With Prospective Economic Advantage.

In any event, Counts Seven through Nine must also be dismissed because they fail to state a claim. "Under New York law, to state a claim for tortious interference with prospective economic advantage, the plaintiff must allege that (1) it had a business relationship with a third party; (2) the defendant knew of that relationship and intentionally interfered with it; (3) the defendant acted

44

solely out of malice, or used dishonest, unfair, or improper means; and (4) the defendant's interference caused injury to the relationship." *Kirch*, 449 F.3d at 400. DIRECTV's tortious interference claims fail to adequately allege elements one, two, and three.

*First*, "to state a cause of action to recover for tortious interference with prospective economic advantage, the plaintiff must allege a ***specific*** business relationship with an ***identified*** third party with which the defendants interfered." *Mehrhof v. Monroe-Woodbury Cent. Sch. Dist.*, 168 A.D.3d 713, 714 (N.Y. App. Div. 2019). A "general allegation of interference with customers without any sufficiently particular allegation of interference with a ***specific contract or business relationship*** will not withstand a motion to dismiss." *Plasticware, LLC v. Flint Hills Res., LP*, 852 F. Supp. 2d 398, 403 (S.D.N.Y. 2012) (emphasis in original)).

DIRECTV has not identified any specific relationship that Mission or White Knight allegedly interfered with. Instead, DIRECTV alleges they harmed its relations with unnamed "subscribers." *See, e.g.*, Compl. ¶¶ 218, 222 ("DIRECTV has relationships with its millions of subscribers"); *id.* ¶¶ 220, 224 ("[Mission/White Knight] intentionally interfered with DIRECTV's prospective relations with numerous of its subscribers"), *id.* ¶¶ 221, 225 ("DIRECTV's relations with its subscribers have been harmed"); *see also id.* ¶ 216 ("Nexstar intentionally interfered with DIRECTV's … future relations with its subscribers"). A generalized reference to DIRECTV's customer base is insufficient to state a claim. *See Camelot SI, LLC v. ThreeSixty Brands Grp. LLC*, 2022 WL 4628757, at *9 (S.D.N.Y. Sept. 30, 2022) (dismissing tortious interference claim where plaintiff "fail[ed] to identify any concrete relationship with a particular consumer" and referred instead to its "hundreds of customers"); *Plasticware*, 852 F. Supp. 2d at 403 (dismissing tortious interference claim where plaintiff alleged interference with "existing customers" in lieu of "***specific*** business relationships" (emphasis in original)); *accord Mumin v. Uber Techs., Inc.*, 239

F. Supp. 3d 507, 535 (E.D.N.Y. 2017) (dismissing tortious interference claim that failed to identify "any *specific* business relationship with which Uber allegedly interfered, other than the generic reference to riders or customers" (emphasis in original)).

*Second*, the antitrust component of DIRECTV's tortious interference claims fails to allege that Defendants intentionally interfered with any subscriber relationship. "[C]onduct constituting tortious interference with business relations is, by definition, conduct directed not at the plaintiff itself, but at the party with which the plaintiff has or seeks to have a relationship." *Carvel Corp. v. Noonan*, 3 N.Y.3d 182, 192 (2004). Accordingly, "[t]he defendant's interference must be direct: the defendant must direct some activities *towards the third party* and convince the third party not to enter into a business relationship with the plaintiff." *B & M Linen, Corp. v. Kannegiesser, USA, Corp.*, 679 F. Supp. 2d 474, 485 (S.D.N.Y. 2010).

DIRECTV alleges that Defendants tortiously interfered with its prospective relations with subscribers by "entering into an unlawful conspiracy to raise retransmission rates and sharing commercially sensitive information." Compl. ¶¶ 220, 224; *see also id.* ¶ 216. But an alleged price-fixing conspiracy has nothing to do with DIRECTV's subscribers, and is thus insufficient to satisfy the second element of DIRECTV's tortious interference claim. *See G.K.A. Beverage Corp. v. Honickman*, 55 F.3d 762, 768 (2d Cir. 1995) (dismissing tortious interference with prospective business relations claim premised on alleged Sherman Act violation; "[A]ppellees' alleged goal was to obtain a monopoly in bottling, and the [plaintiff's]' relationship with their retail customers is irrelevant to that goal…. It is axiomatic that, in order to prevail on this claim, the distributors would have to show that the appellees intentionally caused the retailers not to enter into a contractual relation with them.").

