UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
                                          :

DIRECTV, LLC,                               :
                                          :
                      *Plaintiff*,         :
                                          :         23-cv-2221 (PKC)
               *-against-*          :
                                          :
NEXSTAR MEDIA GROUP, INC.,     :         <u>OPINION AND ORDER</u>
MISSION BROADCASTING, INC. and   :
WHITE KNIGHT BROADCASTING, INC., :
                                          :
                      *Defendants*.   :
-----------------------------------------------------------X

CASTEL, Senior District Judge.

        Plaintiff DIRECTV, LLC ("DIRECTV") describes itself as the country's leading satellite television provider.  Defendants, Nexstar Media Group Inc. ("Nexstar"), Mission Broadcasting, Inc. ("Mission"), and White Knight Broadcasting, Inc. ("White Knight") (collectively "Defendants"), are a group of broadcasters that own popular television networks in various local markets.  A retransmission agreement or "RCA" permits a television provider such as DIRECTV to retransmit programming content furnished by broadcasters in exchange for a fee. In 2022, DIRECTV did not renew its RCA with Mission and White Knight because it considered the prices demanded to be unreasonable.  With no RCA in place, there were content "blackouts" for nearly 1 million DIRECTV subscribers and a loss of thousands of customers who terminated their subscriptions with DIRECTTV.  DIRECTV claims that all three Defendants conspired to fix prices for RCAs and it suffered losses as a result.

        DIRECTV now brings this action for violations of the federal antitrust laws, and for related contract and tort claims arising under New York law.  Presently before the Court is

Defendants' motion to dismiss the Complaint pursuant to Rule 12(b)(1) and 12(b)(6), Fed. R. Civ. P.  ECF 52.

For the reasons that follow, the Court concludes that the Complaint adequately alleges DIRECTV's Article III standing but does not plausibly allege standing under the antitrust laws.  Specifically, DIRECTV did not enter into an RCA with Mission or White Knight which would have required it to pay what it alleges to be "supracompetitive" fees.  Compl. ¶ 2, ECF 1. Because the RCAs were not renewed, DIRECTV customers experienced "blackouts" that caused them to cancel or not renew their services causing DIRECTV to suffer a profit loss.  DIRECTV cannot allege that the injury is of the type the antitrust laws were intended to prevent and that it flows from the anticompetitive nature of Defendants' conduct.  Also, on the facts alleged, the Court concludes that DIRECTV lacks antitrust standing because it would not be an efficient enforcer of the antitrust laws.  The Court declines to exercise supplemental jurisdiction over Plaintiff's remaining state law claims and dismisses them without prejudice.

BACKGROUND

The following facts are drawn from Plaintiff's Complaint and are taken as true for the purpose of resolving the instant motions.  *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011).

I.   The Parties

Nexstar, White Knight, and Mission are broadcasters that own local affiliates of popular television networks in various local markets, called "designated market areas" ("DMAs"). Compl. ¶¶ 31–33.  Defendants each own stations affiliated with "Big-4" networks—ABC, CBS, NBC, and Fox—that acquire rights to national programming (like sports) and create content of their own (like local news).  *Id.* ¶ 37.  Big-4 stations are typically the highest ranked in terms of

audience share and ratings in each DMA, primarily due to their combination of high-value content such as sports, primetime shows, local news, and events such as The Oscars. *Id.* ¶ 80.

Plaintiff DIRECTV is a multichannel video programming distributor ("MVPD") that provides its customers with satellite and streaming access to popular broadcast television programming. *Id.* ¶ 3.  MVPDs regularly contract with broadcast groups, such as Defendants, to negotiate "retransmission consent agreements," which allow MVPDs to pay a fee to transmit broadcast content from Big-4 stations to MVPD subscribers. *Id.* ¶¶ 4, 39.  If an RCA between an MVPD and a broadcast group expires without renewal, the MVPD loses retransmission rights, and the broadcast content is "blacked out" for the MVPD's subscribers until a new agreement is reached. *Id.* ¶ 62.

