# KING & SPALDING

King & Spalding LLP
1290 Avenue of the Americas
14th Floor
New York, NY 10104

June 12, 2026

**VIA ECF**

Hon. P. Kevin Castel
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, NY 10007

      Re:     *DIRECTV, LLC v. Nexstar Media Group, Inc. et al.*, No. 1:23-cv-02221-PKC

Dear Judge Castel:

      I write on behalf of Plaintiff DIRECTV, LLC ("DIRECTV") concerning a narrow but critical discovery dispute related to documents at the center of DIRECTV's case. DIRECTV's Request for Production No. 7 ("RFP No. 7"), served on Defendants Nexstar Media Group, Inc., Mission Broadcasting, Inc., and White Knight Broadcasting, Inc. (collectively, "Defendants"), seeks documents concerning Eric Sahl, a non-party co-conspirator whom DIRECTV alleges acted as the key conduit for Defendants' conspiracy to raise and fix the prices of retransmission consent fees for Big-4 broadcast networks (ABC, CBS, FOX, and NBC). *See, e.g.*, Compl. ¶¶ 11–18, 34, 92–136.[1]

      As DIRECTV alleges in its complaint, Mission and White Knight are Nexstar's "sidecars," which are effectively divestiture vehicles that Nexstar uses when competition concerns would forbid Nexstar from acquiring a broadcaster. *See, e.g.*, Compl. ¶¶ 6–8. As Nexstar acknowledges in its public filings with the Securities and Exchange Commission, although it is permitted to share certain services with Mission and White Knight, the sidecars "must separately negotiate their retransmission consent agreements with MVPDs [like DIRECTV] for stations in markets where we also own a station."[2] DIRECTV alleges that Sahl, at Nexstar's behest, provided a workaround to this prohibition by serving as the common negotiator for Mission and White Knight in their retransmission consent agreement negotiations with DIRECTV, while facilitating the exchange of confidential information among Defendants, thereby permitting Nexstar to conspire and coordinate with its sidecars to raise and fix retransmission consent prices.

      As the linchpin to Defendants' conspiracy, evidence concerning Sahl's relationship with Defendants—including the nature and volume of their communications—is critically important to DIRECTV's case. Yet Defendants have refused to produce all but a narrow subset of their documents and communications concerning Sahl—specifically, documents related to "Retransmission Consent Agreements, Retransmission Fees, or Blackouts." Nexstar and Mission have proposed further limiting their production of documents in those categories to only those

---

[1] DIRECTV notes, in accordance with Individual Practice 1.A.iii., that the next conference before the Court is set for November 12, 2026. ECF 99.
[2] Nexstar Media Group, Form 10-K at 17 (Feb. 28, 2023).

Hon. P. Kevin Castel
Page 2

"involving DIRECTV." Importantly, Defendants impose these limitations not because producing other documents would be burdensome, but because Defendants claim those materials are irrelevant. That argument is both legally and factually incorrect. DIRECTV is entitled to all documents concerning Sahl in Defendants' possession, custody, or control because those materials will provide critical context regarding the nature and extent of each Defendant's relationship with Sahl, and bear directly on the central question in this case: whether Defendants have conspired to fix the price of DIRECTV's retransmission consent fees.

Despite multiple meet-and-confers discussing these issues, the parties have now reached an impasse on the scope of RFP No. 7. DIRECTV therefore respectfully requests that the Court order Defendants to produce all documents in their possession, custody, and control concerning Eric Sahl.

**I.      Defendants Refuse to Produce Any Materials Concerning Sahl Beyond Those "That Relate to Retransmission Consent Agreements, Retransmission Fees, or Blackouts," With Nexstar and Mission Further Limiting Those Categories to Materials "Involving DIRECTV."**

RFP No. 7, as served to Nexstar, seeks:

All Documents concerning Sahl, including all Communications between or involving Sahl, on the one hand, and You, Mission, White Knight, Marshall, or Vaughan on the other hand,[3] including text messages, instant messages, calendar entries, meeting invitations, call logs or similar records sufficient to identify the participants and phone numbers used, and Communications sent, received, or maintained on personal devices or personal email accounts used for such matters.[4]

In the parties' meet-and-confers, DIRECTV explained that the RFP generally includes three categories of documents: (1) communications involving Sahl; (2) agreements between Defendants and Sahl; and (3) other documents that reference or concern Sahl, including materials in which he is discussed but not a direct participant.

