UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
DIRECTV, LLC,

Plaintiff,

23-cv-2221 (PKC)

-against-

OPINION AND ORDER

NEXSTAR MEDIA GROUP, INC., MISSION BROADCASTING, INC. and WHITE KNIGHT BROADCASTING, INC.,

Defendants.
-----------------------------------------------------------x

CASTEL, U.S.D.J.

In an Opinion and Order of March 20, 2024, this Court granted defendants' motion to dismiss plaintiff's Sherman Act claims for lack of antitrust standing and declined to exercise supplemental jurisdiction over the remaining state law claims. DIRECTV, LLC v. Nexstar Media Grp., Inc., 724 F. Supp. 3d 268 (S.D.N.Y. 2024) (the "March 2024 Opinion"). The Second Circuit reversed and remanded, concluding that DIRECTV plausibly alleged antitrust injury by way of reduced output and that it could act as an efficient enforcer of the antitrust laws. DIRECTV, LLC v. Nexstar Media Grp., Inc., 162 F.4th 295, 309 (2d Cir. 2025).

Because this Court concluded that DIRECTV did not plausibly allege antitrust standing, the March 2024 Opinion did not address defendants' additional arguments in favor dismissal. On remand, defendants have sought a decision on so much of its earlier motion to dismiss as sought dismissal for failure to state a claim on DIRECTV's three Sherman Act claims and its claims under New York law for breach of contract, tortious interference with contract and tortious interference with prospective economic advantage. (See ECF 92; 3/17/26 Transcript (ECF 94).)

The Court has reviewed defendants' additional arguments in support of their motion to dismiss pursuant to Rule 12(b)(6), Fed. R. Civ. P., and for the reasons that will be explained, the motion will be denied. The Court assumes the reader's familiarity with the case, and incorporates by reference the well-understood standards of Iqbal, Twombly and their progeny for plausibly stating a claim for relief, as set forth in the March 2024 Opinion. 724 F. Supp. 3d at 275-76. Briefly summarized, the Complaint asserts that defendants conspired and colluded to fix the price of fees demanded from DIRECTV for rights to retransmit the popular "Big-4" network television channels. See 724 F. Supp. 3d at 273-75. DIRECTV brings three claims under section 1 of the Sherman Act, 15 U.S.C. § 1: Count One asserts a per se conspiracy to increase retransmission fees, Count Two asserts a conspiracy to increase retransmission fees under the rule of reason and Count Three asserts an unlawful information exchange among the defendants. (Compl't ¶¶ 152-82.) Counts Four through Nine are brought under New York law, and assert claims for breach of contract, tortious interference with contract and tortious interference with prospective economic advantage. (Compl't ¶¶ 183-225.)

I. The Complaint Plausibly Alleges Claims Under Section 1 of the Sherman Act.

A. The Existence of a Price-Fixing Conspiracy.

In alleging the existence of a "contract, combination . . . or conspiracy in restraint of trade or commerce," 15 U.S.C. § 1, "[t]he crucial question . . . is . . . whether the challenged conduct stems from independent decision or from an agreement, tacit or express." Mayor & City Council of Baltimore, Md. v. Citigroup, Inc., 709 F.3d 129, 135 (2d Cir. 2013) (quotation marks omitted). At the pleading stage, a plaintiff may plausibly allege the existence of an agreement or conspiracy through circumstantial evidence showing conscious parallelism and "plus factors"

that include a common motive to conspire, high levels of interfirm communication, or acts that were apparently against economic self-interest. Id. at 136.

The Complaint includes facts that plausibly allege an agreement among defendants to fix and raise the retransmission fees they demanded in their negotiations with DIRECTV. Specifically, the Complaint alleges that all three defendants retained the same consultant, Eric Sahl, to exclusively negotiate retransmission consent fees on their behalf, that Sahl made negotiation demands that were detrimental to the economic self-interest of Mission and White Knight for the benefit of Nexstar, that White Knight and Mission lacked independent management, and that defendants regularly shared confidential and proprietary information. (See, e.g., Compl't ¶¶ 11, 59, 92-102 98-117, 121-36, 144-46.) It points to other circumstantial evidence of parallel conduct, collusion and coordination, such as the use of identical press releases about their separate retransmission-consent fee disputes. (Compl't ¶¶ 106-13.)