*Finally*, DIRECTV's tortious interference claims fail to adequately allege that any Defendant's alleged interference was "dishonest, unfair, or improper." *Kirch*, 449 F.3d at 400. "The third element [of a tortious interference claim] represents a particularly high hurdle, for it requires a plaintiff to show that the defendant committed a crime or an independent tort such as fraud, or acted for the sole purpose of inflicting intentional harm on the plaintiff." *Enzo Biochem, Inc. v. Molecular Probes, Inc*., 2013 WL 6987615, at *3 (S.D.N.Y. Dec. 6, 2013); *see also Wellington Shields & Co. LLC*, 2016 WL 5414979 at *7 ("With respect to wrongful means, New York law interprets that term narrowly to include physical violence, fraud, misrepresentation, civil suits, criminal prosecutions and some degree of economic pressure.").

Here, DIRECTV alleges that Mission and White Knight further tortiously interfered with its relationships with subscribers by publishing supposedly "misleading and disparaging information." *See* Compl. ¶¶ 220; 224. DIRECTV does not allege – because it cannot – that Mission or White Knight's press releases were defamatory, *i.e.*, independently tortious. Instead, DIRECTV alleges they constituted breaches of ███████████ clauses in the parties' RCAs. That is not enough to satisfy the "wrongful means" element of a tortious interference claim. *See, e.g.*, *Enzo Biochem, Inc. v. Amersham PLC*, 981 F. Supp. 2d 217, 225 (S.D.N.Y. 2013) ("[T]he record must reflect something more than mere contract breach in order to support a claim for tortious interference."); *see also Carvel*, 3 N.Y.3d at 193 (affirming dismissal of tortious interference claim where, *inter alia*, plaintiff's allegations sounded in contract and not tort; "The intervention of tort law to regulate when a franchisor may or may not compete with its franchisees is neither necessary nor useful.").

As such, DIRECTV's tortious interference with prospective economic advantage claims must be dismissed.

## **CONCLUSION**

For the foregoing reasons, DIRECTV's Complaint should be dismissed with prejudice.

Respectfully submitted,

Date: Dallas, Texas
June 26, 2023

LYNN PINKER HURST & SCHWEGMANN

By: s/ _____

Chris Schwegmann

Chris Schwegmann
LYNN PINKER HURST &
SCHWEGMANN LLP
2100 Ross Avenue Suite 2700
Dallas, Texas 75201
Tel: (214) 981-3835
cjs@lynnllp.com

David W. Haller
COVINGTON & BURLING LLP
620 Eighth Avenue
New York, New York 10018-1405
Tel: (212) 841-1000
dhaller@cov.com

*Attorneys for Nexstar Media Group, Inc.*

s/ Kan M. Nawaday[*]

Kan M. Nawaday
Anna G. Dimon
151 West 42nd Street, 49th Floor
New York, New York 10036
KMNawaday@Venable.com
AGDimon@Venable.com
Tel.: (212) 307-5500
Fax: (212) 307-5598

Craig A. Gilley (admitted *pro hac vice*)
600 Massachusetts Avenue, NW
Washington, D.C. 20001
Tel: (202) 344-4000
Fax: (202) 344-8300
CAGilley@Venable.com

---

[*] Signature used pursuant to SDNY ECF Rule 8.5(b).

49

Elizabeth C. Rinehart (admitted *pro hac vice*)
750 E. Pratt Street, Suite 900
Baltimore, Maryland 21202
Tel.: (410) 528-4646
Fax: (410) 244-7742
ECRinehart@Venable.com

*Attorneys for White Knight Broadcasting, Inc.*

s/ Stephen J. Obermeier[*]

Stephen J. Obermeier (admitted *pro hac vice*)
WILEY REIN LLP
2050 M St NW
Washington, DC 20036
Tel: 202.719.7000
SObermeier@wiley.law

*Attorneys for Mission Broadcasting, Inc.*

To:

Glen G. McGorty
Olivier N. Antoine
Jared Levine
CROWELL & MORING LLP
590 Madison Ave., 20th Floor
New York, New York 10022
(212) 223-4000
gmcgorty@crowell.com
oantoine@crowell.com
jalevine@crowell.com

Jason C. Murray
Jordan L. Ludwig
CROWELL & MORING LLP
515 South Flower Street, 40th Floor
Los Angeles, CA 90071
(213) 622-4750
jmurray@crowell.com
jludwig@crowell.com

*Attorneys for DIRECTV, LLC.*