To promote competition among broadcasters, federal regulations generally prohibit a single broadcast station group from owning, operating, or controlling more than one Big-4 station within the same DMA (known as the "Duopoly Rule"). *Id.* ¶ 5.  If a broadcast group seeks to acquire a second Big-4 affiliate within a single DMA, it generally must divest one of its Big-4 stations to another broadcaster. *Id.*  Federal law permits the divested and divesting stations to enter "sharing arrangements," where one station can provide services to the other, such as common facilities or technical services, but the stations are barred from coordinating on matters such as RCA negotiations. *Id.*  Divested stations relying on services from divesting stations are known as "sidecars," as they must rely on the larger group for many aspects of their operations. *Id.* ¶ 6.

In recent years, Nexstar has acquired many broadcast groups and is now the largest U.S. broadcaster, with 200 owned or operated stations in 116 markets reaching 212 million people. *Id.* ¶ 65.  When Nexstar acquires a broadcast group which owns stations that overlap with its existing portfolio, it divests a Big-4 station to its sidecars to comply with the Duopoly Rule. *Id.*

¶¶ 67–74.  White Knight and Mission are two such sidecars of Nexstar.  *Id.* ¶ 66.  Today, Mission owns Big-4 stations in 23 DMAs, while White Knight owns stations in two DMAs; in each of these markets, Nexstar maintains a competing Big-4 station.  *Id.* ¶¶ 71, 73.

## II. DIRECTV's RCA Renewal Negotiations with Mission and White Knight

In June 2022, DIRECTV began negotiating the renewal of its RCAs with Mission and White Knight, each of which was set to expire in August 2022 (later extended to October).  *Id.* ¶¶ 90–91, 95.  Despite federal regulations prohibiting Nexstar from coordinating with its sidecars in the RCA negotiations, DIRECTV alleges that Mission and White Knight have entered into an agreement "with Nexstar to raise prices and extract supracompetitive retransmission consent fees from DIRECTV in 'overlap' DMAs—those markets where both Nexstar and either Mission or White Knight each own a Big-4 station."  *Id.* ¶ 9.  For example, DIRECTV claims that Nexstar "orchestrated a common third party," consultant Eric Sahl, to be the common negotiator for the sidecars.  *Id.* ¶ 11.  They claim that Sahl failed to conduct independent negotiations for each of the companies, and instead coordinated terms in order to serve Nexstar's interests.  *See id.* ¶¶ 17–19.  Moreover, they claim that Sahl demanded fees that were "radically disproportionate to the number of stations" Mission and White Knight owned, and which were "intentionally calculated to prevent the parties from reaching an agreement."  *Id.* ¶¶ 97, 99.  Finally, DIRECTV points to "nearly identical press releases" issued by Nexstar, Mission, and White Knight concerning their respective blackouts as evidence of collusion.  *Id.* ¶ 106.

DIRECTV avers that Nexstar had two goals in conspiring with Mission and White Knight to fix prices.  First, it claims that Nexstar would benefit directly from Mission and White

Knight's increased prices.[1]  *Id.* ¶ 18.  Second, and more importantly, DIRECTV claims that its contract with Nexstar was set to expire in July 2023, and that its contract renewal with Nexstar represented "DIRECTV's largest single retransmission consent agreement in terms of total dollars paid to a broadcast station group."  *Id.*  With an eye towards these "enormous" negotiations, DIRECTV claims Nexstar wanted to ensure that its sidecars had set a "sufficiently high price floor in their negotiations so Nexstar can enter its own negotiations with DIRECTV with confidence that it can attain a similarly supracompetitive rate."  *Id.* ¶¶ 18–19.

Deprived of a competitive process, DIRECTV claims that it was "forced to either accept higher prices or lose access to Mission's and White Knight's networks."  *Id.* ¶ 156. "Choosing the lesser of two evils," *id.*, DIRECTV refused Defendants' supracompetitive demands, resulting in blackouts for nearly 1 million DIRECTV subscribers.  *Id.* ¶ 2.  DIRECTV claims that some 13,000 subscribers have cancelled their subscriptions with DIRECTV due to the blackouts, resulting in substantial lost profits.  *Id.* ¶¶ 190, 202.