Defendants each objected to RFP No. 7 on several grounds, including objections based on relevance and proportionality. (The full text of each Defendant's objection to RFP No. 7 is set forth in Appendix A.) During meet-and-confer discussions, however, Defendants confirmed that their position turns on relevance, not any asserted burden. Subject to these objections, Defendants stated they would produce only "non-privileged documents concerning Sahl that relate to Retransmission Consent Agreements, Retransmission Fees, or Blackouts,"[5] and Nexstar and Mission proposed further limiting their production of documents in those categories to those "involving DIRECTV." Defendants insist that other communications involving Sahl—whether

---

[3] Sahl has also served as a negotiator for Marshall and Vaughan, two other Nexstar sidecars. *See* Compl. ¶¶ 131, 133.

[4] RFP No. 7, as served to Mission and White Knight, is substantively identical to RFP No. 7 as served to Nexstar, though each request is tailored to the specific recipient.

[5] Mission's response tracks this quoted language from Nexstar's response. *See* App'x A. White Knight uses slightly different language, agreeing to produce "non-privileged Documents within its custody, possession, and control concerning Sahl that relate to Retransmission Consent Agreements, Retransmission Fees, or Blackouts involving White Knight." *Id.*

Hon. P. Kevin Castel
Page 3

related to DIRECTV more generally, related to Sahl's negotiations with other MVPDs, or even an email concerning a social event—are irrelevant and thus fall outside the scope of permissible discovery.

Defendants' position is frivolous. Sahl is the alleged linchpin in Defendants' price-fixing conspiracy, so all of Defendants' documents concerning Sahl—including communications, agreements, and other materials referencing him—are directly relevant to establishing the conspiracy. Defendants must be required to produce them.

## II.     As the Linchpin of Defendants' Conspiracy, Evidence Relating to Sahl Is Central to DIRECTV's Case.

Defendants' objections are inconsistent with Rule 26's broad mandate in favor of "discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering," among other things, "the importance of discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1). "[R]elevance is an extremely broad concept for purposes of discovery." *Edmar Fin. Co. v. Currenex, Inc.*, 347 F.R.D. 641, 646 (S.D.N.Y. 2024) (citing *Pearlstein v. BlackBerry Ltd.*, 332 F.R.D. 117, 120 (S.D.N.Y. 2019)). It encompasses "any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case." *Underwood v. Coinbase Global, Inc.*, No. 21 Civ. 8343 (PAE), 2025 WL 1984293, at *2 (S.D.N.Y. July 17, 2025) (quoting *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978)). And once "relevance has been shown, it is up to the responding party to justify curtailing discovery[.]" *Lojewski v. Grp. Solar USA, LLC*, No. 22 Civ. 10816 (PAE), 2024 WL 4785067, at *1 (S.D.N.Y. Nov. 14, 2024) (citing *Condit v. Dunne*, 225 F.R.D. 100, 105 (S.D.N.Y. 2004)).

In the context of an antitrust conspiracy claim, Defendants' refusal to produce any Sahl documents beyond those narrowly related to retransmission consent agreement negotiations is nonsensical—even more so for Nexstar and Mission, given their proposal to further limit production to only those materials "involving DIRECTV." The nature and extent of Sahl's communications are directly relevant to DIRECTV's allegations of conspiracy. To prove Defendants' conspiracy, DIRECTV will adduce evidence that is probative of certain "plus factors"—that is, additional circumstances which, when considered alongside parallel conduct, would permit a factfinder to infer a conspiracy. *See In re Publ'n Paper Antitrust Litig.*, 690 F.3d 51, 61–62 (2d Cir. 2012). Evidence of a high level of interfirm communications—including the use of third-party intermediaries like Sahl as "conduits"—is one such circumstance courts consider in conducting a plus-factor analysis. *See, e.g.*, *In re Domestic Airline Travel Antitrust Litig.*, 691 F. Supp. 3d 175, 208–10 (D.D.C. 2023); *In re Domestic Drywall Antitrust Litig.*, 163 F. Supp. 3d 175, 242–48 (E.D. Pa. 2016). Courts will also evaluate the existence, frequency, timing, and context of interfirm communications. *See, e.g.*, *Fears v. Wilhelmina Model Agency, Inc.*, No. 02-cv-4911-HB, 2004 WL 594396, at *4, *7 (S.D.N.Y. Mar. 23, 2004). For example, in *Fears v. Wilhelmina Model Agency*, the court highlighted the "sheer volume of communications" among defendants—alongside other conduct—in concluding that plaintiffs' price-fixing claim could proceed past summary judgment. 2004 WL 594396, at *7. The court explained that it was "unable to find any cases in this Circuit or in this District" requiring interfirm communications "to be specifically about the subject matter of the conspiracy" in "order to be relevant." *Id.* Thus, even

Hon. P. Kevin Castel
Page 4

communications regarding "other pricing strategies" not directly tied to the conspiracy supported an inference of collusion. *See id.* (disagreeing "that evidence of discussions and agreements, even related to other pricing strategies, lacks relevance here and fails to bolster an inference that defendants colluded on commissions as well").