The Complaint also includes facts alleging that Nexstar has prohibited Mission and White Knight, its two "sidecars," from directly negotiating with multichannel video programming distributors ("MVPDs") like DIRECTV, and required them to negotiate exclusively through Stahl. (Compl't ¶¶ 11-12.) It alleges that Nexstar receives nearly all profits generated by the two sidecars, and that Nexstar has option agreements that would permit it to purchase the full equity of both sidecars, which diminishes the incentives of White Knight and Mission to pursue their own economic self-interests. (Compl't ¶¶ 75-77, 20.)

These allegations are sufficient to plausibly allege that the defendants agreed to act in concert to fix the retransmission fees that they demanded from DIRECTV.

B. Relevant Antitrust Markets.

DIRECTV plausibly alleges the existence of relevant product markets and geographic markets. See Concord Assocs., L.P. v. Ent. Props. Tr., 817 F.3d 46, 52-53 (2d Cir. 2016). A relevant product market consists of "products that have reasonable interchangeability" and a geographic market identifies the "precise geographic boundaries of effective competition." Id. (quotation marks omitted). "Courts generally measure a market's geographic scope, the 'area of effective competition,' by determining the areas in which the seller operates and where consumers can turn, as a practical matter, for supply of the relevant product." Id. at 53 (quotation marks omitted). "[M]arket definition is a deeply fact-intensive inquiry not ordinarily subject to dismissal at the pleadings stage." Id.

DIRECTV plausibly alleges a relevant product market as the market for retransmission consent for the so-called "Big-4" stations consisting of ABC, CBS, FOX and NBC. (Compl't ¶¶ 78-81.) The Complaint asserts that the Big-4 stations broadcast high-value content like professional sports, primetime programs, local news and "tentpole events." (Compl't ¶ 80.) It asserts that the FCC and DOJ have long treated Big-4 stations as distinct from other broadcast stations (such as the CW or Telemundo) and cable channels, which offer programming that is syndicated and targeted to niche viewer interests. (Compl't ¶¶ 79, 81.) Defendants argue that non-broadcast channels like ESPN and streaming services like Netflix and HBO offer programming similar to Big-4 stations. This fact-based argument is better addressed after the close of discovery and is not susceptible to adjudication on a motion to dismiss.

DIRECTV plausibly alleges a relevant geographic market. It asserts that the United States as a whole is a relevant geographic market because retransmitters negotiate agreements for national or multi-state geographic footprints. (Compl't ¶ 82.) Separately, there

are also distinct geographic submarkets called "designated market areas," or "DMAs," consisting of a common geographic market like metropolitan New York City. (Compl't ¶¶ 5, 83.) Thus, DIRECTV asserts that in addition to a national market, there are distinct submarkets of individual DMAs in which defendants overlap. (Compl't ¶¶ 83, 85.) Specifically, Nexstar owns Big-4 television stations in all of the 23 DMAs where Mission also owns a Big-4 station. (Compl't ¶ 86.) White Knight owns Big-4 stations in two DMAs, both of which also have a station owned by Nexstar. (Compl't ¶ 87.) DIRECTV's Sherman Act claims are directed to these "Overlap DMAs," where Nexstar and its two "sidecars" allegedly conspired to demand higher retransmission fees. (Compl't ¶¶ 166-68.) The FCC and the DOJ both treat DMAs as distinct geographic markets, including in the review of proposed mergers between broadcasters. (Compl't ¶ 83.)

At the pleading stage, DIRECTV has plausibly identified a national geographic market that includes distinct geographic submarkets consisting of individual DMAs. Defendants' fact-intensive arguments in favor of dismissal are better addressed after the close of discovery.

C. Unreasonable Restraint of Trade.

Section 1 of the Sherman Act prohibits unreasonable restraints of trade. US Airways, Inc. v. Sabre Holdings Corp., 938 F.3d 43, 54 (2d Cir. 2019). "Horizontal price-fixing conspiracies traditionally have been, and remain, the 'archetypal example' of a per se unlawful restraint on trade." United States v. Apple, Inc., 791 F.3d 290, 321 (2d Cir. 2015). "If a restraint is not per se unreasonable, it is analyzed under the 'rule of reason,' which is a fact-specific analysis designed to distinguish between restraints with anticompetitive effect that are harmful to

the consumer and restraints stimulating competition that are in the consumer's best interest." U.S. Airways, 938 F.3d at 55 (quotation marks and alteration omitted).