On March 15, 2023, DIRECTV sued Mission, White Knight, and Nexstar for their purportedly collusive activity and for related contract and tort claims arising under New York law. Counts One through Three assert Section 1 antitrust claims pursuant to 15 U.S.C. § 1 against all Defendants for: (1) *per se* price fixing; (2) a price-fixing conspiracy under the rule of reason; and (3) unlawful information exchange.  *Id.* ¶¶ 152–82.  Counts Four and Five bring breach of contract claims against Mission and White Knight for allegedly violating the confidentiality provisions of their RCAs with DIRECTV.  *Id.* ¶¶ 183–205.  Count Six asserts a tortious interference with contracts claim against Nexstar for allegedly inducing the aforementioned breaches.  *Id.* ¶¶ 206–

---

[1] DIRECTV claims that increasing prices would benefit Nexstar because Mission and White Knight have entered "service agreements" with Nexstar which allow Nexstar to receive "substantially all of their profits."  Compl. ¶¶ 75–77.

13.   Counts Seven, Eight, and Nine assert claims for tortious interference with prospective economic advantage against all Defendants for their allegedly collusive behavior and for interfering with DIRECTV's relationship with its subscribers. *Id.* ¶¶ 214–25.  On June 26, 2023, Defendants moved to dismiss the Complaint pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.

DISCUSSION

I.   Legal Standard Under Rule 12(b)(1) and 12(b)(6)

"A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000).  "When the Rule 12(b)(1) motion is facial, i.e., based solely on the allegations of the complaint or the complaint and exhibits attached to it (collectively the 'Pleading'), the plaintiff has no evidentiary burden.  The task of the district court is to determine whether the Pleading 'alleges facts that affirmatively and plausibly suggest that the plaintiff has standing to sue.'"  *Carter v. HealthPort Tech., LLC*, 822 F.3d 47, 56 (2d Cir. 2016) (quoting *Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 145 (2d Cir. 2011) (brackets omitted)).  When deciding a motion to dismiss under Rule 12(b)(1) at the pleadings stage, the court "must accept as true all material factual allegations of the complaint and draw all reasonable inferences in favor of the plaintiff."  *Id.* at 56–57 (cleaned up).  "Where, as here, the defendant moves for dismissal under Rule 12(b)(1), as well as on other grounds, the court should consider the Rule 12(b)(1) challenge first since if it must dismiss the complaint for lack of subject matter jurisdiction, the accompanying defenses and objections become moot and do not need to be determined."  *Rhulen Agency, Inc. v. Alabama Ins. Guar. Ass'n*, 896 F.2d 674, 678 (2d Cir. 1990) (internal citations and quotations omitted).

To defeat a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a complaint must allege sufficient facts to state a plausible claim for relief.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678.  While the court must accept all well-pleaded factual allegations as true and draw all reasonable inferences in the plaintiff's favor, the court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Id.*  Thus, a pleading that offers only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  The task "is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *Lopez v. Jet Blue Airways*, 662 F.3d 593, 596 (2d Cir. 2011).

II.  <u>Article III Standing</u>

The Court begins with Defendants' argument that DIRECTV lacks Article III standing.  To establish constitutional standing, "a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021).

Defendants argue that DIRECTV has failed to establish the second and third factors—traceability and redressability—of constitutional standing.  Defs.' Mem. Law Supp. Mot. Dismiss Compl. ("Defs.' Mem.") 8, ECF 53.[2]  Defendants emphasize that they "retain[] the discretion to contract with DIRECTV or not." *Id.*  Accordingly, even in the absence of their purportedly anticompetitive activity, "the parties might or might not come to an agreement on a

---

[2] A redacted version of Defendants' brief is located at ECF 54.

myriad of contractual terms." *Id.* Thus, Defendants urge, an injunction preventing Defendants' collusion would fail to redress Plaintiff's injury—lost profits stemming from blackouts—because Defendants would remain free to blackout their content on DIRECTV for other reasons. *Id.* Similarly, Defendants argue that because Plaintiff cannot show that Mission and White Knight would have reached an agreement with DIRECTV—a decision entirely within Defendants' discretion—Plaintiff cannot show that any alleged unlawful conduct caused their injury, therefore failing the traceability requirement of Article III. *Id.* at 8–9.