Courts in other districts agree. For example, in a recent case in the District of Minnesota, the court relied on the extent and pattern of communications among defendants in denying summary judgment, pointing to repeated exchanges and shared information—such as "herd liquidation plans" and "harvest schedules"—as supporting an inference of coordinated conduct. *In re Pork Antitrust Litig.*, 781 F. Supp. 3d 758, 821–24 (D. Minn. 2025). And in a similarly recent case from the Eastern District of Pennsylvania, the court likewise held that evidence of frequent communications—particularly when considered alongside contemporaneous pricing decisions and other conduct—is sufficient to sustain an antitrust conspiracy claim past summary judgment. *See In re Generic Pharms. Pricing Antitrust Litig.*, MDL No. 2724, 2025 WL 2483981, at *14 (E.D. Pa. Aug. 27, 2025) (explaining that plaintiffs relied not only on communications between competitors, but on those communications in context, including their timing, related emails, and resulting pricing decisions). Even where a single communication is not "inherently supportive of a conspiracy," courts consider such evidence in context, and the pattern of communications—viewed alongside other conduct—can provide sufficient inferential evidence of coordination to defeat summary judgment. *See id.*

DIRECTV alleges that Sahl served as a key conduit among Defendants, and documents reflecting communications with and about him therefore bear on whether Defendants engaged in the alleged price-fixing conspiracy at issue in this case. That includes not only communications expressly addressing retransmission consent agreements, retransmission fees, or blackouts, but also materials reflecting the existence, frequency, timing, and context of Defendants' contacts with Sahl. Those communications themselves may inform whether Sahl was used "as [a] conduit[] of messages between" Defendants or to "facilitate monitoring and enforcement" of their agreements. *See Domestic Airline Litig.*, 691 F. Supp. 3d at 209–10; *see also In re Generic Pharms*, 2025 WL 2483981, at *14.

Defendants' subject-matter limitation therefore misses the point. The relevance inquiry does not ask only whether a particular communication, viewed in isolation, expressly references the alleged conspiracy. It also considers whether the communications, viewed in context, bear on the relationship among the alleged conspirators and the role Sahl played in that relationship. To be sure, even if a particular communication would not, standing alone, prove coordination, it may still be relevant when considered alongside other evidence of the alleged conspiracy. Defendants' examples of routine or facially innocuous communications therefore do not justify limiting production in response to RFP No. 7. All documents concerning Sahl must be produced.

Hon. P. Kevin Castel
Page 5

**III.    DIRECTV's Efforts to Obtain Documents from Sahl by Subpoena Do Not Relieve Defendants of Their Discovery Obligations.**

Defendants' production obligations are not relieved by DIRECTV's efforts to obtain documents from Sahl by subpoena. While DIRECTV continues to negotiate with Sahl's counsel regarding production in response to that subpoena, those negotiations do not relieve Defendants of their independent discovery obligations as parties to the case. Under Rule 34, Defendants must produce responsive documents within their possession, custody or control, even if those documents may also be obtainable from another source. Fed. R. Civ. P. 34(a); *see Bujnicki v. Am. Paving & Excavating, Inc.*, No. 99-cv-0646S-SR, 2004 WL 1071736, at *16 (W.D.N.Y. Feb. 25, 2004) ("Notwithstanding the fact that plaintiff has provided defendants with an authorization to obtain the requested records from their source, plaintiff is required to produce all responsive documents in her possession."); *cf. Turner v. Hudson Transit Lines, Inc.*, 142 F.R.D. 68, 73–74 (S.D.N.Y. 1991) ("[A] party's discovery obligations are   not   satisfied   by   relying   on   non-parties to preserve documents[.]"). Accordingly, Defendants cannot rely on DIRECTV's efforts to obtain documents from Sahl to avoid their own production obligations under Rules 26 and 34.

* * *

For these reasons, DIRECTV respectfully requests that the Court order Defendants to produce all documents responsive to RFP No. 7, without any subject-matter limitation and without regard to DIRECTV's efforts to obtain documents from Sahl by third-party subpoena.

Respectfully submitted,

*/s/ Laura Harris*

Laura Harris

cc: Counsel of Record Via ECF

Hon. P. Kevin Castel
Page 6

## **Fed. R. Civ. P. 37(a)(a) Certificate of Conference**

DIRECTV has conferred in good faith with defendants regarding the relief requested in this letter, including meet-and-confers on May 19, May 28, and June 1, 2026. The parties, however, have reached an impasse and now require Court intervention.