As previously discussed, the Complaint alleges facts that describe collusion among the defendants to fix retransmission fees, which, if proven, would be an "'archetypal example' of a per se unlawful restraint of trade." Apple, 791 F.3d at 321. The Complaint also asserts that the demanded retransmission fees were inflated to supracompetitive levels and that output was suppressed through station blackouts, with no benefit to consumers or competition, which plausibly states a claim under a rule of reason analysis. (Compl't ¶ 163.)

The Complaint plausibly alleges an unreasonable restraint of trade.

D. The Unlawful Exchange of Information.

In addition to the two price-fixing claims, "[t]here is a closely related but analytically distinct type of claim, also based on § 1 of the Sherman Act, where the violation lies in the information exchange itself—as opposed to merely using the information exchange as evidence upon which to infer a price-fixing agreement. This exchange of information is not illegal per se, but can be found unlawful under a rule of reason analysis." Todd v. Exxon Corp., 275 F.3d 191, 198 (2d Cir. 2001). "A number of factors including most prominently the structure of the industry involved and the nature of the information exchanged are generally considered in divining the procompetitive or anticompetitive effects of this type of interseller communication." Id. at 199 (quoting United States v. United States Gypsum Co., 438 U.S. 422, 441 n.16 (1978)).

Count Three asserts that defendants shared commercially sensitive information about their retransmission negotiations, including detailed, non-public competitive information about their past rates and their demands for future rates, and that this information-sharing

resulted in higher prices and reduced output. (Compl't ¶¶ 174, 176-77.) In support of the claim, the Complaint describes an incident in which Nexstar sent DIRECTV a screenshot of DIRECTV's billing to White Knight, which included the per-subscriber rate of DIRECTV and White Knight's retransmission agreement. (Compl't ¶ 144.)

Based on this screenshot, the Complaint has alleged facts showing that White Knight shared information with Nexstar about its non-public, commercially sensitive retransmission fees. The plausibility that the three defendants exchanged information in violation of section 1 is enhanced by the three defendants' retention of Sahl and the allegations of Nexstar's economic control over Mission and White Knight. Defendants' motion to dismiss Count Three will be denied.

## II. The Complaint Plausibly Alleges Claims under New York Law.

### A. Breach of Contract.

Count Four asserts that Mission breached confidentiality and non-disparagement clauses contained in its retransmission consent agreement ("RCA") with DIRECTV. (Compl't ¶¶ 183-94.) Count Five brings the same claim as to White Knight. (Compl't ¶¶ 195-205.) Both claims are premised on the same underlying conduct.

Section 16(b) of the RCAs barred Mission and White Knight from making disparaging statements about DIRECTV as part of "any campaign to pressure DIRECTV to retransmit any local television broadcast station." (Pl. Mem. 40.) On October 16, 2022, Mission and White Knight issued materially identical press releases that stated in part: "Despite our tireless efforts, DIRECTV has refused our fair offer and is making negotiations very difficult. They will tell you it's for your benefit, but don't believe it. Our offer is fair. And now they hold you the subscriber hostage. It's not right." (Compl't ¶¶ 110-11.)

DIRECTV asserts that it was damaged when it lost thousands of subscribers due to these statements. (Compl't ¶¶ 190, 202.) Section 18 of the RCA excludes liability for consequential damages, but section 18(a) provides that "no amounts payable in connection with . . . confidentiality claims pursuant to Section 16 shall be deemed either incidental, punitive, or consequential damages." (Pl. Mem. 41.) DIRECTV urges that because the non-disparagement clause is contained within Section 16, it falls within the section 18(a) reference to "confidentiality claims pursuant to Section 16 . . . ." (Id. at 42.)

Citing to confidentiality concerns, the parties elected not to file a copy of the RCA and instead quote excerpts of it in their memoranda, though they also offer to file the agreement if directed to do so by the Court. (See Def. Mem. at 34 n. 12.) On this Rule 12(b)(6) motion, without the ability to review the full text of the parties' agreement, the Court is constrained in its ability to definitively interpret sections 16 and 18 of the RCA. See, e.g., China United Lines, Ltd. v. Amazon.com Services LLC, 2025 WL 239412, at *6 (S.D.N.Y. Jan. 17, 2025) (denying motion to dismiss breach of contract claims because the parties' redactions "limit the Court to 'cherry-picked provisions' rather than considering the agreements 'in their entirety and read[ing] them to give effect to all their provisions . . . .'") (quoting N. Star Textile, Corp. v. Micro Office Solutions 4 LLC, 215 A.D.3d 426, 427 (1st Dep't 2023)). Moreover, whether DIRECTV was actually damaged by defendants' statements is better considered on a developed factual record than at the pleading stage.