Defendants' redressability argument fails. A plaintiff "satisfies the redressability requirement when he shows that a favorable decision will relieve a discrete injury to himself. He need not show that a favorable decision will relieve his *every* injury." *Chevron Corp. v. Donziger*, 833 F.3d 74, 121 (2d Cir. 2016). Here, DIRECTV seeks lost profits from the subscribers it lost during the blackouts. Those lost profits would provide Plaintiff "some measure of relief" which is sufficient to establish redressability. *Connecticut v. Am. Elec. Power Co.*, 582 F.3d 309, 348 (2d Cir. 2009), *rev'd on other grounds*, 564 U.S. 410 (2011).

Defendants' argument regarding traceability fails for similar reasons. The Court agrees with Defendants that DIRECTV relies on a somewhat speculative chain of causation, i.e., that but for the collusive activity, the parties would have reached an agreement, and that but for the blackout, customers would not have left DIRECTV. While these factors play a significant role in the Court's conclusion that DIRECTV lacks standing under the antitrust laws, they do not deprive it of Article III standing. As phrased by Judge Kaplan, to establish constitutional standing, a plaintiff need not allege that its injury is "*plausibly* fairly traceable, but, rather, [that] the injury is *possibly* fairly traceable." *Dennis v. JPMorgan Chase & Co.*, 343 F. Supp. 3d 122, 156 (S.D.N.Y. 2018); *see also Harry v. Total Gas & Power N. Am., Inc.*, 889 F.3d 104, 110 (2d Cir.

2018) ("It is well established in principle that the pleading standard for constitutional standing is lower than the standard for a substantive cause of action.").  Plaintiff has sufficiently alleged that the parties would have reached an agreement but for Defendants' challenged conduct.

### III. Antitrust Standing

Having determined that Plaintiff has Article III standing to maintain its suit, the Court next turns to Defendants' argument that DIRECTV lacks antitrust standing.

"Section 4 of the Clayton Act establishes a private right of action for violations of the federal antitrust laws, and entitles 'any person who is injured in his business or property by reason of anything forbidden in the antitrust laws' to treble damages for those injuries." *Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.*, 711 F.3d 68, 75 (2d Cir. 2013) (quoting 15 U.S.C. § 15). Although the statute speaks of "any person," the Supreme Court has limited this grant of authority, clarifying that "Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation." *Associated General Contractors of Cal., Inc. v. California State Council of Carpenters*, 459 U.S. 519, 534 (1983). "[A]ntitrust standing is a threshold, pleading-stage inquiry and when a complaint by its terms fails to establish this requirement we must dismiss it as a matter of law." *Gatt*, 711 F.3d at 75 (quotation marks omitted).  In the Second Circuit, this requires a plaintiff to plead "two things: (1) 'that it suffered a special kind of antitrust injury,' and (2) 'that it is a suitable plaintiff to pursue the alleged antitrust violations and thus is an efficient enforcer of the antitrust laws.'" *IQ Dental Supply, Inc. v. Henry Schein, Inc.*, 924 F.3d 57, 62 (2d Cir. 2019) (internal quotation marks omitted) (quoting *Gatt*, 711 F.3d at 76).

A.    <u>Antitrust Injury</u>

The requirement that a plaintiff demonstrate antitrust injury "ensures that the harm claimed by the plaintiff corresponds to the rationale for finding a violation of the antitrust laws in the first place." *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 342 (1990).  Identification of an antitrust injury "involves a 'three-step process' in which, first the plaintiff must 'identify the practice complained of and the reasons such a practice is or might be anticompetitive'; then the court must 'identify the actual injury the plaintiff alleges' by 'look[ing] to the ways in which the plaintiff claims it is in a worse position as a consequence of defendant's conduct'; and finally, the court must 'compare the anticompetitive effect of the specific practice at issue to the actual injury the plaintiff alleges.'"  *Harry*, 889 F.3d at 115 (quoting *Gatt*, 711 F.3d at 76)

DIRECTV readily satisfies the first two factors.  Plaintiff alleges that Defendants have engaged in a horizontal price-fixing conspiracy, which is a *per se* antitrust violation. *Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643, 647 (1980) ("It has long been settled that an agreement to fix prices is unlawful *per se*.").  Plaintiff likewise identifies its actual injury: lost profits stemming from content blackouts.  *See* Compl. ¶ 158.