The parties also dispute whether the statements of Mission and White Knight can plausibly be described as "disparagement," as opposed to opinion-based statements. Defendants point out that DIRECTV made similar public comments directed toward them. Whether the

parties' public statements amounted to "disparagement" under the RCA is also better considered on a developed factual record than at the pleading stage.

As to defendants' alleged breach of their confidentiality obligations, section 16(a) of the RCA states that "[n]o party shall disclose to any third party (including any network) any of the terms or provisions of this Agreement . . . ." (Compl't ¶ 130; Def. Mem. at 35.) The provision exempts consultants retained for retransmission negotiations. (Def. Mem. at 35.) DIRECTV asserts that Misson and White Knight breached this provision by sharing confidential rate information with Nexstar. The plausibility of this allegation is strengthened by the previously summarized allegation that Nexstar sent DIRECTV a screenshot that included White Knight's confidential rate information. (Compl't ¶ 144.) DIRECTV's argument that the confidentiality provision ought not apply to "prospective new deals" does not warrant dismissal of the claim. The issue of whether DIRECTV was ultimately placed at a competitive disadvantage and therefore damaged as a result of any alleged breach is better considered after the close of discovery.

The motion to dismiss the breach of contract claims will be denied.

B. <u>Tortious Interference with Contract.</u>

Counts Six asserts that Nexstar tortiously interfered with the DIRECTV's agreements with Mission and White Knight by instructing them to breach the non-disparagement and confidentiality clauses contained in the RCAs. (Compl't ¶¶ 206-13.) Defendants argue that DIRECTV does not plausibly allege Nexstar's knowledge of the terms of the RCAs, specifically including the non-disparagement and confidentiality clauses. But the Complaint describes Nexstar's transmittal of a screenshot that showed confidential terms of the RCA between White

Knight and Nexstar. It also describes Nexstar's close economic relationship with its two sidecars, which supports the plausibility that Nexstar knew the terms of the RCAs.

The Complaint plausibly alleges that Nexstar tortiously interfered with the RCAs of Mission and White Knight.

C. Tortious Interference with Prospective Economic Advantage.

Counts Seven through Nine assert claims of tortious interference with prospective economic advantage against each defendant. (Compl't ¶¶ 214-25.) Each of the three counts asserts that defendants interfered with DIRECTV's future relations with subscribers by coordinating or conspiring to raise retransmission rates. (Compl't ¶¶ 216, 220, 224.) DIRECTV asserts that Mission and White Knight published misleading and disparaging information about their negotiations with DIRECTV. (Compl't ¶¶ 220, 224.) As to Nexstar, the Complaint also asserts that its acts of coordination interfered with DIRECTV's future relations with Mission and White Knight. (Compl't ¶ 216.)

A tortious interference claim is properly dismissed when it is duplicative of a breach of contract claim or another claim for relief. See Clark-Fitzpatrick, Inc. v. Long Island R. Co., 70 N.Y.2d 382, 389 (1987); Choquette v. Motor Info. Sys., Inc., 2017 WL 3309730, at *6 (S.D.N.Y. Aug. 2, 2017) (Caproni, J.). Defendants accurately point out that Counts Seven through Nine are premised on activity that is already alleged to breach the parties' RCAs or to violate section 1 of the Sherman Act. In reply, DIRECTV point out that alternative pleading is authorized by Rule 8(d)(2), Fed. R. Civ. P., and urge that if it is unable to prevail on its Sherman Act or contract claims, it should be permitted to purse this alternate theory.

Though not expressly pleaded in the alternative, Counts Seven through Nine are possible avenues for relief in the event that plaintiff's other claims are unavailing. The Court declines to dismiss them at the pleading stage.

CONCLUSION.

Defendants' motion to dismiss is DENIED.

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated: New York, New York
July 13, 2026