The critical issue regards step three: the comparison of the anticompetitive effect of the practice to the injury alleged by the plaintiff.  *Harry*, 889 F.3d at 115.  This comparison requires more than demonstrating a causal link between the actual injury and asserted violation. *See Gatt*, 711 F.3d at 76.  Instead, the plaintiff must demonstrate that its injury is "of the type the antitrust laws were intended to prevent and that flows from that which makes or might make defendants' acts unlawful." *Id.* (brackets omitted).  The antitrust harm that flows from horizontal price fixing is the payment of supracompetitive prices.  *See Yong Ki Hong v. KBS Am., Inc.*, 951 F. Supp. 2d 402, 418 (E.D.N.Y. 2013) ("[H]orizontal price-fixing schemes are illegal under the

antitrust laws 'only because of the harm they may cause—increased prices—to *purchasers*' of the product for which prices have been fixed." (brackets omitted) (quoting *Gatt*, 711 F.3d at 77)).

Here, Plaintiff's injury—lost profits resulting from the blackouts—does not flow from that which makes Defendants' acts unlawful because DIRECTV does not allege that it paid anticompetitive rates but instead made the unilateral decision to abandon RCA negotiations.  Its losses therefore flow from its own choice to exit the market.  While this choice may have been influenced by Defendants' demands, it does not result from Defendants' claimed unlawful acts, i.e., the extraction of supracompetitive prices.  *See Port Dock & Stone Corp. v. Oldcastle Ne., Inc.*, 507 F.3d 117, 123–24 (2d Cir. 2007) ("Dealers in this situation lack standing because their particular injury was not caused by an exercise of the defendant's newly acquired power to raise prices. . . .  Those who would suffer from the defendant's exercise of monopoly power would be the dealers or consumers who were forced to buy at higher prices . . . ." (citation omitted)); *Gatt*, 711 F.3d at 77 ("[Plaintiff]'s lost revenue resulting from the [contract] termination, however, is not an injury that flows from that which makes bid-rigging unlawful.  [Plaintiff] has not been forced to pay higher prices for a product, as customers who are victimized by price-fixing schemes might.").

Relying on *DNAML Pty, Ltd. v. Apple Inc.*, 25 F. Supp. 3d 422 (S.D.N.Y. 2014), Plaintiff argues that its lost profits can establish antitrust injury regardless of whether it actually paid anticompetitive rates.  But *DNAML* is readily distinguishable.  In *DNAML*, manufacturers conspired to fix prices in order to drive a competing discount reseller from the market.  *See id.* at 427.  The discount reseller's lost profits constituted antitrust injury because "its inability to survive in the market in the absence of price competition, where its business model hinged on aggressive price competition . . . [was] 'precisely the type of loss that defendants' conduct would be likely to

cause' by colluding to strip retailers of pricing discretion." *Id.* at 429 (alteration omitted) (quoting *Blue Shield of Va. v. McCready*, 457 U.S. 465, 479 (1982)).  In other words, because the goal of the conspiracy in *DNAML* was to oust the discounter from the market, its lost profits stemming from that exclusion flowed from that which made defendants' conduct illegal. *Id.* at 429.

Here, DIRECTV is not a competitor of the Defendants, as the plaintiff was in *DNAML*, but instead "is a buyer (i.e., a consumer) in the retransmission consent market." Pl.'s Mem. Law Opp'n Defs.' Mot. Dismiss ("Pl.'s Mem.") 14, ECF 60.[3]  Unlike in *DNAML*, Defendants did not conspire to vanquish DIRECTV from the market so that they could sell directly to consumers at inflated prices; they allegedly conspired to extract supracompetitive prices from DIRECTV. *See* Compl. ¶ 19 ("Nexstar wants to ensure that its sidecars have set a sufficiently high price floor . . . [so Nexstar] can attain a similarly supracompetitive rate.").  Thus, as a consumer, DIRECTV must show that it actually paid supracompetitive rates to establish antitrust injury. *See* IIA Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 345 (4th ed. 2014) ("Areeda & Hovenkamp") ("Of course, *a consumer* cannot obtain damages without showing that she actually paid more or received less than she would have in the absence of the violation." (emphasis added)).

Because "DIRECTV has refused Defendants' supracompetitive, price-fixed demands," Compl. ¶ 156, it cannot show that its lost profits flow from that which makes Defendants' price-fixing illegal.  As such, it has failed to show that it suffered "a special kind of antitrust injury," *IQ Dental Supply*, 924 F.3d at 62, and therefore lacks antitrust standing to bring this suit.

---

[3] A redacted version of Plaintiff's brief is available at ECF 61.

B.    Efficient Enforcer

Even were the Court to conclude that DIRECTV had demonstrated antitrust injury, it is not an "efficient enforcer" of the antitrust laws and therefore lacks statutory standing on that basis as well.  "The efficient enforcer inquiry turns on: (1) whether the violation was a direct or remote cause of the injury; (2) whether there is an identifiable class of other persons whose self-interest would normally lead them to sue for the violation; (3) whether the injury was speculative; and (4) whether there is a risk that other plaintiffs would be entitled to recover duplicative damages or that damages would be difficult to apportion among possible victims of the antitrust injury." *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 772 (2d Cir. 2016).  "These four factors need not be given equal weight: the relative significance of each factor will depend on the circumstances of the particular case." *IQ Dental Supply*, 924 F.3d at 65.

Non-purchasers are typically inefficient enforcers of the antitrust laws, as their damages are both too indirect and speculative.  "Directness in the antitrust context means close in the chain of causation." *Gatt*, 711 F.3d at 78.  In the ordinary horizontal price fixing case, "sellers collude on price and output in an effort to maximize their profits."  Areeda & Hovenkamp ¶ 391b1. Direct purchasers from the cartel have "standing to recover any collusive overcharges . . . because an overcharge reflects the anticompetitive effect of the price-fixing conspiracy."  *Id.*  Consumers who are priced out of the market, however, typically do not have antitrust standing.  As Areeda & Hovenkamp explain, "[a]nyone could claim that he or she would have purchased at the competitive price but was priced out of the market as a result of the anticompetitive pricing.  Thus, courts are likely to find that the claims of those who refused to purchase at the cartel price are *speculative*." *Id.*

The Ninth Circuit recently confronted a somewhat similar situation in *City of Oakland v. Oakland Raiders*, 20 F.4th 441 (9th Cir. 2021). There, the City of Oakland claimed that the NFL and its thirty-two member teams artificially reduced the number of eligible teams to demand supracompetitive prices from host cities. *Id.* at 448. When Oakland refused these anticompetitive demands, the Raiders moved to Las Vegas. *Id.* at 449. Oakland sued the NFL and its franchises for horizontal price fixing, claiming that in a more competitive market, defendants would not be able to "demand supracompetitive prices from host cities." *Id.* at 452. The Ninth Circuit concluded that the City's injuries were both too indirect and speculative to confer standing. Because there were "too many speculative links in the chain of causation between Defendants' alleged restrictions on output and the City's alleged injuries" the court affirmed dismissal for lack of antitrust standing. *Id.* at 460.

Here, DIRECTV's injuries are too indirect and speculative to confer antitrust standing. Plaintiff's theory is as follows: (1) Defendants demanded supracompetitive prices; (2) Plaintiff did not renew its retransmission contract; (3) Defendants' stations were blacked out on DIRECTV; (4) subscribers left DIRECTV because of the blackouts resulting in lost profits. This theory is speculative because it relies on two critical assumptions: that absent Defendants' collusive demands the parties would have reached an agreement, and that had the parties agreed, subscribers would not have left DIRECTV. There is no way of knowing whether, and on what terms, the parties would have agreed, and whether because of such an agreement, subscribers would have stayed with DIRECTV. Further, Plaintiff's injury is indirect, as DIRECTV did not pay higher prices, but claims to have suffered by losing customers due to the blackouts. *See Gatt*, 711 F.3d at 78–79 ("[Plaintiff] was only incidentally harmed . . . . It did not pay higher prices by virtue of the conspiracy . . . . If there are direct victims of the alleged conspiracy, they are the

[actual purchasers], not [the plaintiff].").  The uncertainty of Plaintiff's injuries stands in stark contrast to the MVDPs who actually paid Defendants, further attenuating DIRECTV's antitrust standing.  *See In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 689 (2d Cir. 2009) ("'Inferiority' to other potential plaintiffs can be relevant, but it is not dispositive." (quoting *Andrx Pharms., Inc. v. Biovail Corp., Int'l*, 256 F.3d 799, 816 (D.C. Cir. 2001)).

In sum, DIRECTV has not adequately alleged antitrust standing.  Assuming that it was harmed by its failure to reach an agreement with Defendants, because it never paid supracompetitive rates, this harm did not flow from that which made Defendants' conduct illegal and is thus not the "special kind" of antitrust injury which confers standing on a private plaintiff to sue under the antitrust laws.  *Port Dock*, 507 F.3d at 121.  Moreover, due to the indirectness of its injuries, the existence of more direct victims, and the speculative nature of its harm, it has failed to show that it is an efficient enforcer of the antitrust laws and therefore lacks antitrust standing on that basis as well.  As such, Defendants' motion to dismiss Plaintiff's antitrust claims (Counts One, Two and Three) will be granted.

IV. <u>Remaining State Law Claims</u>

Having dismissed Plaintiff's federal claims, the Court must consider whether it has supplemental jurisdiction over Plaintiff's remaining state law claims.  *See Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006) ("[Courts] have an independent obligation to determine whether subject-matter jurisdiction exists, even in the absence of a challenge from any party.").

DIRECTV is alleged to be a Delaware corporation and all three defendants are alleged to be Delaware corporations.  Compl. ¶¶ 30-33.  The Complaint invokes federal question jurisdiction based on Plaintiff's antitrust claims and supplemental jurisdiction over its state law

claims, which assert breach of contract and tortious interference under New York law.  Compl. ¶¶ 23-24, 183-225.

The Court will decline to exercise supplemental jurisdiction over DIRECTV's state law claims.  *See* 28 U.S.C. § 1367(c)(3) (district courts "may decline to exercise supplemental jurisdiction over a claim" where "the district court has dismissed all claims over which it has original jurisdiction.").  District courts are instructed "that 'in the usual case in which all federal-law claims are eliminated before trial, the balance of factors will point toward declining to exercise jurisdiction over the remaining state-law claims.'"  *Kolari v. New York-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006) (ellipsis omitted) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988)).  The relevant factors are "the traditional 'values of judicial economy, convenience, fairness, and comity.'"  *Id.* (quoting *Cohill*, 484 U.S. at 350).  "The Second Circuit takes a particularly strong view that district courts should decline to exercise supplemental jurisdiction in the absence of a 'clearly articulated federal interest.'"  *Cummings v. City of New York*, No. 19 Civ. 7723, 2021 WL 1664421, at *2 (S.D.N.Y. Apr. 28, 2021) (quoting *Kolari v. New York-Presbyterian Hosp.*, 455 F.3d 118, 123 (2d Cir. 2006)).

This proceeding is at an early stage and the Court's familiarity is limited to threshold issues of plaintiff's Article III standing and antitrust standing.  "The Court is no more familiar with the facts and legal issues of this case than any court would be at the pleading stage.  As a result, this Court lacks any interest in continuing to preside of the resolution of these state law claims, and resolution of the state law claims in state court will avoid 'needless decisions of state law' by a federal court."  *Cummings*, 2021 WL 1664421, at *3 (quoting *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966)).  Accordingly, the Court declines to exercise

supplemental jurisdiction over Plaintiff's state law claims and dismisses them without prejudice as to renewal in a state court of competent jurisdiction.

<u>CONCLUSION</u>

For the foregoing reasons, the Court GRANTS Defendants' motion to dismiss Plaintiff's antitrust claims for lack of antitrust standing.  Further, the Court declines to exercise supplemental jurisdiction over Plaintiff's remaining state law claims.   The letter motion seeking oral argument is denied.  ECF 75.  The Clerk of the Court is respectfully directed to terminate the motions at ECF 52 and ECF 75.

Dated: New York, New York
       March 20, 2024

P. Kevin Castel
United States District Judge